UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

RYAN BOWMAN and SANDRA BOWMAN,     :
                                   :
            Plaintiffs,            :
                                   :     **COMPLAINT**
-against-                          :     **JURY TRIAL DEMANDED**
                                   :
SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN SAL, :   **Case No. 19-cv-2096**
FRANSABANK SAL, MIDDLE EAST AFRICA BANK :
SAL, BLOM BANK SAL, BYBLOS BANK SAL,   :
BANK AUDI SAL, BANK OF BEIRUT SAL,     :
LEBANON AND GULF BANK SAL, BANQUE      :
LIBANO-FRANÇAISE SAL, BANK OF BEIRUT AND :
THE ARAB COUNTRIES SAL, JAMMAL TRUST   :
BANK SAL, and JOHN DOES 1-50,          :
                                       :
            Defendants.                :

-----------------------------------------------------------------------x

## TABLE OF CONTENTS

I.  NATURE OF THE ACTION.................................................................................... 1

II. BACKGROUND ............................................................................................... 2

III. JURISDICTION AND VENUE ............................................................................... 7

IV. THE PARTIES ................................................................................................. 8

    A.  THE PLAINTIFFS ...................................................................................... 8

    B.  THE DEFENDANTS .................................................................................... 9

        1.  SOCIETE GENERALE DE BANQUE AU LIBAN SAL ("SGBL") ............... 9

        2.  FRANSABANK SAL ......................................................................... 13

        3.  MIDDLE EAST AFRICA BANK SAL ("MEAB") ........................................ 16

        4.  BLOM BANK SAL ("BLOM") ............................................................... 18

        5.  BYBLOS BANK SAL ("BYBLOS") ......................................................... 20

        6.  BANK AUDI SAL ............................................................................. 21

        7.  BANK OF BEIRUT SAL ...................................................................... 23

        8.  LEBANON AND GULF BANK SAL ("LGB") ............................................ 25

        9.  BANQUE LIBANO-FRANCAISE SAL ("BLF") ......................................... 27

        10. BANK OF BEIRUT AND THE ARAB COUNTRIES SAL ("BBAC") ........ 28

        11. JAMMAL TRUST BANK SAL .............................................................. 30

V.  FACTUAL BACKGROUND .................................................................................. 32

    A.  ISLAMIC REVOLUTIONARY GUARD CORPS (IRGC).................................... 32

    B.  HEZBOLLAH ............................................................................................ 35

        1.  HEZBOLLAH'S INITIAL TERRORIST OPERATIONS AND
            ORGANIZATIONAL STRUCTURE ................................................... 35

        2.  HEZBOLLAH'S KEY LEADERS AND CURRENT ORGANIZATIONAL
            STRUCTURE ............................................................................... 41

    a.   HEZBOLLAH'S EMBRACE OF TERRORISM IS OPEN AND PUBLIC ................................................................. 41

    b.   SHURA COUNCIL (MAJLIS AL-SHURA) ............................... 42

    c.   PARLIAMENTARY COUNCIL ............................................... 43

    d.   JIHAD COUNCIL ................................................................ 44

    e.   JIHAD COUNCIL'S EXTERNAL SECURITY ORGANIZATION ...... 49

    f.   HEZBOLLAH'S BUSINESS AFFAIRS COMPONENT (BAC) ............. 50

    g.   HEZBOLLAH'S "SOCIAL WELFARE" SECTOR – THE *DA'WA* .... 101

    h.   MEDIA / ENTERTAINMENT ................................................. 124

    i.   AUTOMOTIVE SALES ........................................................ 129

    j.   ARMS DEALING ............................................................... 130

    k.   TECHNOLOGY & COMMUNICATIONS ................................... 132

    l.   NARCOTICS TRAFFICKING ................................................ 132

    m.  PHARMACEUTICALS AND COUNTERFEITING MEDICATIONS ................................................................ 136

    n.   INTERNATIONAL TRADE ................................................... 137

C.   THE IRGC DEPLOYS HEZBOLLAH SIGNATURE WEAPONS IN IRAQ ................................................................................ 138

D.   HEZBOLLAH'S INVOLVEMENT IN TERRORISM IN IRAQ ..................... 142

E.   HEZBOLLAH'S AND THE IRGC'S AGENTS & PROXIES IN IRAQ .......... 159

    1.   THE BADR CORPS (a/k/a BADR ORGANIZATION) ............................... 159

    2.   ASA'IB AHL AL–HAQ ("AAH" OR THE "LEAGUE OF THE RIGHTEOUS") ................................................................ 161

    3.   JAYSH AL MAHDI ("JAM" or the "MAHDI ARMY") AND THE PROMISED DAY BRIGADES ("PDB") ................................. 165

    4.   KATA'IB HEZBOLLAH ("KH") ................................................. 166

**VI.  DEFENDANTS ARE DEPENDENT ON UNITED STATES CORRESPONDENT BANK ACCOUNTS AND U.S. DOLLAR CLEARING, INCLUDING DOLLAR CLEARING FOR HEZBOLLAH** ................................................................ 172

**VII. DEFENDANTS' MATERIAL SUPPORT TO HEZBOLLAH** ................................. 178

    **A.  SOCIETE GENERALE DE BANQUE AU LIBAN, SAL** ................ 178

        **1.  SGBL ACQUIRED LCB** .......................................................... 178

        **2.  SGLB ACQUIRED LCB'S LIABILITIES** ............................... 179

            **a.  LCB KNOWINGLY PROVIDED MATERIAL SUPPORT TO HEZBOLLAH'S MARTYR FOUNDATION THROUGH ITS CORRESPONDENT BANK ACCOUNTS IN THE UNITED STATES** ...................................................... 180

            **b.  LCB PROVIDED MATERIAL SUPPORT TO ABDALLAH SAFIEDDINE** .................................................................. 181

            **c.  LCB PROVIDED MATERIAL SUPPORT TO HEZBOLLAH'S OWN FINANCE UNIT** .................................... 181

            **d.  LCB MAINTAINED ACCOUNTS FOR VARIOUS HEZBOLLAH CONTROLLED ENTITIES** ........................ 183

            **e.  LCB DISREGARDED ANTI-MONEY LAUNDERING RULES FOR INDIVIDUALS AND ENTITIES ASSOCIATED WITH HEZBOLLAH** .............................. 185

            **f.  LCB PARTICIPATED IN A MAJOR MONEY LAUNDERING SCHEME WITH HEZBOLLAH IN THE UNITED STATES INVOLVING NARCOTICS, USED CARS, AND THE TRANSFER OF OVER $250 MILLION (U.S.) THROUGH LCB'S NEW YORK CORRESPONDENT BANK ACCOUNTS** .............................. 187

            **g.  LCB'S GAMBIAN SUBSIDIARY, PRIME BANK, WAS CO-OWNED BY AN INDIVIDUAL DESIGNATED BY THE U.S. GOVERNMENT FOR PROVIDING MATERIAL SUPPORT FOR HEZBOLLAH** ....... 193

        **3.  SGBL HAS AIDED AND ABETTED HEZBOLLAH** ................. 196

    **B.  FRANSABANK SAL** ........................................................................ 197

    **C.  BLOM BANK SAL** ........................................................................... 198

    **D.  MIDDLE EAST AFRICA BANK SAL ("MEAB")** ............................ 201

    **E.  BYBLOS BANK SAL** ....................................................................... 202

**F.**     **BANK AUDI SAL** ................................................................................ **207**

**G.**     **LEBANON AND GULF BANK** ................................................................ **210**

**H.**     **BANQUE LIBANO-FRANCAISE SAL** .................................................. **215**

**I.**     **BANK OF BEIRUT SAL** ...................................................................... **216**

**J.**     **BANK OF BEIRUT AND THE ARAB COUNTRIES** ............................ **217**

**K.**     **JAMAL TRUST BANK SAL** ................................................................ **218**

**CLAIMS FOR RELIEF** .................................................................................... **219**

**FIRST CLAIM FOR RELIEF** .......................................................................... **219**

**SECOND CLAIM FOR RELIEF** ...................................................................... **220**

**THIRD CLAIM FOR RELIEF** ........................................................................ **222**

**FOURTH CLAIM FOR RELIEF** ..................................................................... **223**

**PRAYER FOR RELIEF** ................................................................................... **224**

Plaintiffs, by their attorneys, allege the following:

## I.    NATURE OF THE ACTION

1.     This is a civil action brought under 18 U.S.C. §§ 2333(a) and 2333(d) of the Anti-Terrorism Act ("ATA") as a related action to *Bartlett, et al. v. Société Générale de Banque au Liban SAL, et al.* (1:19-cv-00007-CBA-VMS) by Ryan Bowman, an American national who was injured by reason of an act of international terrorism in Iraq in 2009 that was committed, planned or authorized by the United States-designated Foreign Terrorist Organization ("FTO") Hezbollah[1] in coordination with Iran's Islamic Revolutionary Guard Corps ("IRGC") (recently designated an FTO).[2] His mother, Sandra Bowman, also a U.S. national, brings this action under 18 U.S.C. §§ 2333(a) and 2333(d) for solatium based on her son's injuries.

2.     In 1997, the United States designated Hezbollah as an FTO (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")). Hezbollah has remained continuously designated as an FTO since that time.

3.     Defendants are Lebanese commercial banks whose conduct involved violent acts and acts dangerous to human life that violated 18 U.S.C. § 2339B when they knowingly provided material support to FTO Hezbollah in the form of financial and banking services, including, but not limited to, access to the United States financial system through their respective correspondent banking accounts in New York.

4.     Defendants aided and abetted Hezbollah in violation of 18 U.S.C. § 2333(d)(2) by knowingly providing substantial assistance to Hezbollah in the form of financial services and

---

[1]     Hezbollah is transliterated in a variety of ways. The U.S. Government prefers the spelling "Hizballah," but for the sake of consistency, all spellings in the Complaint use the more common iteration, "Hezbollah."

[2]     On April 8, 2019, the U.S. Department of State announced that effective April 15, 2019 the IRGC will be a designated FTO.

resources, including, but not limited to, access to the United States financial system through their respective correspondent banking accounts in New York.

5.      Defendants conspired with Hezbollah in violation of 18 U.S.C. § 2333(d)(2) by agreeing to provide Hezbollah with financial services and resources, including, but not limited to, access to the U.S. financial system through their respective correspondent bank accounts in New York while actively concealing this information from U.S. correspondent banks and U.S. regulatory, law enforcement, and intelligence agencies.

6.      Defendants were (and are) aware of their vital role in assisting Hezbollah in its illicit activities, including money laundering (including both cross-border electronic funds transfers and physical bulk-transfers of banknotes), sanctions evasion, arms export violations, drug trafficking, kidnapping for ransom, and terrorist financing.

7.      Defendants were (and are) aware that by assisting Hezbollah, they were (and are) playing a crucial role in Hezbollah's violent and life-endangering activities, including the acts of international terrorism that injured Plaintiffs in Iraq.

## II.      BACKGROUND

8.      Most of what is publicly known about Hezbollah, its exploitation of the U.S. financial system, and its collaboration with Lebanese banks comes from two principal sources: (a) U.S. Department of the Treasury designations of Hezbollah operatives and commercial enterprises; and (b) the publicly available information concerning what became known as Project Cassandra, which originated in the Drug Enforcement Administration's ("DEA") investigation of Hezbollah's development into an international crime syndicate that collected as much as $1 billion a year from narcotics and weapons trafficking, money laundering, and other criminal activities across Europe, Africa, and the Americas.

9.      The DEA came to learn that Hezbollah, working closely with Iran's intelligence services and its IRGC, had carefully cultivated clandestine networks among Lebanese expatriate communities around the world to create a web of businesses that acted as front companies for Hezbollah's and the IRGC's black-market trading and money laundering activities.

10.     DEA agents tracked Hezbollah's flow of weapons, drugs, ammunition, explosives, military-grade spare parts (including parts for Iran's illicit nuclear and ballistic missile programs), and U.S. dollar-denominated funds along the same Hezbollah front company routes that carried shipments of frozen chicken, raw materials, used cars, cigarettes, and consumer electronics.

11.     Following Hezbollah's July 2006 conflict with Israel (which devastated parts of southern Lebanon and Hezbollah-controlled neighborhoods south of Beirut), Hezbollah further intensified its efforts to raise funds (mostly denominated in U.S. dollars) in order to fund its post-conflict rebuilding efforts in the Shi'a-dominated areas of Lebanon.

12.     Hezollah's urgent need for cash led the trans-national terrorist organization to join the global cocaine trade on a large-scale basis.

13.     As DEA agents working on Project Cassandra would learn, Hezbollah ran these networks through its Business Affairs Component ("BAC"), a special financial unit established by the late Imad Mughniyah, Hezbollah's most senior terrorist commander. As discussed in detail below, BAC oversees Hezbollah's world-wide criminal and commercial enterprises.

14.     After Mr. Mughniyah was killed in 2008, leadership of Hezbollah's BAC was assumed by both Adham Tabaja, a prominent Hezbollah financier and real estate developer in Lebanon, and Abdallah Safieddine (a/k/a "Safi al-Din"). One of Safieddine's brothers sits on Hezbollah's governing council; the other sits on the board of various companies controlled by Hezbollah.

15.     The DEA ultimately concluded that Abdallah Safieddine was the key connection between Hezbollah's BAC and Iran's IRGC.

16.     As Project Cassandra proceeded, multiple DEA narcotics investigations also linked Mr. Safieddine to international drug smuggling and money laundering networks, and especially to Lebanese operative Ayman Joumaa, who served as the key contact between Hezbollah and Mexico's murderous Los Zetas drug cartel.[3]

17.     The DEA investigations of Mr. Safieddine and Mr. Joumaa eventually intersected with a separate effort by U.S. Special Operations Command ("SOCOM") that was tracking the source of funds used by Iranian proxies that were deploying sophisticated weapons against U.S. armored vehicles in Iraq, including, among other weapons, IRGC-supplied (and Hezbollah-designed) Explosively Formed Penetrators ("EFPs") (a highly effective anti-armor weapon, discussed in detail below).

18.     When phone numbers connected to the IRGC network supplying EFPs to Iranian and Hezbollah proxies in Iraq crossed with phone numbers intercepted in the DEA's Colombia investigation of Mr. Joumaa's network, Project Cassandra and SOCOM investigative teams were able to tie Mr. Safieddine's EFP network in Iran to Hezbollah's narcotics trafficking and money laundering network operating in Colombia and the Tri-Border Area ("TBA") (covering the joint borders between Paraguay, Brazil, and Argentina).

19.     Ultimately, the U.S. Intelligence Community's analysis of thousands of hours of intercepted Arabic phone conversations from Colombia, among other locations, painted a picture

---

[3]     See *U.S. Department of the Treasury Targets Major Money Laundering Network Linked to Drug Trafficker Ayman Joumaa and a Key Hizballah Supporter in South America*, U.S. Department of the Treasury (June 27, 2012), online at https://www.U.S. Department of the Treasury.gov/press-center/press-releases/Pages/tg1624.aspx (visited Dec. 26, 2018).

of Abdallah Safieddine as the central figure in Hezbollah's (and the IRGC's) global financial network.

20.      According to then-DEA Acting Deputy Administrator Jack Riley, "[t]hese drug trafficking and money laundering schemes utilized by the Business Affairs Component provide a revenue and weapons stream for an international terrorist organization responsible for devastating terror attacks around the world."

21.      Armed with a better understanding of Hezbollah's BAC network, the Project Cassandra team soon went to work targeting LEBANESE CANADIAN BANK SAL ("LCB") by gathering evidence showing how Ayman Joumaa's narcotics network was laundering an estimated $200 million a month in U.S. dollar-denominated funds through LCB and various Lebanese money exchange houses, including Ellissa Exchange in Beirut.[4]

22.      A large portion of Hezbollah's laundered funds was then transferred to used-car dealerships in the United States to buy and ship thousands of vehicles to West Africa, where Hezbollah's BAC network operated hundreds of businesses.

23.      Mr. Safieddine, at the center of this BAC network, provided Hezbollah and the IRGC with access to U.S. dollar-clearing through LCB.

24.      In 2011, the work of the Project Cassandra team resulted in the U.S. Department of Justice ("DOJ") filing a civil action against LCB. Later, DOJ seized $102 million (U.S.) from the bank.

25.      In February 2010, the U.S. Department of the Treasury, pursuant to 31 U.S.C. § 5318A, identified LCB as "a financial institution of primary money laundering concern."

---

[4]      See *U.S. Department of the Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network*, U.S. Department of the Treasury (Jan. 26, 2011), online at https://www.U.S. Department of the Treasury.gov/press-center/press-releases/Pages/ tg1035.aspx (visited Dec. 26, 2018).

26.     This action, combined with DOJ's civil suit, indirectly forced LCB to sell itself to Defendant SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN, SAL ("SGBL") and close its doors.

27.     No criminal charges were ever filed against LCB or the money exchange houses that worked with LCB to launder hundreds of millions of U.S. dollars through the United States.[5]

28.     However, the court filings from DOJ's civil action and the U.S. Department of the Treasury's regulatory action did reveal several key facts beyond the criminal wrongdoing of LCB and its management, including, among others:

> (a) The vast amounts of U.S. dollar-denominated funds from Hezbollah secretly flowing into the Lebanese banking system through the willful participation of LCB;
>
> (b) The close ties and financial connections between Hezbollah's BAC and its social welfare institutions;
>
> (c) The vast amounts of cash imported by those Hezbollah social welfare institutions;
>
> (d) Hezbollah's (and the IRGC's) dependence on Lebanese commercial banks to provide it access to the U.S. financial system to launder drug money (in USD) and clear U.S. dollar-denominated electronic funds transfers; and
>
> (e) The intersection between Hezbollah's BAC network, narcotics trafficking and terrorist operations, including terrorist attacks carried out in Iraq.

29.     While the U.S. Department of the Treasury has, in recent years, stepped up its designations of components of the BAC network (for example, designating Messrs. Safieddine, Tabaja and Joumaa), it never prosecuted LCB or its management, or ever pursued either civil or criminal actions against any of the dozens of Lebanese banks that have been complicit in aiding

---

[5]     Ayman Joumaa was indicted in November 2011.

and abetting Hezbollah's growth into the preeminent transnational terrorist organization of the twenty-first century.

30. This Action attempts to identify and highlight an integral part of the BAC network and Hezbollah's "financial angels" that have midwifed its birth into a truly global terrorist financial empire.

31. That global financial empire, in turn, sustains Hezbollah's global terrorist operations, including the FTO's training camps, intelligence operations, procurement supply-chains, and research and development of various weapons systems that allowed it to play a central role in Iran's efforts to maim and murder Americans in Iraq and drive the United States out of Iraq.

## III.   JURISDICTION AND VENUE

32. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(a), § 2333(d) and 18 U.S.C. § 2338 as a civil action brought by citizens of the United States who have been injured by reason of acts of international terrorism.

33. Venue is proper in this District pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. §§ 1391(b) and 1391(d).

34. Defendants are each subject to personal jurisdiction in New York pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2).

35. As set forth below, Defendants purposefully and deliberately used their correspondent accounts with U.S. financial institutions in New York over a long period of time to provide financial services to Hezbollah on a recurring basis, including facilitating the transfer of hundreds of millions of U.S. dollars through the United States on Hezbollah's behalf and for Hezbollah's benefit, including in the years and months immediately preceding the terrorist attack at issue.

IV.    **THE PARTIES**

A.  **THE PLAINTIFFS**

36.    Plaintiff Ryan Bowman is a citizen of the United States and domiciled in the State of Pennsylvania.

37.    On April 13, 2009, Ryan Bowman, then 23, was serving in the U.S. military in Iraq when the Chinook helicopter he was traveling in was attacked with an RPG-29.

38.    The operatives who fired at Mr. Bowman's helicopter were trained by Hezbollah and funded and supplied by the IRGC-QF, and they attacked Mr. Bowman and his fellow U.S. service members at the direction of both Hezbollah and the IRGC-QF.

39.    At the time of the attack, Ryan Bowman was not clipped in to the Chinook helicopter. When the pilot of the Chinook helicopter took evasive actions to avoid the RPG, Mr. Bowman bounced around the helicopter, suffering a Traumatic Brain Injury as well as a significant injury to his back.

40.    Mr. Bowman has been determined to be 100% disabled by the Veterans Administration.

41.    As a result of the attack, and the injuries he suffered, Plaintiff Ryan Bowman has experienced severe physical and mental anguish and extreme emotional pain and suffering.

42.    Plaintiff Sandra Bowman is a citizen of the United States and domiciled in the State of Pennsylvania.

43.    As a result of the attack and the injuries Ryan Bowman suffered, Plaintiff Sandra Bowman has experienced severe mental anguish and extreme emotional pain and suffering.

### B.  THE DEFENDANTS

#### 1.  SOCIETE GENERALE DE BANQUE AU LIBAN SAL ("SGBL")

44.    Defendant SOCIETE GENERALE DE BANQUE AU LIBAN SAL is a private joint stock company with limited liability (*société anonyme libanaise*), incorporated in 1953. SGBL was registered under number "3696" with the Commercial Registry of Beirut and under number "19" on the list of banks licensed by Banque du Liban, the Central Bank of Lebanon.

45.    SGBL's headquarters is located at Saloumeh Square, Sin El Fil, Beirut, Lebanon.

46.    According to SGBL's 2017 annual report, the bank ended the year with assets valued at over $21 billion (U.S.); operated 70 branches across Lebanon; and employed 2,161 people in Lebanon, Jordan, and Cyprus.

47.    Antoun N. Sehnaoui is SGBL's Chairman and its majority shareholder (51.65 percent of the bank's common shares).

48.    SGBL participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

49.    SGBL is the Lebanese subsidiary of SOCIETE GENERALE SA ("SOCGEN"), one of the largest bank-holding companies in France.

50.    According to SOCGEN's 2017 annual report, the company owns 16.79 percent of SGBL's common shares.

51.    SOCGEN maintains a branch in New York, New York ("SOCGEN–New York"). SOCGEN–New York's primary business activity is correspondent banking[6] (including, among

---

[6]    Correspondent banking is an essential component of the global financial system, especially for cross-border electronic funds transfers. Banks establish and maintain correspondent banking relationships to access financial

other things, processing Eurodollar[7] transactions through the U.S. financial system and managing U.S. dollar-denominated correspondent accounts).

52.     SOCGEN is a founding member of the Wolfsburg Group, an association of thirteen global banks, formed in 2000, that develops "frameworks and guidance for the management of financial crime risks, particularly with respect to Know Your Customer, Anti-Money Laundering and Counter Terrorist Financing policies."

53.     SGBL's Board of Directors includes an Anti-Money Laundering/Counter-Financing of Terrorism ("AML/CFT") Committee that purports to assist SGBL's Board with carrying out its "supervisory role with respect to fighting money laundering and terrorist financing and understanding the related risks."

54.     In coordination with SOCGEN, SGBL purports to utilize the following technical capabilities for complying with various AML/CFT requirements from, among others, the Central Bank of Lebanon, European Union ("EU"), United Nations ("UN"), Financial Action Task Force ("FATF"), and the U.S. Department of the Treasury's Office of Foreign Asset Control ("OFAC"):

> Accuity's "Fircosoft" sanctions watchlist filtering software;
> Thomson Reuters's "World-Check" financial crime risk-screening database; and
> FICO TONBELLER's "Siron AML" money-laundering detection and analytics software.

55.     SGBL maintains a U.S. dollar-denominated correspondent account—used for its

---

services in different jurisdictions and provide international payment services for their customers. However, correspondent banking is also a major vehicle for financial crime, including, money laundering and terror financing.

[7]     Eurodollar refers to a multinational bank's unsecured time-deposit liability (chose in action), denominated in the U.S. dollar unit of account and maintained by credit and debit book-entries, but not subject to U.S. banking regulations. The clearing of Eurodollar electronic funds transfers occurs primarily through a bank-owned clearinghouse in New York, based on payment orders issued by correspondent banks and transmitted cross-border through a bank-owned secure messaging service. The settlement of Eurodollar electronic funds transfers occurs *only* in New York, across the balance sheet of the Federal Reserve Bank of New York ("FRB–New York"), acting in its role as the U.S. Central Bank and "lender of last resort" for all Eurodollar deposits globally.

Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

> **From 2003 to 2011:**
> The Bank of New York Mellon ("BNY–New York"),
> account number 8033216603;
>
> JP Morgan Chase Bank NA ("JPM–New York"),
> account number 00155161;
>
> SOCGEN–New York, account number 00150347; and
>
> **From 2004 to 2008:**
>
> American Express Bank Ltd. ("AMEX–New York").[8]

56.     SGBL's Eurodollar clearing account at CHIPS–New York is identified by Universal Identifier ("UID") number "001079."

57.     According to the Society for Worldwide Interbank Financial Telecommunications SCRL ("SWIFT–Belgium"),[9] SGBL's secure financial messaging account on SWIFT–Belgium's network ("SWIFT–Net")[10] is identified by Bank Identifier Code ("BIC") routing address "SGLILBBX".

58.     SGBL settles its foreign exchange transactions through, among others, settlement

---

[8]     AMERICAN EXPRESS BANK LTD was acquired by STANDARD CHARTERED BANK in 2008.

[9]     SWIFT–Belgium, founded in 1973, is a limited-purpose financial institution organized under Belgian law as a limited-liability cooperative society (*société coopérative à responsabilité limitée*). Member commercial banks own and control SWIFT–Belgium. An oversight committee comprising representatives from the Group of Ten ("G–10") central banks oversees SWIFT–Belgium, including representatives from, among others, the Federal Reserve Board of Governors ("FRB–DC"), FRB–NY, and National Bank of Belgium ("NBB–Brussels") (lead central-bank overseer).

[10]    SWIFT–Net launched in 1977, replacing international Telex and telegraph systems by providing customers with improved financial messaging services for correspondent banking activities, securities market infrastructures, U.S. Department of the Treasury operations, trade finance, precious metals trading, large-value payment systems, and foreign exchange transactions.

member SOCGEN's account at CLS Bank International in New York ("CLS–New York").[11]

59.     As noted above, in February 2011, the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") issued a notice concluding that LCB was a "financial institution of primary money laundering concern," and it further issued a Notice of Proposed Rule Making giving notice of FinCEN's proposal to issue a rule prohibiting, among other things, all U.S. financial institutions from establishing, maintaining, administering, or managing a correspondent or payable-through account in the United States for, or on behalf of, LCB.

60.     Four months later, after receiving approval from the Central Bank of Lebanon, LCB entered into a $580 million (U.S.) Sale and Purchase Agreement ("Purchase Agreement") with Defendant SGBL.

61.     Pursuant to paragraphs 2.1 and 2.3 of the Purchase Agreement, attached as **Exhibit 1**, Defendant SGBL assumed all of LCB's liabilities, defined as follows:

> The Assumed Liabilities consist *inter alia* of any and all of the Seller's liabilities and/or obligations and/or debts of any kind, character or description, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, determined, determinable or otherwise, to the extent they relate to the Seller's Business, all as at the Completion Date. (Emphasis in original.)

62.     Furthermore, by assuming all of LCB's liabilities, Defendant SGBL also assumed LCB's liability for the banking and trade-finance services that LCB knowingly performed for Hezbollah, the material support LCB knowingly provided to Hezbollah, and the conduct of LCB's managers, officers and directors who knowingly conspired with and/or aided and abetted Hezbollah in its money-laundering and drug trafficking operations.

---

[11]     CLS–New York is a limited-purpose Edge Act banking corporation organized under U.S. federal law, owned and controlled by its member banks, and regulated by FRB–DC. CLS–Bank began operations in September 2002, using payment-versus-payment settlement to reduce the risk involved in settling obligations related to foreign exchange transactions.

63. In September 2011, the Central Bank of Lebanon's Central Council granted final approval of SGBL's acquisition of all assets and liabilities of LCB.

64. Two years later, LCB, SGBL and the DOJ reached an agreement whereby LCB paid $102 million (U.S.) to settle the claims for money-laundering and International Emergency Economic Powers Act ("IEEPA") violations raised by the U.S. Government in its 2011 Complaint against LCB.

65. At all relevant times, both SGBL and LCB purposefully and deliberately used their New York correspondent banks to "clear" U.S. dollar-denominated transactions on behalf of Hezbollah on an ongoing and recurring basis.[12]

### 2. FRANSABANK SAL

66. Defendant FRANSABANK SAL was established in 1921 and incorporated in its present form in 1984 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. FRANSABANK was registered under number "25699" with the Commercial Registry of Beirut and registered under number "1" on the list of banks licensed by the Central Bank of Lebanon.

67. FRANSABANK's head office address is Fransabank Center, Hamra Street, PO Box 11-0393, Riad El Solh, Beirut, 1107 2803, Lebanon.

68. According to FRANSABANK's 2017 annual report, the bank ended the year with assets valued at over $22.1 billion (U.S.), denominated in, among others, the following units of

---

[12] Defendants all participate in the Eurodollar payment system, which includes a set of instruments, procedures, and rules for transferring funds between or among financial institution participants. Within that payment system, dollar "clearing" is the process of transmitting, reconciling, and, in some cases, confirming dollar-denominated electronic funds transfer transactions prior to settlement. "Settlement" in this context refers to the funds transfer process where the paying institution's debt obligation (denominated in U.S. dollars) is discharged and the receiving institution obtains irrevocable access to the transferred funds. The "clearing" of U.S. dollar-denominated payment orders occurs primarily at CHIPS–New York, and settlement only occurs across the balance sheet of the Federal Reserve Bank of New York.

account: U.S. dollars (47.2 percent), Lebanese pounds (45.8 percent), and EU euros (4.9 percent); its customers' deposits funded 80.5 percent of the bank's assets; the bank operated 75 branches across Lebanon; and it employed 1,735 people in Lebanon.

69.     FRANSABANK participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

70.     FRANSABANK describes its AML/CFT compliance program as implementing the following objectives:

> Promoting a Know Your Customer (KYC) standard as a cornerstone principle for Fransabank Group business ethics and practices:
>
> - Prior to any transaction of any type, Fransabank Group's entities gather and document the relevant customer identification data, along with the background information, the purpose and the intended nature of the business.
>
> - Fransabank Group's entities retain and document any additional customer information relevant to the assessment of the money laundering risk, by adopting a risk-based approach which triggers the proper enhanced due diligence for the relevant customers.
>
> Enforcing the following additional due diligence measures while establishing and maintaining correspondent relations:
>
> - Gathering sufficient documentary evidence on a respondent institution, to avoid any relationships with 'shell banks.'
>
> - Enquiring about the good reputation of a respondent institution from public sources of information, including whether it has been subject to a money laundering or terrorist financing investigation or other regulatory action.
>
> - Verifying, on a periodic basis, that the respondent institution is implementing sufficient and effective procedures to fight money laundering and terrorist financing.
>
> Monitoring and reporting suspicious transactions/activity:

14

- Fransabank Group's entities apply due diligence measures whenever they detect any unusual or suspicious transaction or activity, taking into account the legal framework of the concerned institution.

- All suspicious transactions or activities complying with the laws and regulations of the corresponding jurisdiction are reported.

- The Group's compliance department is notified of all suspicious transactions or activities when doubts arise.

Developing an effective internal control structure where no activity with a customer is carried out without obtaining in advance all the required information relating to the customer.

71.     FRANSABANK maintains a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

> **From 2003 to 2011:**
> BNY–New York, account number 8900018224;
>
> **From 2003 to 2005:**
> HSBC Bank USA NA ("HSBC–New York");
>
> **From 2005 to 2008:**
> AMEX–New York; and
>
> **From 2005 to 2011:**
> JPM–New York, account number 544728788.

72.     FRANSABANK's Eurodollar clearing account at CHIPS–New York is identified by Universal Identifier ("UID") number "002233".

73.     According to SWIFT–Belgium, FRANSABANK's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "FSABLBBX".

74.     FRANSABANK primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

75.     At all relevant times, FRANSABANK purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on behalf of Hezbollah on an ongoing and recurring basis.

### 3.  MIDDLE EAST AFRICA BANK SAL ("MEAB")

76.     Defendant MEAB SAL was incorporated in its present form in 1991 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years.

77.     MEAB was registered under number "58153" with the Commercial Registry of Beirut and registered under number "110" on the list of banks licensed by The Central Bank of Lebanon.

78.     MEAB's head office address is MEAB Building, Adnan al-Hakim Avenue, Beirut, 1105 2080, Lebanon.

79.     MEAB describes itself as a family-owned commercial bank in Lebanon whose creation was propelled by the tremendous success of its founding Hejeij brothers in business ventures developing underserved regions of Africa.

80.     MEAB claims to be a full-service bank with 11 branches throughout Lebanon, with a reputation for high-quality financial services and a strong record of modernization and growth.

81.     According to MEAB's 2016 annual report, the bank had total assets of over $1.8 billion (U.S.) and employed 335 people in Lebanon.

82.     MEAB claims to be the 15th largest bank in Lebanon by deposits. The bank was named the "Fastest Growing Bank in Lebanon" by Banker Middle East Industry Awards in 2011 and was named "Best Private Bank in Lebanon" by the World Finance Banking Awards in 2012.

83.     Kassem Hejeij co-founded MEAB and served as the bank's Chairman until June 2015 when he was forced to step down as a result of being designated by the U.S. Department of

the Treasury as a Specially Designated Global Terrorist ("SDGT") for his direct links to Hezbollah.

84.     MEAB participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

85.     MEAB describes its AML/CFT compliance program as follows:

> The bank's Anti-Money Laundering/Counter Terrorist Financing (AML/CFT) programs meet or exceed the requirements of both the Banque du Liban and the international standards of the Financial Action Task Force (FATF).
>
> In addition to screening customers and transactions against the requirements of the Banque du Liban, MEAB also screens its banking activity against the U.S. Office of Foreign Assets Control (OFAC) Specifically Designated National (SDN) list, the U.S. sanction lists, among others, using EastNet's state-of-the-art SafeWatch system.

86.     MEAB maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

> **From 2003 to 2004:**
> Union Bank of California ("UBOCI") – New York;
>
> **From 2004 to 2007:**
> Standard Chartered Bank ("SCB") – New York;
>
> **2006:**
> Wachovia Bank ("WB") - New York;
>
> **2008 to 2011:**
> Dresdner Bank – Frankfurt (via Dresdner Bank branch in New York).[13]

87.     According to SWIFT–Belgium, MEAB's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "MEABLBBE".

---

[13]     DRESDNER BANK AG was later acquired by COMMEZBANK AG, Frankfurt, Germany.

88.     MEAB primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

89.     At all relevant times, MEAB purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on behalf of Hezbollah on an ongoing and recurring basis.

### 4.  BLOM BANK SAL ("BLOM")

90.     Defendant BLOM BANK SAL was established in 1951 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. BLOM was registered under number "2464" with the Commercial Registry of Beirut and registered under number "14" on the list of banks licensed by the Central Bank of Lebanon.

91.     BLOM's head office address is BLOM Bank Building, Rashid Karameh Street, Beirut, Lebanon.

92.     The bank's shares are listed on the Beirut Stock Exchange and the Luxembourg Stock Exchange.

93.     Mr. Sa'd Azhari serves as the bank's Chairman and General Manager, and Dr. Numan al-Azhari serves as the Chairman of BLOM Group (BLOM's ultimate parent).

94.     In June 2017, BLOM acquired 100 percent of the assets and liabilities of HSBC Bank Middle East Limited, Lebanon Branch, for a total consideration of $146 million (U.S.).

95.     According to BLOM's 2017 annual report, the bank ended the year with assets valued at over $32.5 billion (U.S.), denominated in, among others, the following units of account: U.S. dollars (47.1 percent), Lebanese pounds (31.8 percent), and EU euros (7.3 percent); its customers' deposits funded 81.9 percent of the bank's assets; and the bank operated 77 branches across Lebanon and employed 4,357 people.

96.     BLOM participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

97.     BLOM's Board of Directors includes a Compliance Committee that purportedly assists the Board with carrying out its functions and supervisory role with respect to "proper implementation and effectiveness of AML/CFT procedures and regulations."

98.     BLOM maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

> **From 2003 to 2011:**
> BNY–New York;
>
> **From 2005 to 2011:**
> JPM–New York;
>
> **2005 to 2008:**
> AMEX–New York;
> UBOCI–New York;
>
> **2008 to 2011:**
> Deutsche Bank Trust Company Americas ("DBTCA–New York"); and
> WB–New York.

99.     BLOM's Eurodollar clearing account at CHIPS–New York is identified by UID number "001871".

100.    According to SWIFT–Belgium, BLOM's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "BLOMLBBX".

101.    BLOM primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

102.    At all relevant times, BLOM purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on behalf of Hezbollah on an ongoing and recurring basis.

## 5.  BYBLOS BANK SAL ("BYBLOS")

103.    Defendant BYBLOS BANK SAL was established in 1950 and incorporated in its present form in 1961 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. BYBLOS was registered under number "14150" with the Commercial Registry of Beirut and registered under number "39" on the list of banks licensed by the Central Bank of Lebanon.

104.    BYBLOS's head office address is Elias Sarkis Street, Ashrafieh, Beirut, Lebanon.

105.    According to BYBLOS's 2017 annual report, the bank ended the year with total assets of over $22.7 billion (U.S.) and employed 2,485 people in Lebanon.

106.    BYBLOS participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

107.    BYBLOS describes its corporate governance program—including AML/CFT compliance—as implementing the following objectives:

> Byblos Bank's governance model is based on recommendations from the Basel Committee on Banking Supervision, guidelines published by the Financial Action Task Force, all relevant national regulations, and the constantly evolving body of international best practice. In keeping with this by-the-book approach, the Bank has developed a world-class toolbox of compliance policies, procedures, and systems, all helping us to meet our obligations to help identify and block money laundering, terrorism financing, sanctions violations, and other illicit activities.

108.    BYBLOS maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

> **From 2003 to 2011**:
> BNY–New York, account number 8033218622;
> Citibank NA ("CITI–New York"), account number 10948284;
> Wells Fargo Bank ("WFB–New York"), account number 2000191103571;
> SCB–New York, account number 3582049770001; and
>
> **Prior to 2009**:
> AMEX–New York, account number 00716613.

109.    BYBLOS's Eurodollar clearing account at CHIPS–New York is identified by UID number "037179".

110.    According to SWIFT–Belgium, BYBLOS secure financial messaging account on the SWIFT–Network is identified by BIC routing address "BYBALBBX".

111.    BYBLOS primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

112.    At all relevant times, BYBLOS purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on behalf of Hezbollah on an ongoing and recurring basis.

### 6.  BANK AUDI SAL

113.    Defendant BANK AUDI SAL was founded in 1830 and incorporated in its present form in 1962 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. BANK AUDI was registered under number "11347" with the Commercial Registry of Beirut and registered under number "56" on the list of banks licensed by the Central Bank of Lebanon.

114.    BANK AUDI's head office address is Bank Audi Plaza, Omar Daouk Street, Bab Idriss, Beirut, 2021 8102, Lebanon.

115.    According to BANK AUDI's 2017 annual report, the bank has total assets of over $43.8 billion (U.S.) and employs 6,541 people in Lebanon and ten other countries.

116.    BANK AUDI participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

117.    BANK AUDI's Board of Directors includes a "Compliance/AML/CFT Committee" that purports to assist the Board with carrying out its functions and supervisory role with respect to "fighting money laundering and terrorist financing," "protecting the Bank from other compliance-related risks," and "overseeing the Bank's compliance with applicable laws, policies and regulations."

118.    BANK AUDI maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

> **From 2003 to 2011:**
> BNY–New York, account number 8900111712;
> JPM–New York, account number 544729027;
>
> **From 2003 to 2005:**
> BANK AUDI (USA);
>
> **From 2005 to 2008:**
> AMEX–New York;
> Interaudi Bank, New York;
>
> **2008 to 2011:**
> SCB–New York, account number 3582023406001;
> HSBC–New York, account number 0000301159;

WFB–New York, account number 2000191102776; and
CITI–New York.

119.    BANK AUDI's Eurodollar clearing account at CHIPS–New York is identified by UID number "000980".

120.    According to SWIFT–Belgium, BANK AUDI's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "AUDBLBBX".

121.    BANK AUDI primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

122.    At all relevant times, BANK AUDI purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on behalf of Hezbollah on an ongoing and recurring basis.

### 7.   BANK OF BEIRUT SAL

123.    Defendant BANK OF BEIRUT SAL was incorporated in 1963 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. BANK OF BEIRUT was registered under number "13187" with the Commercial Registry of Beirut and registered under number "75" on the list of banks licensed by the Central Bank of Lebanon.

124.    BANK OF BEIRUT's head office address is Bank of Beirut Building, Fosh Street, Beirut, Lebanon.

125.    According to BANK OF BEIRUT's 2016 annual report, the bank has total assets of over $17.2 billion (U.S.) and employs 1,491 people in Lebanon.

126.    BANK OF BEIRUT participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

127.    BANK OF BEIRUT claims to maintain an "AML Compliance Program" that includes the following functions:

AML Procedures designed to implement the Bank's Customer Identification Program;

The designation of an Anti-Money Laundering Compliance Officer responsible for coordinating and monitoring day-to-day compliance with the Anti-Money Laundering Policy and applicable laws, rules and regulations;

Recordkeeping and reporting practices in accordance with the Anti-Money Laundering Policy and applicable laws, rules and regulations;

Appropriate methods of monitoring transactions and account relationships to identify potential suspicious activities;

Reporting suspicious activities to competent authorities in accordance with the Anti-Money Laundering Policy and applicable laws, rules and regulations;

On-going training of appropriate personnel with regard to anti-money laundering and counter financing of terrorism issues and their responsibilities for compliance; and

Independent testing to ensure that the Anti-Money Laundering Compliance Program has been implemented and continues to be appropriately maintained.

128.    BANK OF BEIRUT maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

**From 2003 to 2011:**
BNY–New York, account number 8900097906;
JPM–New York, account number 400228661;

**From 2003 to 2008:**
AMEX–New York, account number 28134;

**From 2008 to 2011:**
HSBC–New York;

> CITI–New York, account number 10952793;
> SCB–New York, account number 3582036868001; and
> WB–New York.

129.    BANK OF BEIRUT's Eurodollar clearing account at CHIPS–New York is identified by UID number "030264".

130.    According to SWIFT–Belgium, BANK OF BEIRUT's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "BABELBBE".

131.    BANK OF BEIRUT primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

132.    At all relevant times, BANK OF BEIRUT purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on behalf of Hezbollah on an ongoing and recurring basis.

### 8.  LEBANON AND GULF BANK SAL ("LGB")

133.    Defendant LEBANON AND GULF BANK SAL was established in 1963 as Banque de Crédit Agricole and incorporated in its present form in 1980 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. LEBANON AND GULF BANK was registered under number "43171" with the Commercial Registry of Beirut and registered under number "94" on the list of banks licensed by the Central Bank of Lebanon.

134.    LEBANON AND GULF BANK's head office address is located in Allenby Street, Beirut, Lebanon.

135.    According to LEBANON AND GULF BANK's website, in 2017 the bank had total assets of over $4.7 billion (U.S.) and employed 420 people in Lebanon.

136.    LEBANON AND GULF BANK participates in various domestic and international

payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

137.    LEBANON AND GULF BANK describes its AML/CFT compliance program as follows:

> LGB Bank has implemented a set of rules that apply to all Bank's activities to ensure compliance with Lebanese AML/CFT laws and regulations as well as international standards. The Bank has in place policies and procedures for the better knowledge of the customers' activities and their expected use of Bank's products and services.

138.    LEBANON AND GULF BANK maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

> **From 2003 to 2011:**
> JPM–New York, account number 544729422;
>
> **From 2005 to 2008:**
> BNY–New York, account number 8900256141;
> SCB–New York, account number 3582023247001;
> DBTCA–New York, account number 04449171;
> WB–New York, account number 2000191104101;
> UBOCI–New York, account number 91267070112/NY; and
> AMEX–New York.

139.    LEBANON AND GULF BANK's Eurodollar clearing account at CHIPS–New York is identified by UID number "160871".

140.    According to SWIFT–Belgium, LEBANON AND GULF BANK's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "LGBALBBX".

141.    LEBANON AND GULF BANK primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

142.    At all relevant times, LEBANON AND GULF BANK purposefully and

26

deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on behalf of Hezbollah on an ongoing and recurring basis.

### 9. BANQUE LIBANO-FRANCAISE SAL ("BLF")

143.     Defendant BANQUE LIBANO–FRANCAISE SAL was established in 1930 as a branch of the French Bank, the Compagnie Algérienne de Crédit et de Banque and incorporated in its present form in 1967 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. BANQUE LIBANO–FRANCAISE was registered under number "19618" with the Commercial Registry of Beirut and registered under number "10" on the list of banks licensed by the Central Bank of Lebanon.

144.     BANQUE LIBANO–FRANCAISE's head office address is Beirut Liberty Plaza, 5 Rome Street, Hamra, Beirut, 1107 2060, Lebanon.

145.     According to BANQUE LIBANO–FRANCAISE's web-site, in 2017 the bank had total assets of over $13.6 billion (U.S.) and employed 1,546 people in Lebanon.

146.     BANQUE LIBANO–FRANCAISE participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

147.     BANQUE LIBANO–FRANCAISE's Board of Directors purportedly includes a Compliance Committee that assists the Board with carrying out its functions and supervisory role with respect to "proper implementation and effectiveness of AML/CFT procedures and regulations."

148.     BANQUE LIBANO–FRANCAISE maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

**From 2003 to 2011:**
BNY–New York, account number 8033222085;

**From 2005 to 2011:**
CITI–New York, account number 36154781;

**From 2008 to 2011:**
JPM–New York;
SCB–New York, account number 3582023510001;
DBTCA–New York, account number 04089495; and
AMEX–New York (prior to 2009).

149.    BANQUE LIBANO–FRANCAISE's Eurodollar clearing account at CHIPS–New York is identified by UID number "002902".

150.    According to SWIFT–Belgium, BANQUE LIBANO–FRANCAISE's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "BLFSLBBX".

151.    BANQUE LIBANO–FRANCAISE primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

152.    At all relevant times, BANQUE LIBANO–FRANCAISE purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on behalf of Hezbollah on an ongoing and recurring basis.

**10. BANK OF BEIRUT AND THE ARAB COUNTRIES SAL ("BBAC")**

153.    Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES SAL was founded in 1956 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. BBAC–Beirut was registered under number "6196" with the Commercial Registry of Beirut and registered under number "28" on the list of banks licensed by the Central Bank of Lebanon.

154.    The bank was founded by Tawfiq Assaf, whose son, Ghassan, replaced him as

28

chairman and general manager after Tawfiq's death in 1996.

155.    In 2000, the bank changed its name in a rebranding push, to become BBAC.

156.    BBAC's head office is located at BBAC Building, 250 Clemenceau Street, Beirut, Lebanon.

157.    According to BBAC's 2016 annual report, the bank had total assets of over $6.4 billion (U.S.) and employed 833 people in Lebanon.

158.    BBAC participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

159.    BBAC claims that the role of its "AML/CFT and Sanctions section is to ensure that the Bank is operating in compliance with the applicable laws related to fighting money laundering and terrorism financing."

160.    BBAC maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

> **From 2003 to 2011:**
> BNY–New York, account number 8033216271;
> JPM–New York, account number 544729289;
> CITI–New York, account number 36070254; and
>
> **From 2005 to 2008:**
> AMEX–New York, account number 00716738.

161.    BBAC–Beirut's Eurodollar clearing account at CHIPS–New York is identified by UID number "000724".

162.    According to SWIFT–Belgium, BBAC–Beirut's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "BBACLBBX".

163.    BBAC–Beirut primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

164.    At all relevant times, BBAC–Beirut purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on behalf of Hezbollah on an ongoing and recurring basis.

## 11. JAMMAL TRUST BANK SAL

165.    Defendant JAMMAL TRUST BANK SAL was founded in 1963 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years.

166.    JAMMAL TRUST BANK was registered under number "13578" with the Commercial Registry of Beirut and registered under number "80" on the list of banks licensed by the Central Bank of Lebanon.

167.    JAMMAL TRUST BANK's head office is located at JTB Tower, Tahweeta Highway, Elias al-Harawi Street, Beirut, Lebanon.

168.    JAMMAL TRUST BANK maintains dozens of branches in Lebanon and internationally, including branches in Egypt, Nigeria, Ivory Coast, and the United Kingdom.

169.    According to JAMMAL TRUST BANK's 2016 annual report, the bank had total assets of over $997 million (U.S.) and employed over 541 people in Lebanon.

170.    JAMMAL TRUST BANK participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

171.    JAMMAL TRUST BANK claims that the bank is "in full and accurate compliance with all the laws, regulations and circulars related to Anti-Money Laundering and Countering the Financing of Terrorism of which most notably those issued by the Financial Action Task Force

(FATF/GAFI)."

172.     JAMMAL TRUST BANK maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at the following correspondent banks in New York:

>**From 2003 to 2005:**
>HSBC–New York;
>
>**From 2003 to 2008:**
>AMEX–New York, account number 000197640;
>BNY–New York, account number 8033219009;
>
>**From 2005 to 2008:**
>SCB–New York, account number 3582023316001;
>UBOCI–New York, account number 91291740112; and
>
>**From 2007 to 2008:**
>WB–New York, account number 2000193002162.

173.     JAMMAL TRUST BANK's Eurodollar clearing account at CHIPS–New York is identified by UID number "025502".

174.     According to SWIFT–Belgium, JAMMAL TRUST BANK's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "JTBKLBBE".

175.     JAMMAL TRUST BANK primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

176.     At all relevant times, JAMMAL TRUST BANK purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on behalf of Hezbollah on an ongoing and recurring basis.

## V.     FACTUAL BACKGROUND

### A.  ISLAMIC REVOLUTIONARY GUARD CORPS (IRGC)

177.    On May 5, 1979, Ayatollah Ruhollah Khomeini, the first Supreme Leader of the Islamic Republic of Iran, promulgated a decree establishing the *Pasdaran e-Enqelab* (literally the "Guardians of the Revolution," also referred to in English as the Revolutionary Guard and later as the "Islamic Revolutionary Guard Corps") three months after the fall of the Shah and his government.

178.    Initially composed of a disparate group of militias that emerged after the revolution, the newly-formed IRGC was established to ensure that there would be no backsliding in implementing Ayatollah Khomeini's vision for an Islamic theocratic government in Iran based on his concept of an Islamic state ruled by a *velayat-e faqih* (guardianship of the jurist).

179.    The IRGC and (later) its subordinate directorate IRGC Qods Force ("IRGC–QF") were established as entities under the direction, control and authority of the Supreme Leader of Iran and they report directly to him.

180.    In September 1980, when Iraq invaded Iran, the Iranian armed forces suffered numerous setbacks on the battlefield. The newly-formed IRGC and an affiliated militia known as the Basij helped the Iranian army halt the Iraqi invasion and drive the Iraqi army back to roughly the original border between the two countries.

181.    For eight years, until the war ended in 1988, Iran responded to Iraq's superior military matériel by deploying highly-motivated infantry formations populated by the IRGC and its affiliated Basij militia.

182.    In 1982, despite being heavily engaged in combat with Iraqi forces, the Iranian government sent IRGC members to assist the Lebanese Shi'a community build a political

movement and military capable of pushing the Israeli army out of Southern Lebanon (following the Israeli army's 1982 incursion known as "Operation Peace for Galilee" to evict the Palestine Liberation Organization from Lebanon).

183.    Initially, the IRGC supported the Amal movement,[14] which garnered support from southern Lebanon's Shi'a community. But the IRGC also provided critical assistance to newly-emerging Hezbollah, which swore an oath of fealty to Iran, thereby tying it to decisions made by the theocratic Supreme Leader of Iran, Ayatollah Khomeini.

184.    Hezbollah's fealty to the IRGC and Iran's Supreme Leader ensured that Iran would provide funding, military equipment, advisors and training for Hezbollah at a level not enjoyed by Amal. That support and coordination continues to this day and is reciprocal: Iran bankrolls, arms and trains Hezbollah, and Hezbollah supports Iranian strategy and interests in Lebanon, Syria, Iraq and elsewhere.

185.    From Hezbollah's inception, the IRGC funded, armed, and supported it and provided it with the ability to attack Israeli forces in southern Lebanon.

186.    The October 23, 1983 bombing of the U.S. Marine Corps barracks in Beirut, Lebanon (resulting in the death of 220 Marines, 18 Sailors, and 3 Soldiers), was a coordinated attack sponsored and planned by the IRGC and carried out by Hezbollah operatives under the command of Imad Mughniyah and Mustafa Badr al-Din.

187.    The IRGC-QF was later created as a special directorate tasked with exporting terrorism and terrorist tactics internationally.

188.    It was and remains separate from Iran's regular military and is accountable directly

---

[14]    Amal was a political movement and militia established in the mid-1970s by Musa al-Sadr, a leading Shi'a cleric who emigrated to Lebanon. After Sadr's disappearance in Libya (and presumed death), Hezbollah broke away from Amal in the early 1980s. The two groups have remained competitors but also actively cooperate in many spheres.

to Iran's Supreme Leader.

189. In many cases, young officers and leaders of the IRGC's new formations during the Iran-Iraq War are now senior members of the IRGC's leadership, including its IRGC–QF, such as Major General Qasem Soleimani, who assumed his position as IRGC-QF leader in 1998.

190. Major General Soleimani was designated by the United States on October 25, 2007 under Executive Order 13382, based on his "relationship to the IRGC"; in May 2011, under Executive Order 13572, which focuses on human rights abuses in Syria, for his role as IRGC-QF commander; and again, on October 11, 2011, as an SDGT.

191. In an April 1990 interview, Major General Mohsen Rezai, then-IRGC Commander, explained the reasoning behind the IRGC–QF's establishment and the scope of its responsibilities:

> [T]he Qods Force, which is for assisting Muslims, Islamic states or Islamic governments, should they ask for help in training or advice. That is now a global custom. If an Islamic state, government or people need to be put through some training, well the corps will go there and give them training; it will take measures to provide training support for world Muslims or Islamic states. There was a need for a force to perform this task, and the Eminent Leader commanded the corps to set it up.

192. On October 25, 2007, the U.S. Department of the Treasury designated the IRGC-QF an SDGT for supporting terrorism as it: "…provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians."

193. The IRGC–QF trains, advises and logistically supports terrorist and insurgent movements, and performs related clandestine and covert special operations activities, on behalf of the Iranian government. According to a U.S. Department of Defense assessment:

> The Iranian regime uses the Islamic Revolutionary Guard Corps-Qods Force (lRGC-QF) to clandestinely exert military, political, and economic power to advance Iranian national interests abroad. IRGC–QF global activities include: gathering tactical intelligence; conducting covert

34

diplomacy; providing training, arms, and financial support to surrogate groups and terrorist organizations; and facilitating some of Iran's provision of humanitarian and economic support to Islamic causes.

## B.  HEZBOLLAH

### 1.  HEZBOLLAH'S INITIAL TERRORIST OPERATIONS AND ORGANIZATIONAL STRUCTURE

194.    Hezbollah was established in Lebanon circa 1982 by Sheikh Subhi al-Tufayli and Abbas al-Musawi with the support and assistance of Iran's IRGC.

195.    Mr. al-Tufayli was Hezbollah's first Secretary General, from 1989 until 1991.

196.    Sheikh Muhammad Hussein Fadlallah served as the group's "Spiritual Leader," providing Hezbollah its intellectual basis both for pursuing *jihad* and departing from the more apolitical and passive theological trend in Shi'a Islam.

197.    In 1995, the U.S. Treasury Department designated Sheikh Fadlallah a Specially Designated Terrorist ("SDT").

198.    At all times relevant hereto, Hezbollah is and was a radical Islamic terrorist organization that views the United States and other Western countries as its enemies.

199.    Since its founding, Hezbollah has committed numerous acts of international terrorism, including, but not limited to, the following:

- July 19, 1982: The kidnapping of American University president David S. Doge in Beirut.

- April 18, 1983: A car bomb attack on the United States Embassy in Beirut, in which sixty-three people were killed.

- October 23, 1983: A truck bomb attack on the U.S. Marine barracks where American military personnel stationed in Beirut were serving as part of a peace-keeping force; 241 American military personnel were killed. A separate attack against the French military compound in Beirut killed 58 people.

- December 12, 1983: Bombings against U.S. and French embassies in Kuwait, in which 5 people were killed.

- September 20, 1984: A car bomb attack on the U.S. Embassy annex in Beirut, in which two Americans and twenty-two others were killed.

200. Hezbollah's stated aims were published in February 1985 in a letter entitled "The Hezbollah Program."

201. With respect to Israel and the United States, the Hezbollah Program states:

We see in Israel the vanguard of the United States in our Islamic world. It is the hated enemy that must be fought until the hated ones get what they deserve.… *our struggle will end only when this entity is obliterated. We recognize no treaty with it, no cease fire, and no peace agreements, whether separate or consolidated.* (Emphasis added.)

202. From its founding through the present, Hezbollah has carried out hundreds of terrorist attacks against American targets that have killed hundreds of U.S. citizens and wounded hundreds more.

203. Hezbollah's policy and practice of carrying out terrorist attacks against United States targets was well known to Defendants, because Hezbollah has openly, publicly and repeatedly acknowledged having such a policy and carrying out such attacks.

204. Hezbollah made these acknowledgments on its official websites, in its official press releases, on its official television station, *Al-Manar*, on its official radio station, *Al-Nour*, and in numerous press conferences and news media interviews conducted by senior Hezbollah officials.

205. As a result of its mission, conduct, and terrorist activities, on January 25, 1995, Hezbollah was designated as an SDT by the United States. It has retained this designation since that time.

206. On October 8, 1997, Hezbollah was designated as an FTO by the United States. It has retained this designation since that time.

36

207.   On October 31, 2001, Hezbollah was designated as an SDGT by the United States. It has retained this designation since that time.

208.   The IRGC has funded, trained and supplied Hezbollah, and facilitated its attacks against the Israel Defense Forces ("IDF") from at least as early as 1983.

209.   Hezbollah had developed advanced tactical capabilities through the battlefield experience of attacking the IDF in southern Lebanon, including the use of roadside bombs featuring remote detonators and passive infrared ("PIR") switch systems.

210.   By the late 1990s, Hezbollah effectively deployed EFPs against IDF armor and had developed sophisticated tools to defeat IDF counter-measures.

211.   In 2003, Hezbollah began to successfully export its Tactics, Techniques & Procedures ("TTP") to Iraq.

212.   This included TTP for ambushes, kidnappings, indirect fire on stationary bases and particularly its experience deploying EFPs against High Mobility Multipurpose Wheeled Vehicles ("HMMWVs").

213.   Over time, Hezbollah also became increasingly adept at inflicting casualties on the Israeli military, and it eventually forced the IDF in 1985 to withdraw into what Israel called a "Security Zone" in Southern Lebanon.

214.   The Security Zone added depth to Israel's security along its northern border. The IDF and its proxy militia, the South Lebanese Army ("SLA"), occupied strong points within the zone, conducted patrols, and occasionally used its bases to launch raids on Hezbollah targets deeper in Lebanon.

215.   For 15 years, the IDF maintained this buffer zone until increasing IDF casualties precipitated an Israeli withdrawal in 2000 to its current border with Lebanon.

216.    During that 15-year period, southern Lebanon served as a laboratory for Hezbollah to hone its tactical war fighting skills and weapons development.

217.    Attacks on the IDF's Security Zone allowed Hezbollah to study and improve its insurgent tactics, including: *first*, effectively ambushing Israeli patrols; *second*, deploying Improvised Explosive Devices ("IEDs"); *third*, kidnapping Israeli soldiers; and, *fourth*, developing and deploying EFPs (described herein) in the late 1990s against Israeli armored vehicles.

218.    The accumulated experience Hezbollah gained through its decades-long campaign against the IDF also included developing precision use of indirect fire weapons and employing Iranian-provided 107mm and 122mm rockets to launch indirect fire attacks on Israeli fortified outposts and on Israel itself.

219.    Hezbollah's tactics evolved and improved over time. Examples of that evolution included:

- Beginning in August 1991, Hezbollah began regularly detonating bombs by remote radio control, precluding the need for command wire. The IDF attempted to counter the remote-control detonations by sweeping a wide spectrum of radio frequencies from its listening bases on the mountain peak of Mount Hermon to explode the bombs prematurely.

- In response, Hezbollah resumed using command-wire, victim-initiated pressure plates and mat detonations for a while, before introducing a new coded remote-control system in mid-1993. The bombs were fitted with two receivers and scramblers, initially defeating Israeli attempts to reproduce the detonating signals. Hezbollah engineers then refined the bombs' switches further by incorporating small jammers and turning the weapons on using computerized multi-frequency transmissions.

- By 1995, Hezbollah was equipping its IEDs with cellular phone receivers to trigger firing switches. In turn, Israel jammed cell phone frequencies from aircraft flying high above southern Lebanon. As the technology improved and grew smaller, the IDF fitted cell phone jammers into armored personnel carriers and vehicles. Eventually foot

soldiers could carry the equipment in a backpack.

- In a major step change in capability, Hezbollah began using passive infrared receivers in 1997 with the IED detonating when the target, human or vehicular, crossed the beam, thereby negating the effectiveness of IDF jamming devices.

220.  The relatively rapid evolution of Hezbollah's TTP was a product of at least three related factors. First, Hezbollah's operatives were highly motivated and willing to risk heavy losses in their confrontations with Israel. Second, Hezbollah benefited enormously from Iranian financial support and IRGC training and technology transfers. Finally, Hezbollah took advantage of the first two factors and perfected its TTP through trial and error against the SLA and IDF. These combined factors allowed Hezbollah to inflict significant (but not decisive) casualty levels on the IDF.

221.  The status quo began to change, however, with the first reported use of an EFP by Hezbollah in southern Lebanon on October 5, 1998, when an Israeli HMMWV was struck, resulting in the deaths of two Israeli soldiers and the wounding of six more.

222.  EFPs introduced into the Israeli Security Zone in southern Lebanon very quickly began to significantly increase Israeli casualties because they were highly effective against Israeli armor and therefore diminished the IDF's ability to protect its patrols and supply lines, forcing the IDF to resupply their now isolated and beleaguered outposts by helicopter, thereby avoiding the use of armored convoys whenever possible.

223.  By the late 1990s, Hezbollah effectively deployed EFPs against IDF armor and had developed sophisticated tools to defeat IDF counter-IED measures.

224.  In 2000, the Israelis withdrew their forces to the current border with Lebanon rather than suffer further personnel losses that were becoming politically unsustainable.

225.  Another early warning sign of Hezbollah's threat to American personnel in Iraq occurred in May 2003 when Israeli naval commandos seized a small fishing boat off the country's

northern coast and captured a Hezbollah explosives expert who had bomb detonators and computer disks on board.

226.    The computer disks contained detailed instructions on how to manufacture and assemble EFPs:

> Anti-armor devices -
>
> Like with anti-personnel devices, one of the most important factors in increasing the effectiveness of anti-armor devices is:
>
> 1. The speed of the explosive substance: the faster the explosive substance is and the more powerful it is, the more effective the device is.
> 2. The weight of the explosive substance: the greater the weight of the explosive substance, the more effective the device is.
> 3. The case: the thicker the case is, the more effective the device is. The container is normally between 5 mm and 2½ cm in thickness.
>
> Anti-armor devices come in two types: plate devices and hollow devices.
>
> 1. Plate devices: these are devices designed to be used against light armor, such as: Land Hummer and the M113 armored personnel carrier.
>    EF
>    To penetrate armor, these devices depend on a formed projectile moving at a speed 2,000 to 3,000 meters per second.
>
> This is a concave projectile

227.    Hezbollah successfully exported its TTP to Iraq – particularly its experience deploying EFPs against HMMWVs, including hiding IEDs and EFPs inside fiberglass 'rocks' painted to match the limestone geology of south Lebanon.

228.    Hezbollah's transfer of weapons, technology and tactics was critical to the effectiveness and lethality of its proxies in Iraq who would go on to kill and maim more than a thousand Americans between 2004 and 2011.

229.    As set forth below, the IRGC–QF and Hezbollah jointly played a pivotal role in

fomenting sectarian violence in Iraq between 2004 and 2011, and they orchestrated numerous attacks against U.S. service members in Iraq, including nearly all attacks involving EFPs, IRAMs and other specified weapons.

## 2. HEZBOLLAH'S KEY LEADERS AND CURRENT ORGANIZATIONAL STRUCTURE

230.    After its founding, Hezbollah evolved into a multifaceted, sophisticated, highly organized, politically powerful, and well-financed terrorist organization.

231.    Hezbollah now resembles a multinational corporate or governmental entity, with departments, agencies, branches, in-house banking, insurance, and other financial services, and media outreach. Its estimated enterprise value is worth billions of U.S. dollars.

232.    Hezbollah's network consists of a multitude of departments that assist its leadership in carrying out its mission, and includes, but is not limited to, entities that are tasked with: *first*, terrorist and paramilitary activities; *second*, social services and "charitable" activities; *third*, general fundraising; *fourth*, construction and infrastructure; *fifth*, financial and insurance services; and, *sixth*, media services. Notwithstanding Hezbollah's multifaceted nature, it is a single, unified entity dedicated to terrorism in the name of Allah.

### a.  HEZBOLLAH'S EMBRACE OF TERRORISM IS OPEN AND PUBLIC

233.    Hassan Nasrallah (discussed below) has been Hezbollah's supreme leader for decades.

234.    Mr. Nasrallah's public pronouncements leave no doubt about Hezbollah's embrace of terrorism. For example:

- "... put a knife in your shirt, then get close to an Israeli occupier and stab him." *(Nightline*, October 19, 2000)

41

- "Suicide attacks shake the enemy from within, they plunge him into an existential crisis, and thus prepare the ground for victory; these acts are completely legitimate, since there are no innocent civilians in Israel; rather they all are occupiers and accomplices to crime and massacre." (Statement broadcast on *Al-Manar* TV, September 14, 2001)

- "Martyrdom operations - suicide bombings - should be exported outside Palestine. I encourage Palestinians to take suicide bombings worldwide. Don't be shy about it." *(Washington Times,* December 6, 2002)

- "…This American administration is an enemy. Our motto, which we are not afraid to repeat year after year, is: 'Death to America.'" (Statement broadcast on *Al-Manar* TV, February 18-19, 2005)

- "The Lebanese resistance today inspires all the resistance in the world, all the free persons, all the noble people and all who refuse to surrender to American humiliation in the world. This is our victory, and this too is the result of our battle." (Hassan Nasrallah's speech after the July 2006 War "Divine Victory Rally," September 22, 2006)

- "There is no doubt that American terrorism is the source of all terrorism in the world. The Bush administration has turned the U.S. into a danger—threatening the whole world, on all levels." (Statement broadcast, November 2009)

### b. SHURA COUNCIL (MAJLIS AL-SHURA)

235.    Hezbollah's Shura Council (a/k/a Majlis al-Shura) is the decision-making body within the terrorist organization, composed of Hezbollah's highest in command—its Secretary-General, the heads of the other Councils (see below) and advisors to Hezbollah's leader, Hassan Nasrallah.

236.    All Councils in Hezbollah are subordinate to and overseen by the Shura Council.

237.    Hassan Nasrallah, Hezbollah's Secretary General, presides over the Shura Council and functions as the group's leader under the authority of the "jurist theologian" Ayatollah Ali Khamenei, Iran's second – and current – Supreme Leader.

238.    Hezbollah's Shura Council comprises the following members:

- **Hassan Nasrallah**. In 1992, after Mr. al-Musawi's death, Hassan

42

Nasrallah became Hezbollah's leader and Secretary General. At all relevant times, he has remained in that position. He was designated as an SDT on January 24, 1995, and as an SDGT by the U.S. Department of the Treasury on May 16, 2018.

- **Naim Qassem**. Sheikh Naim Qassem is the Deputy Secretary General of Hezbollah. He was designated as an SDGT by the U.S. Department of the Treasury on May 16, 2018.

- **Hashem Safieddine**. In 1995, Hashem Safieddine was promoted to the Majlis al-Shura. He is the Head of the Executive Council, the largest council in Hezbollah. The U.S. Department of the Treasury designated Mr. Safieddine as an SDGT on May 19, 2017.

- **Muhammad Yazbek**. Muhammad Yazbek is the Head of Hezbollah's Judicial Council. He was designated as an SDGT by the U.S. Department of the Treasury on May 16, 2018. He is considered the personal representative of the Supreme Leader of the Islamic Revolution, Ali Khamenei, in Lebanon. Moreover, Mr. Yazbek manages many of Hezbollah's bank accounts.

- **Ibrahim Amin al-Sayyed**. Ibrahim Amin al-Sayyed is the Head of Hezbollah's Political Council. He was Hezbollah's first official spokesperson and was involved in the formation of Hezbollah in the 1980's. He was designated as an SDGT by the U.S. Department of the Treasury on May 16, 2018.

- **Hussein Khalil**. Hussein Khalil is Nasrallah's top political advisor. He was designated as an SDGT by the U.S. Department of the Treasury on May 16, 2018.

- **Hussein al-Shami**. Mr. Al-Shami is the current Head of the Islamic Resistance Support Organization and Bayt al-Mal, fundraising institutions that help finance Hezbollah. Due to Mr. Al-Shami's significant role in this effort, he was appointed to be a member of the Governing Council of Hezbollah. Prior to that time, Mr. Al-Shami headed Hezbollah's Social Services Unit. The U.S. Department of the Treasury designated Mr. Al-Shami as an SDGT on September 7, 2006.

### c. PARLIAMENTARY COUNCIL

239. Hezbollah's Parliamentary Council is subordinate to the Shura Council and is composed of Hezbollah's Members of Lebanon's Parliament and Ministers, both current and past. This council supervises the actions of Hezbollah's bloc in Lebanon's parliament, "the Loyalty to

the Resistance." In the latest Lebanese general elections, held on May 6, 2018, Hezbollah's bloc won 13 seats in the parliament.

### d.  JIHAD COUNCIL

240.     The Jihad Council is the functional council underneath the Shura Council, responsible for Hezbollah's paramilitary and terrorist activities. It overseas the organization's "Resistance" operations, including oversight, recruitment, training, equipment and internal security. This includes Hezbollah's Islamic Jihad Organization ("IJO").

241.     The Jihad Council is officially headed by Hassan Nasrallah himself. Below are the most prominent figures in the military wing of Hezbollah.

### 1.  IMAD MUGHNIYAH

242.     Imad Mughniyah was one of the founders of Hezbollah in the 1980s and headed the organization's terror apparatus, the IJO (under the supervision of the Jihad Council), until his death in 2008.

243.     Mr. Mughniyah was known as Hezbollah's "Chief of Staff" and, as such, oversaw Hezbollah's military, intelligence, and security apparatuses.

244.     He began his career in terrorism with the Palestinian Fatah movement and rose through the organization's ranks.

245.     He helped found and organize the unit that would eventually turn into Yasser Arafat's Force 17, a commando and special operations unit of Fatah in Beirut. After the PLO fled from Lebanon, Mr. Mughniyah joined Amal, and through Amal was introduced to the IRGC in Baalbek, Lebanon.

246.     Later, he joined Hezbollah and formed the organization's IJO with his brother-in-law and cousin, Mustafa Badr al-Din.

247.     Mr. Mughniyah was identified by both Israeli and American officials as personally involved in planning and directing many of Hezbollah's suicide bombings, deadly terrorist attacks, murders, kidnappings and assassinations throughout the 1980s and 1990s against the United States and other Western countries, and against Israel and Jewish targets around the world.

248.     Below is a partial list of Hezbollah's terrorist operations that were planned, directed, and/or executed by Mr. Mughniyah:

- April 18, 1983: A terrorist attack against the U.S. embassy in Beirut, resulting in the death of 63 people;

- October 23, 1983: A suicide bombing against the U.S. Peacekeeping Forces' barracks in Beirut, resulting in the death of 241 people;

- October 23, 1983: A suicide bombing against the French Peacekeeping Forces' barracks in Beirut, resulting in the death of 58 people;

- November 4, 1983: A suicide bombing against the IDF's headquarters in Tyre, resulting in the death of 60 people;

- December 12, 1983: A suicide bombing against the U.S. embassy in Kuwait, resulting in the death of 5 people;

- March 16, 1984: Kidnapping and torture of CIA Officer, William F. Buckley, who was murdered on June 3, 1985;

- September 20, 1984: A terrorist bombing against the U.S. Embassy annex in Beirut, killing 24 people;

- March 10, 1985: A terrorist attack against IDF soldiers, resulting in the death of 12 people;

- June 14, 1985: Hijacking of TWA Flight 847, resulting in the death of a U.S. Navy diver;

- December 3, 1985: Hijacking of Kuwait Airways Flight 221, resulting in the death of two American hostages;

- September 30, 1985: Kidnapping of four Soviet diplomats from the Soviet embassy in Lebanon, and eventual murder of the consular attaché;

- February 17, 1988: Kidnapping, torture and murder of Colonel William R. Higgins;

- April 5, 1988: Hijacking of Kuwait Airways Flight 422, resulting in the death of two Kuwaiti hostages;

- October 19, 1988: A terrorist attack against IDF officers, resulting in the death of 8 people;

- March 17, 1992: A suicide bombing against the Israeli embassy in Argentina, resulting in the death of 29 people;

- July 18, 1994: AMIA bombing in Argentina, in which a suicide bomber attacked the Jewish Community Center in Buenos Aires, resulting in the death of 85 people;

- June 25, 1996: Khobar Tower bombings, in which the U.S. Air Force housing complex was attacked by bombers, killing 19 U.S. Airmen, a Saudi national, and wounding 498 people;

- October 4, 2000: Kidnapping of Israeli citizen Elhanan Tannenbaum;

- October 7, 2000: Kidnapping and murder of 3 IDF soldiers;

- March 12, 2002: A terrorist attack in Matzuva, in which six Israelis were killed;

- February 14, 2005: Orchestrating of the assassination of Rafiq Hariri, former Prime Minister of Lebanon;

- April 4, 2005: Kidnapping and torture of two Israeli citizens; and

- July 12, 2006: Murder of three IDF soldiers, and kidnapping and eventual murder of two other soldiers (this kidnapping brought about the 2006 Lebanon War).

249. Mr. Mughniyah also helped construct Hezbollah's military terrorist infrastructure in Lebanon, which was used against the IDF in 2006.

250. Mr. Mughniyah was designated as an SDT in January 1995, and the U.S. Department of the Treasury designated Mr. Mughniyah as an SDGT in October 2001.

## 2. MUSTAFA BADR AL-DIN

251. Mustafa Badr al-Din was a military leader of Hezbollah and both the cousin and brother-in-law of Imad Mughniyah (Mughniyah was married to Mustafa Badr al-Din's sister Sa'ada).

252. Like his cousin Mr. Mughniyah, Mr. Badr al-Din served in Fatah's Force 17 in Beirut (before 1982) and joined Hezbollah with him.

253. Mr. Badr al-Din later became an expert bomb maker.

254. He headed Hezbollah's security apparatus and was a member of the Shura Council as well as Head of the IJO unit responsible for overseas operations. He was a key participant in the bombing of the U.S. Marine Corps barracks in Lebanon in 1983, killing 241 marines.

255. After that bombing, Mr. Badr al-Din was soon dispatched to Kuwait to work with a joint Iraqi Da'wa Party–Hezbollah operation to attack Western targets at the behest of the IRGC.

256. At the start of his career, Mr. Badr al-Din commanded the IRGC's operation to assassinate the Emir of Kuwait. The attempt failed, and he ultimately spent five years in a Kuwaiti jail. (He was also charged with the bombing of the American and French embassies in Kuwait City.)

257. The Kuwaiti authorities sentenced him to death, but he fled from prison during the Iraqi invasion of Kuwait in August 1990.

258.    Hezbollah had previously tried to gain his release, along with other Hezbollah operatives held in Kuwait, by hijacking airplanes as bargaining chips, including the hijacking of a TWA flight in 1985 and Kuwaiti aircraft in 1984 and 1988.

259.    In June 2011, the prosecutor of the Special Tribunal for Lebanon charged Mr. Badr al-Din with involvement in the February 14, 2005 bombing that killed former Lebanese Prime Minister Rafiq Hariri and 21 others.

260.    The U.S. Department of the Treasury designated Mr. Badr al-Din as an SDGT in September 2012 "for providing support to Hizballah's terrorist activities in the Middle East and around the world." Saudi Arabia also designated Mr. Badr al-Din as a global terrorist linked to Hezbollah, and as an activist in the Syrian war.

### 3.    MUHAMMAD KAWTHARANI

261.    Since 2003, Muhammad Kawtharani has been responsible for Hezbollah's Iraq portfolio, overseeing all of the organization's Iraqi operations. He has also assisted in coordinating the movement of Hezbollah fighters to support pro-regime forces in Syria.

262.    As the individual in charge of Hezbollah's Iraq activities, Mr. Kawtharani worked on behalf of Hezbollah's leadership to promote the group's interests in Iraq, including Hezbollah's efforts to provide training, funding, political, and logistical support to Iranian-backed terror cells in Iraq.

263.    As a member of Hezbollah's Political Council, Mr. Kawtharani also helped secure the release from Iraqi custody of senior Hezbollah commander Ali Mussa Daqduq. The latter was designated an SDGT by the U.S. Department of the Treasury in November 2012 and was responsible for numerous attacks against the Coalition Forces in Iraq, including the January 20, 2007, attack on a compound in Karbala that claimed the lives of five American soldiers and injured

many others.

264.    Mr. Kawtharani was designated as an SDGT by the U.S. Department of the Treasury in August 2013.

### e.  JIHAD COUNCIL'S EXTERNAL SECURITY ORGANIZATION

265.    The Jihad Council's External Security Organization ("ESO") (also known as the Islamic Jihad Organization) was established in 1983, after Hezbollah's attack on the U.S. military in Beirut.

266.    ESO is a sub-directorate of the Jihad Council, working alongside, but distinct from, Hezbollah's formal militia activity in Lebanon.

267.    The ESO is a discrete branch within Hezbollah, responsible for procurement, intelligence, counter-intelligence, surveillance, planning, coordination, and execution of terrorist attacks against Hezbollah's enemies outside of Lebanon.

268.    The ESO was responsible for numerous significant attacks against targets outside of Lebanon including the following terrorist operations:

- On 18 July 2012, a bomb exploded on an Israeli tourist bus at Sarafovo Airport in Burgas, Bulgaria, killing the attacker, five Israelis and their Bulgarian bus driver. The Bulgarian authorities have charged two individuals in connection with the attack; they state the individuals were members of the Islamic Jihad Organization (IJO), an alias of ESO.

- On 18 July 1994, a van carrying explosives was detonated outside the Argentinian-Israeli Mutual Association in Buenos Aires, Argentina, killing 85 people and injuring more than 300 others. In 1999, Argentinian authorities issued an arrest warrant for ESO leader Imad Mughniyah for his alleged involvement. No group claimed responsibility for the attack and Hezbollah has repeatedly denied accusations that it conducted the attack. However, Argentinian authorities concluded that the ESO was responsible.

- On 17 March 1992, a truck laden with explosives was used to destroy the Israeli Embassy in Buenos Aires, killing 29 people and injuring 242 others. Although Hezbollah denied involvement, responsibility for the

49

attack was claimed in the name of the IJO. Argentinian authorities eventually issued an arrest warrant for ESO leader Imad Mughniyah for organizing the attack.

## 1.   TALAL HAMIYAH

269.    The ESO's current Commander is Talal Hamiyah, previously a deputy of Mr. Mughniyah's. Mr. Hamiyah was implicated in the 1992 and 1994 attacks in Argentina (listed above). The U.S. Department of the Treasury designated Mr. Hamiyah as an SDGT in September 2012. The U.S. State Department is offering a reward of up to $7 million (U.S.) for information that leads to Mr. Hamiyah's location, arrest, or conviction in any country.

## f.   HEZBOLLAH'S BUSINESS AFFAIRS COMPONENT (BAC)

270.    Hezbollah's External Security Organization Business Affairs Component (BAC) is an international apparatus orchestrating Hezbollah's network of businesses and enterprises across the world, tasked with raising funds for Hezbollah through illicit activities, such as money laundering and drug trafficking, as well as ordinary business enterprises.[15]

271.    These proceeds are later used for purchasing weaponry and funding the organization's activities in Lebanon, Iraq and Syria.

272.    BAC's apparatus was founded by Imad Mughniyah but is now headed by Abdallah Safieddine and Adham Tabaja.

273.    According to the U.S. Drug Enforcement Administration, Hezbollah's BAC has developed extensive operational and financial linkages with various drug cartels and money laundering networks across South America:

> Members of the Hizballah BAC have established business relationships with South American drug cartels, such as La Oficina de Envigado, responsible for supplying large quantities of cocaine to the European and United States drug markets. Further, the Hizballah BAC continues to

---

[15]    BAC also aided Hezbollah in other areas such as intelligence-gathering and weapons shipments.

launder significant drug proceeds as part of a trade-based money laundering scheme known as the Black-Market Peso Exchange.

274.    As set forth in granular detail in this Complaint, Hezbollah is a complex organization with many components, but it is ultimately a single, unified entity that serves its central purpose, to wage jihad according to its theological principles.

275.    Hezbollah's political leadership works collaboratively with its terrorism directorates, which are – in turn – part and parcel of its network of social welfare institutions and commercial enterprises that are ubiquitous in much of Lebanon and *openly* identify with Hezbollah.

276.    While its terrorist activities are largely conducted clandestinely, Hezbollah's political, social and commercial activity in Lebanon is conducted *openly* and is well understood by the Defendants, which service the organization's financial and logistical needs.

277.    Much of the operational and financial detail set forth below is intended to demonstrate several, related points about Hezbollah's BAC networks and their interconnectivity with each other and with Lebanese financial institutions (including Defendants):

- Hezbollah's BAC operates prominent businesses in villages, cities and neighborhoods it controls. These include, for example, several amusement parks and theme restaurants and banquet halls in places like Dahiyah.[16]

  For example, **Al-Inmaa Engineering** (controlled by Adham Tabaja) is an SDGT and a core part of the BAC. It is closely tied to another Tabaja-owned project discussed below, the **Fantasy World** amusement park that serves the Hezbollah-dominated suburbs of Beirut. The connection between **Al-Inmaa Engineering** and Defendant SGBL's account holder, Fantasy World, is set forth on the former's website:

---

[16]    Dahiyah is the unofficial name of the munipalities in the southern suburbs of Beirut which are overwhelmingly populated by Lebanese Shi'a and politically and functionally dominated by Hezbollah.



- Hezbollah's BAC financiers (i.e. its leading businessmen) are all well-known and widely identified as part of Hezbollah, often serving as local political leaders as well as leading investors in Hezbollah-dominated villages and neighborhoods.

For example, Walid Ali Jaber, the Beirut director for Jihad al-Bina (SDGT) was also the Hezbollah candidate in municipal elections in Bourj el-Barajneh, a Hezbollah-dominated municipality near Beirut's international airport. Mr. Jaber is the director and founder of one of Jihad al-Bina's commercial entities, **Arch Consulting**—Defendant BLOM BANK's account holder. Arch Consulting's website proudly notes projects the company has worked on for Atlas Holding, a corporate alter-ego of the **Martyrs Foundation–Lebanon** (SDGT):



- Hezbollah's social welfare institutions are not only operated by senior Hezbollah operatives, but these institutions and their leaders are also actively involved in the BAC's commercial enterprises which, in turn, provided services to these social welfare institutions.

For example, the **Martyrs Foundation–Lebanon** (SDGT) owns Atlas Holding SAL, which operates a subsidiary – Defendant LEBANON AND GULF BANK's account holder, **Amana Plus** – a company that owns gas stations in Lebanon.



Another example: **Al-Ittam (Aytam Petroleum)** is a company owned by **Al-Mabarrat Charitable Society** (founded by Sheikh Muhammad Hussein Fadlallah – SDT). Fadlallah's son, Ali al-Sayyid Muhammad, sits on the company's board with Hamzah Safieddine, the brother of senior Hezbollah leaders Hashem and Abdallah Safieddine (both SGDTs).

- The ownership and management of Hezbollah's BAC network of companies consists of overlapping directorates of individuals affiliated with Hezbollah. The same extended families (or clans) control many of Hezbollah's commercial assets in Lebanon and abroad, and the same pool of lawyers and accountants are employed to set up and "audit" these enterprises.

For example, **Car Escort Services (Offshore) SAL**, which maintains accounts with Defendant JAMMAL TRUST BANK, was designated an SDGT by the U.S. Department of the Treasury because it was "owned or controlled by Mr. Bazzi and Mr. Charara, who collectively own two-thirds of the company." Ali Youssef Charara is an SDGT closely associated with Adham Tabaja. Muhammad Ibrahim Bazzi, also an SDGT, is also affiliated with Ayman Joumaa's drug trafficking network. The third partner in the company is Ali Muhammad Kharrubi

(a/k/a Ali Mohammed Kharroubi), an SDNT,[17] who is also affiliated with Ayman Joumaa's drug trafficking network and is the founder of Ellissa Exchange Company SARL, a money exchange business (Specially Designated Narcotics-Kingpin ("SDNTK")) used by the Joumaa network. The Ellissa Exchange maintained an account with Defendant BLOM Bank.

- Many of these Hezbollah BAC operatives have been designated as SDGTs by the United States, but that has not affected Defendants' willingness to continue to provide financial services to these enterprises.

  For example, Defendants SGBL and BANQUE LIBANO-FRANCAISE each maintain accounts for Hoda for Touristic Services and Management Holding SAL, a company co-owned by U.S. designated Hezbollah financier, Ali Yussuf Charara.

278.    In sum, Hezbollah operates in plain sight in Lebanon with the knowing and deliberate assistance of Defendants.

## 1.  HEZBOLLAH BAC LEADERSHIP

### A.  Abdallah Safieddine

279.    Abdallah Safieddine heads Hezbollah's BAC.

280.    Mr. Safieddine is also Hezbollah's longtime Tehran-based envoy to the IRGC and oversees Hezbollah's international drug trafficking networks and operations.

281.    Mr. Safieddine was involved in Iranian officials' access to LCB and key LCB managers, who provide Iran and Hezbollah with banking services (including Eurodollar bank accounts and access to the U.S. financial system). He is also the brother of senior Hezbollah leader Hashem Safieddine, and of Hamzah Safieddine, who represents his brothers' and Hezbollah's interests on the boards of several companies and businesses.

### B.  Adham Tabaja

282.    Adham Hussein Tabaja is a Hezbollah leader and one of its most important

---

[17]    Specially Designated Narcotics Trafficker.

financiers. Alongside Abdallah Safieddine, Mr. Tabaja presides over the BAC and operates an enormous network of companies and businesses, whose proceeds support Hezbollah's terrorist endeavors.

283.    For these reasons, Mr. Tabaja himself, his company, Al-Inmaa Group for Tourism Works, and its subsidiaries "Al-Inmaa Engineering and Contracting" and "Al-Inmaa for Entertainment and Leisure Projects" were all designated as SDGTs by the U.S. Department of the Treasury on June 10, 2015.

284.    Al-Inmaa Group's subsidiary "Al-Inmaa Engineering and Contracting" is one of the largest and most successful real estate companies in Lebanon. It has been used by Hezbollah as an "investment mechanism" and has provided Hezbollah with financial and organizational infrastructure for its real estate investment, construction, and money laundering requirements.

285.    According to the U.S. Department of the Treasury, "Tabaja maintains direct ties to senior Hizballah organizational elements, including the terrorist group's operational component, the Islamic Jihad, and holds properties in Lebanon on behalf of the group".[18]

286.    As a prominent Hezbollah leader, Adham Tabaja was the elected mayor of Kfar Tibnit (located in Nabatiya district in south Lebanon) until his recent resignation in 2017 as a result of his designation as an SDGT.

287.    Mr. Tabaja's successor as mayor is also a Hezbollah operative.

288.    Adham Hussein Tabaja is an investor and holds key positions in a wide variety of Hezbollah commercial enterprises, which together form the "Tabaja Network." These entities also

---

[18]    In 2009, Adham Tabaja bought a plot of land at the cost of $27 million (U.S.) in meetings that took place at the LCB. According to a formal report issued by the Lebanese General Directorate of Land Registry & Cadastre from 2017, Adham Tabaja is also linked to Defendant MEAB regarding the following properties in Lebanon: Ras Beirut 3361 Section 27 Block A and Nabatieh al-Tahta 688.

share common shareholders and officers, many of whom are U.S.-designated terrorist entities or individuals. Specifically, Mr. Tabaja is involved with the following Hezbollah-controlled businesses in Lebanon:

- **Lebanese Communication Group** (SDGT). This media holding company is the parent company of Hezbollah's satellite television station *al-Manar* and *al-Nour* radio station (*see* dedicated section below). The following individuals are shareholders with the company:

  o Adham Hussein Tabaja (SDGT);
  o Amin Muhammad Cherri;
  o Sultan Khalifa As'ad; and
  o Muhammad Hassan Raad (Head of Hezbollah's parliamentary bloc).

- **Al-Inmaa Group for Tourism Works** (SDGT**)** (and its subsidiaries). This company provides travel and tourism services. The following individuals are involved with the company:

  o Adham Hussein Tabaja (SDGT) is a founder, partner and authorized signatory;
  o Issam Ahmad Saad (SDGT) is an authorized signatory of the company, founder and partner;
  o Imad Ramez Wazani is an authorized signatory of the company, founder and partner;
  o Muhammad Taha Jumaa is an authorized signatory of the company, founder and partner;
  o Ibrahim Waked Issa is a founder and partner;
  o Nabil Mahmoud Assaf (SDGT) is a founder and partner;
  o Hassan Muhammad Attiya is a founder and partner;
  o Attallah Jamil Shaito is a founder and partner; and
  o Ali Hussein al-Ashi is the attorney for the company.

- **Al-Inmaa Engineering and Contracting** (SDGT). This company is a subsidiary of Al-Inmaa Group for Tourism Works and provides construction services. The following individuals are involved with the company:

  o Adham Hussein Tabaja (SDGT) is manager, partner, founder and authorized signatory;
  o Issam Ahmad Saad (SDGT) is an authorized signatory of the company, founder and partner;
  o Ibrahim Waked Issa is a founder, partner and authorized signatory;
  o Muhammad Taha Jumaa is an authorized signatory of the company,

founder and partner;
- o  Imad Ramez Wazani is a founder and partner;
- o  Attallah Jamil Shaito is a founder and partner;
- o  Nabil Mahmoud Assaf (SDGT) is a founder and partner;
- o  Hassan Muhammad Attiya is a founder and partner;
- o  Jihad Muhammad Qansu (SDGT) is the financial manager; he serves as statutory auditor of numerous companies associated with Hezbollah (*see* dedicated section below).
- o  Abdul Latif Saad (SDGT) is the manager of Al-Inmaa Engineering and Contracting branch in Baghdad;
- o  Ali Hussein al-Ashi is the attorney for the company;
- o  Muhammad al-Mukhtar Fallah Kallas (SDGT) is an accountant; and
- o  Muhammad Badr al-Din (SDGT) is the manager of Al-Inmaa Engineering and Contracting branch in Basra.

- **Al-Inmaa for Entertainment and Leisure Projects** (SDGT), which is a subsidiary of Al-Inmaa Group for Tourism Works.

- **Family Park SARL**, which is a subsidiary of Al-Inmaa for Entertainment and Leisure Projects (SDGT). The following individuals are involved with the company:

  - o  Issam Ahmad Saad (SDGT) is a partner and authorized signatory;
  - o  Raed Hashem al-Amin is a partner;
  - o  Ali Rauf Shaito is a partner;
  - o  Rauf Ali Shaito is a partner and authorized signatory; and
  - o  Attallah Jamil Shaito is a partner and authorized signatory.

- **Car Care Center** (SDGT), which trades in new and used cars, and is a subsidiary of Al-Inmaa Group for Tourism Works. The following individuals are involved with the company:

  - o  Hussein Ali Faour (SDGT) is a co-founder, partner and authorized signatory;
  - o  Ali Saleh Shuaib is a co-founder;
  - o  Batoul Hussein Faour is a co-founder and partner;
  - o  Abdallah Hassan Romani is a partner; and
  - o  Faruq Muhammad Raef Hammoud is the attorney for the company.

- **Golden Hall**. The following individuals are involved with the company:

  - o  Adham Hussein Tabaja (SDGT) is a founder, partner and authorized signatory;
  - o  Imad Ramez Wazani is a founder, partner and authorized signatory;
  - o  Attiya Muhammad Abbas is a founder and partner;
  - o  Rita Hassam Abu Samra is a founder and partner; and

- o   Ahmad Saad is the company's manager.

- **Trading Development Company SAL**. The following individuals are involved with the company:

  - o   Adham Hussein Tabaja (SDGT) is a founder;
  - o   Imad Ramez Wazani is a founder;
  - o   Attallah Jamil Shaito is a founder;
  - o   Muhammad al-Mukhtar Fallah Kallas (SDGT) is director, partner and authorized signatory;
  - o   Yasser Ibrahim Issa is director, partner and authorized signatory; and
  - o   Naji Tawfiq al-Mazzawi is a partner.

- **Family House SARL**. The following individuals are involved with the company:

  - o   Adham Hussein Tabaja (SDGT) is a partner, director, co-founder and authorized signatory;
  - o   Hassan Muhammad Attiya is a partner and co-founder;
  - o   Imad Ramez Wazani is a partner, co-founder, director and authorized signatory;
  - o   Zaher Ismail al-Zayek is a partner and co-founder;
  - o   Ahmad Saad is the general manager; and
  - o   Ali Hussein al-Ashi is the attorney for the company.

- **Fun World Company** (a/k/a Aalam al-Marah Co SAL). The following entities and individuals are involved with the company:

  - o   Adham Hussein Tabaja (SDGT) is a co-founder;
  - o   Abbas Musallam Wahbah is a shareholder and board member;
  - o   Issam Ahmad Saad (SDGT) is a co-founder;
  - o   Muhammad Taha Jumaa is a co-founder;
  - o   Imad Ramez Wazani is a co-founder;
  - o   Ali Hussein al-Ashi is the attorney for the company;
  - o   Fadi Ali Hawi is chairman, majority shareholder and authorized signatory;
  - o   Ali Muhammad Qubaysi is the statutory auditor;
  - o   Hassan Mussa Awada is a founder, board member and shareholder; and
  - o   Trust Compass Insurance is a shareholder.

- **Farah Travels Company SAE**. The following individuals are involved with the company:

- o Adham Hussein Tabaja (SDGT) is director, partner and authorized signatory;
- o Abbas Ahmad Fahas is a partner;
- o Issam Ahmad Saad (SDGT) is a partner;
- o Ali Hussein Tabaja (brother of Adham Tabaja) is a partner; and
- o Nada Hassan Hijazi is a partner.

- **City Park SARL**. The following individuals are involved with the company:

  - o Adham Hussein Tabaja (SDGT) is a founder and partner;
  - o Abbas Ahmad Fahas is a founder, partner and authorized signatory;
  - o Nada Hassan Hijazi is a founder and partner;
  - o Issam Ahmad Saad (SDGT) is a founder and partner;
  - o Romel Hussein Tabaja (brother of Adham Tabaja) is a founder and partner and;
  - o Butrus Michel Ghanimah is the attorney for the company.

- **Fantasy World SARL**. The following individuals are involved with the company:

  - o Adham Hussein Tabaja (SDGT) is director, founder, authorized signatory and partner;
  - o Romel Hussein Tabaja (brother of Adham Tabaja) is a co-founder;
  - o Amin Muhammad Cherri is a co-founder;
  - o Raouf Ali Shaito is a co-founder;
  - o Muhammad Amin Badr al-Din is a co-founder;
  - o Imad Muhammad Cherri is a founder and partner;
  - o Ali Adham Tabaja is a partner;
  - o Muhammad Adham Tabaja is a partner; and
  - o Ali Hussein al-Ashi is the attorney for the company.

- **Mudun Tourism Projects Company SAL** (a/k/a "Green City"). The following individuals are involved with the company:

  - o Adham Hussein Tabaja (SDGT) is a founder and member of the Board of Directors;
  - o Salah Abd al-Rauf Izz al-Din is a board member;
  - o Safi Ahmad Hussein Darwish is a board member;
  - o Hassan Mussa Awada is a board member;
  - o Hassan Abd al-Matlab Fneish (brother of Hezbollah operative Muhammad Fneish) is a founder and board member;
  - o Hassan Muhammad Ali Safieddine is a board member;
  - o Hussein Muhammad Bahsun is a board member;
  - o Ali Hussein al-Ashi is the attorney for the company;
  - o Haydar al-Sayyed Hashem is a board member;

- o Yussuf Muhammad Hussein Faour is the director, chairman, founder and authorized signatory;
- o Ali Muhammad Jumaa is deputy chairman;
- o Muhammad Mustafa Kalash is statutory auditor;
- o Mustafa Abd al-Mun'im Hamdun is statutory auditor;
- o Hassan Abd al-Amir Dabuq is a co-founder;
- o Husan Salman Madlaj is a founder and board member;
- o Fayyad Abdallah Dimashq is a co-founder;
- o Ali Ahmad Qassir is a co-founder;
- o Muhammad Ali Abd al-Latif Mazih is a co-founder;
- o Muhammad Sa'id Dakrub is a co-founder; and
- o Hassan Dib Amar is a board member.

- **Global Cleaners SARL** (SDGT). The following individuals are involved with the company:

  - o Adham Hussein Tabaja (SDGT) is owner and manager;
  - o Issam Ahmad Saad (SDGT) is a partner and authorized signatory;
  - o Maitham Muhsin Ubayd al-Zaydi is a founder, partner and authorized signatory;
  - o Shibl Muhsin Ubayd al-Zaydi (SDGT) is a partner and founder;
  - o Muhammad Adham Tabaja is a partner;
  - o Adnan Hussein Kawtharani (SDGT) is a partner;
  - o Hassan Muhammad Faour is the attorney for the company;
  - o Ahmad Jawad Shalash al-Fartusi is a co-founder; and
  - o Raed Hamid Taher Abu Eini is a co-founder.

289. In addition to the companies listed above, the Tabaja Network consists of many more companies affiliated with Adham Tabaja, his family, and/or his companies but not directly headed by him, including the following entities:

- **Al-Yaqout Restaurant** is an affiliated company of City Park SARL and Fantasy World SARL along with Farah Travels Company SAE, Fun World Company, Medical Cooperation Co SAL, Development Group for Touristic Projects SARL, Family House SARL, and Al-Inmaa for Engineering and Contracting SARL.

- **Medical Cooperation Co SAL** (Al-Khiam Hospital SAL) is an affiliated company of City Park SARL and Fantasy World SARL, along with Al-Yakout Restaurant, Farah Travels Company SAE, Fun World Company, Development Group for Touristic Projects SARL, Family House SARL, and Al-Inmaa for Engineering and Contracting SARL.

- **Development Group for Touristic Projects SARL** is an affiliated company of City Park SARL and Fantasy World SARL, along with Al-Yakout Restaurant, Farah Travels Company SAE, Fun World Company, Medical Cooperation Co SAL, Family House SARL, and Al-Inmaa for Engineering and Contracting SARL.

- **New Land SARL**. The following individuals are involved with the company:

  o Imad Ramez Wazani is director, co-founder, partner and authorized signatory;
  o Tareq Ali Hawi is a co-founder and partner;
  o Nabil Mahmoud Assaf (SDGT) is a co-founder and partner;
  o Ahmad Saad was human resources manager; and
  o Ali Hussein al-Ashi is the attorney for the company.

- **Gresco for Contracting and Trading Company SARL**. The following individuals are involved with the company:

  o Muhammad Taha Jumaa is a co-founder, partner and authorized signatory;
  o Ibrahim Waked Issa is a co-founder, partner and authorized signatory;
  o Attallah Jamil Shaito is a co-founder, partner and authorized signatory;
  o Abd al-Karim Ahmad Saad is a co-founder and partner; and
  o Ali Hussein al-Ashi is the attorney for the company.

- **Sanabel for Urban Studies and Architectural Design SAL**. The following individuals are involved with the company:

  o Jihad Muhammad Qansu (SDGT) is chairman and statutory auditor;
  o Ali Hussein al-Haj is a shareholder, co-founder and authorized signatory;
  o Adnan Abd al-Halim Mahdi is a shareholder, co-founder and board member;
  o Rafat Said Yunis is a shareholder, co-founder and board member;
  o Fadi Dawud al-Nimr is a shareholder, co-founder and board member; and
  o Ali Hassan Berro is the attorney for the company.

- **Al-Inmaa General Contractors SARL**. The following individuals are involved with the company:

  o Ibrahim Waked Issa is a co-founder, authorized signatory and partner;

- o Attallah Jamil Shaito is a co-founder, authorized signatory and partner;
- o Haidar Saadallah Zgheib is a co-founder, authorized signatory and partner; and
- o Ali Hussein al-Ashi is the attorney for the company.

- **King Company for Manufacturing Trading Building Materials SARL**. The following individuals are involved with the company:

  - o Ibrahim Waked Issa is an authorized signatory of the company, co-founder and partner;
  - o Ali Muhammad Qansu (SDGT) is an authorized signatory of the company;
  - o Mahdi Ali Awada is an authorized signatory of the company, co-founder and partner;
  - o Muhammad Ahmad Farhat is an authorized signatory of the company;
  - o Muhammad Fayyad Jafal is a co-founder; and
  - o Ali Adham Tabaja is a partner.

- **Development Studies SARL**. The following individuals are involved with the company:

  - o Nabil Mahmoud Assaf (SDGT) is director, co-founder, partner and authorized signatory;
  - o Issam Ahmad Saad (SDGT) is a co-founder and partner;
  - o Hassan Muhammad Attiya is director, co-founder, partner and authorized signatory;
  - o Ahmad Izzat Khalil Muhammad is director, co-founder, partner and authorized signatory;
  - o Zinab Muhammad Saraeb is a founder and partner; and
  - o Ali Hussein al-Ashi is the attorney for the company.

- **Alia Company SARL**. The following individuals are involved with the company:

  - o Nabil Mahmoud Assaf (SDGT) is an authorized signatory of the company, co-founder and partner;
  - o Zaher Hassan Dabuq is an authorized signatory of the company and co-founder;
  - o Yasser Hassan Dabuq is an authorized signatory of the company and co-founder;
  - o Muhammad Adham Tabaja (son of Adham Tabaja) is an authorized signatory of the company, co-founder and partner;
  - o City Food Company SARL is a partner; and
  - o Ali Hussein al-Ashi is the attorney for the company.

- **Farah Tyre Company**. The following individuals are involved with the company:

  o Hassan Muhammad Attiya is an authorized signatory of the company, co-founder and partner;
  o Ali Hussein Tabaja (brother of Adham Tabaja) is an authorized signatory of the company, co-founder and partner;[19]
  o Abbas Musallam Wahbah is a co-founder and partner; and
  o Ali Hussein al-Ashi is the attorney for the company.

- **Cheaito Group SARL**. The following individuals are involved with the company:

  o Attallah Jamil Shaito is an authorized signatory of the company and partner;
  o Ahmad Muhammad Shaito is an authorized signatory of the company and co-founder;
  o Fairuz Khalil Shaito is a co-founder and partner;
  o Attallah Khalil Shaito is a co-founder;
  o Najah Khalil Shaito is a co-founder and partner;
  o Zainab Khalil Shaito is a co-founder and partner; and
  o Hisham Ali Faqih is the attorney for the company.

- **Lebanese Bread & Confectionery Company SAL**. The following individuals are involved with the company:

  o Hassan Muhammad Tabaja is general director, chairman, shareholder, co-founder and authorized signatory;
  o Bassam Muhammad Tabaja is vice-chairman, board member, co-founder, shareholder and authorized signatory;
  o Jihad Muhammad Qansu (SDGT) is statutory auditor;
  o Ahmad Mustafa Mahmoud Hammoud is a shareholder, co-founder and board member; and
  o Ali Hussein al-Ashi is the attorney for the company.

- **African Fish Company (Offshore) SAL**. The following individuals are involved with the company:

  o Jihad Muhammad Qansu (SDGT) is a co-founder;
  o Ali Muhammad Qansu (SDGT) is statutory auditor;
  o Muhammad Abdallah al-Amin (SDGT) is a co-founder;
  o Ahmad Muhammad Makke is general director, chairman, shareholder, and authorized signatory;

---

[19]     Defendant MEAB took over Mr. Tabaja's shares in the company.

- o Khalil Hassan Faqih is a shareholder, co-founder and board member;
- o Muhammad Khadir Mattar is a shareholder and board member; and
- o Faruq Muhammad Raef Hammoud is the attorney for the company.

- **Africa Invest Company (Offshore) SAL**. The following individuals are involved with the company:

  - o Jihad Muhammad Qansu (SDGT) is a co-founder;
  - o Muhammad Abdallah al-Amin (SDGT) is chairman, shareholder, co-founder and authorized signatory;
  - o Rulan Amin Madi is statutory auditor;
  - o Khalil Hassan Faqih is a shareholder and board member;
  - o Ali Khalil Faqih is a shareholder and board member;
  - o Hassan Said Farran is a co-founder; and
  - o Malik Jamil al-Sayd is the attorney for the company.

- **Farah Trading Company for Iron & Building Materials SAE**. The following individuals are involved with the company:

  - o Ali Hussein Tabaja (brother of Adham Tabaja) is an authorized signatory of the company and partner;
  - o Muhammad Ali Hawi is an authorized signatory of the company and partner;
  - o Ibrahim Waked Issa is an authorized signatory of the company and partner;
  - o Batul Adham Tabaja is a partner;
  - o Fatima al-Zahra Adham Tabaja is a partner; and
  - o Wala Tabaja (daughter of Adham Tanaja) is a partner.

- **King Charcoal SARL**. The following individuals are involved with the company:

  - o Ali Hussein Tabaja (brother of Adham Tabaja) is an authorized signatory of the company and partner;
  - o Muhammad Adham Tabaja (son of Adham Tabaja) is an authorized signatory of the company and partner; and
  - o Hussein Abd al-Rida Tabaja is an authorized signatory of the company and partner.

290. The following individuals were designated as SDGTs by OFAC as a result of their connections with Adham Hussein Tabaja:

- Hussein Ali Faour worked with Adham Tabaja to secure Al-Inmaa Engineering and Contracting projects in Iraq. Mr. Faour is a member of

Hezbollah's Islamic Jihad Organization and manager of Hezbollah's "Car Care Center" (SDGT).

- Muhammad al-Mukhtar Kallas provided financial services to Adham Tabaja through his work as an accountant for SDGT Al-Inmaa Engineering and Contracting.

- Hassan Jamal al-Din provided financial services to Adham Tabaja through his work as an accountant for SDGT Al-Inmaa Engineering and Contracting.

- Shibl Muhsin Ubayd al-Zaydi facilitated money transfers from Iraq to Lebanon on behalf of Tabaja. Mr. al-Zaydi is a partner and founder of SDGT Global Cleaners SARL.

- Muhammad Abdallah al-Amin assisted Adham Tabaja in concealing funds and circumventing the impact of sanctions.

- Muhammad Noureddine used his company Trade Point International SARL (SDGT) in order to provide financial services to Adham Tabaja and his company Al-Inmaa Engineering and Contracting (SDGT).

- Hamdi Zaher El Dine, an employee of SDGT Trade Point International SARL, transferred funds to Adham Tabaja and to employees of Al-Inmaa Engineering and Contracting.

- Yussuf Hashim oversees Hezbollah operations in Iraq and arranged for the security and protection of Mr. Tabaja inside Iraq.

- Jihad Muhammad Qansu provided financial services to Adham Tabaja through his work as a financial manager for Al-Inmaa Engineering and Contracting (SDGT). Mr. Qansu assisted Adham Tabaja in accounting matters.

- Ali Muhammad Qansu maintained millions of dollars in bonds for Adham Tabaja.

- Issam Ahmad Saad is a managing partner and minority shareholder in Al-Inmaa Engineering and Contracting (SDGT).

- Nabil Mahmoud Assaf is purchasing manager and shareholder in Al-Inmaa Engineering and Contracting (SDGT).

- Abdul Latif Saad is the manager of Al-Inmaa Engineering and Contracting – Baghdad Branch (SDGT), and as such coordinated with Car Care Center (SDGT) and Global Cleaners SARL (SDGT) – both

companies are subsidiaries of Adham Tabaja's Al-Inmaa Group for Tourism Works (SDGT).

- Muhammad Badr al-Din is the manager of Al-Inmaa Engineering and Contracting – Basra Branch (SDGT) in Iraq.

- Muhammad Ibrahim Bazzi provided funds to Adham Tabaja and held a joint line of credit together with Mr. Tabaja.

- Ali Yussuf Charara worked together with Adham Tabaja on oil ventures in Iraq.

### C. Sultan Khalifa As'ad

291.    Sultan Khalifa As'ad is a prominent and longstanding Hezbollah leader and financier who serves as Deputy Chairman of the Executive Council for Municipal Affairs for Hezbollah and formerly headed the Finance Unit of Hezbollah.

292.    He was the founder of Hezbollah's construction arm, Jihad al-Bina, and one of its main front companies, the Meamar Company for Engineering and Development.

293.    Mr. As'ad was also the co-founder and partner of Hezbollah's think tank, the Consultative Center for Studies and Documentation.

294.    Mr. As'ad was also a founder and early shareholder in the Lebanese Communication Group (an SDGT), the parent company of Hezbollah's satellite television station and SDGT, *Al-Manar*.

295.    Mr. As'ad owns several properties associated with Hezbollah, including the building that houses the Lebanese Arts Association – Risalat, one of Hezbollah's leading cultural institutions.

296.    Mr. As'ad is also the largest shareholder in Compu House SARL, a Hezbollah-controlled company serving as a wholesale and retail seller of computers and software.

### D.  Ali Yussuf Charara (a/k/a Ali Sharara)

297.    SDGT Ali Yussuf Charara is a Hezbollah operative and financier who owns and operates a number of companies with his brother, Muhammad Yussuf Charara.

298.    Ali Yussuf Charara is chairman, general manager and the main shareholder of Spectrum Investment Group Holding SAL, a Lebanon-based telecommunications company that provides integrated telecommunications services in the Middle East, Africa, and Europe. On January 7, 2016, both Ali Yussuf Charara and Spectrum Investment Group Holding SAL were designated as SDGTs by the U.S. Department of the Treasury.

299.    According to the U.S. Department of the Treasury, Hezbollah invests millions of U.S. dollars with Mr. Charara on projects that financially support the organization.

300.    Ali Yussuf Charara also worked with Hezbollah supporter Kassem Hejeij (SDGT) of Defendant MIDDLE EAST AND AFRICA BANK and Adham Hussein Tabaja (SDGT) on oil ventures in Iraq.

301.    Mr. Charara is involved in several companies, including:

- **Spectrum Investment Group Holding SAL** (SDGT), which is a Lebanon-based telecommunications services company. The following individuals are involved with the company:

  - Ali Yussuf Charara is the chairman, co-founder, authorized signatory and the main shareholder (holds 750 shares);
  - Abd al-Halim al-Shaykh Musa Charara is the statutory auditor for the company;
  - Yussuf Abd al-Amir Charara is a shareholder (holding 20 shares) and a member of the board of directors;
  - Muhammad Yussuf Charara is a shareholder (holding 230 shares), co-founder and a member of the board of directors;
  - Ali Ibrahim Charara is a co-founder of the company; and
  - Muhammad Farid Mattar is the firm's attorney.

- **Spectrum International Investment Holding SAL** (SDGT), which is a Lebanon-based telecommunications services company. The following individuals are involved with the company:

- o  Ali Yussuf Charara is chairman of the board of directors, a partner (holding 1,760 shares), co-founder and authorized signatory;
- o  Muhammad Yussuf Charara is a partner (holding 200 shares), co-founder and member of the board of directors;
- o  Edmond Yussuf Saadeh serves as statutory auditor for the company; and
- o  Muhammad Farid Mattar is the attorney, as well as a partner (holding 40 shares) and a member of the board of directors.

- **Spectrum (Offshore) SAL**. The following individuals are involved with the company:

  - o  Ali Yussuf Charara (SDGT) is chairman, authorized signatory, co-founder and a shareholder;
  - o  Edmond Yussuf Saadeh serves as statutory auditor for the company;
  - o  Muhammad Yussuf Charara (Ali's brother) is a co-founder, shareholder and board member;
  - o  Yussuf al-Shaykh Abd al-Amir Charara is a shareholder, co-founder and board member; and
  - o  Muhammad Farid Mattar is the attorney for the company (serves as attorney for many Hezbollah-controlled companies).

- **B.I. Group Holding SAL**. The following individuals are involved with the company:

  - o  Ali Yussuf Charara (SDGT) is a co-founder and a majority shareholder;
  - o  Muhammad Yussuf Charara (Ali's brother) is a co-founder and shareholder; and
  - o  Mohammad Farid Mattar is the attorney for the company as well as a co-founder and shareholder.

- **Signum International Holding SAL**. The following individuals are involved with the company:

  - o  Ali Yussuf Charara (SDGT) is a co-founder and a major shareholder;
  - o  Carla Saba is a co-founder and a major shareholder; and
  - o  Mohammad Farid Mattar is the attorney for the company as well as a co-founder and minor shareholder.

- **Car Escort Services (Offshore) SAL**, which is an import/export company based in Lebanon, designated an SDGT by the U.S. Department of the Treasury. The following individuals are involved with the company:

68

- o Fuad Haidar Najm is liquidator;
- o Ali Muhammad Kharrubi (SDNT) is chairman, general manager, co-founder, authorized signatory and co-equal shareholder in the company;
- o Ali Yussuf Charara (SDGT) is a co-founder, board member, and co-equal shareholder in the company;
- o Muhammad Ibrahim Bazzi (SDGT) is a co-founder, board member, and co-equal shareholder in the company;
- o Edmond Yussuf Saadeh serves as statutory auditor for the company; and
- o Muhammad Farid Mattar is the attorney for the company.

- **Hoda for Touristic Services & Management Holding SAL**. Defendants SGLB and BANQUE LIBANO-FRANÇAISE maintain accounts for this company. The following individuals are involved with the company:

  - o Abbas Abd al-Latif Fawaz is chairman, co-founder, shareholder (holds 17,500 shares), and authorized signatory for the company;
  - o Ali Ahmad Ismail is a co-founder and shareholder (holds 7,500 shares);
  - o Ali Yussuf Charara (SDGT) is a co-founder, shareholder (holds 5,000 shares) and member of the board of directors;
  - o Jalal Muhammad Rashed Bitar is a co-founder and shareholder (holds 2,000 shares);
  - o Fadl Abbas Fawaz is a shareholder (holds 2,500 shares), co-founder and member of the board of directors;
  - o Sadeq Abbas Fawaz is a shareholder (holds 2,500 shares), co-founder and member of the board of directors;
  - o Ziyad Ali Ismail is a shareholder (holds 2,500 shares), co-founder and member of the board of directors;
  - o Ahmad Ali Ismail is a shareholder (holds 2,500 shares), co-founder, authorized signatory and member of the board of directors;
  - o Wa'il Jalal Bitar is a shareholder (holds 1,500 shares) and co-founder of the company;
  - o Nasser Jalal Bitar is a shareholder (holds 1,500 shares), co-founder and member of the board of directors;
  - o Fadi Fawzi Fawaz is a co-founder of the company;
  - o Abd al-Reda Abdallah Khorshid is a shareholder (holds 5,000 shares);
  - o Price-Waterhouse-Coopers is the audit firm for the company; and
  - o Muhammad Farid Mattar is the attorney for the company.

- **One Globe Operator SAL Holding**. The following individuals are involved with the company:

- o E.B.D. Group Holding SAL is a shareholder (holds 818 shares) and member of the board of directors;
- o Ali Yussuf Charara (SDGT) is a co-founder of the company;
- o Samir Subhi Abu-Hassan is an authorized signatory and a shareholder (holds one share);
- o Raghid Wasif Charara is an authorized signatory, a shareholder (holds 100 shares), and member of the board of directors;
- o Ihab Awsaf Ghurayb is an authorized signatory, a shareholder (holds 80 shares), and member of the board of directors;
- o Ali Ibrahim Charara (*see* above) is a co-founder of the company;
- o Abd al-Ghani Ra'if Qassem is a co-founder of the company;
- o Wajih Masoun Maliki is a shareholder (holds one share), chairman and authorized signatory;
- o Abd al-Halim al-Shaykh Mussa Charara serves as the statutory auditor for the company; and
- o Muhammad Farid Mattar is the attorney for the company.

- **International Group Holding SAL**. The following individuals and entities are involved with the company:

  - o Abbas Abd al-Latif Fawaz is director general, chairman, majority shareholder (holding 23,950 shares), co-founder, and authorized signatory for the company;
  - o Ali Ahmad Ismail is vice president, a shareholder (holds 3,750 shares), co-founder, authorized signatory and member of the board of directors;
  - o Ziyad Ali Ismail is a shareholder (holding 3,750 shares), co-founder, and member of the board of directors;
  - o Nasrin Ali Ismail is a shareholder (holds 3,750 shares) and co-founder of the company;
  - o Ahmad Ali Ismail is a shareholder (holds 3,750 shares), co-founder and member of the board of directors;
  - o Fadl Abbas Fawaz is a shareholder (holds 5,000 shares), co-founder and member of the board of directors;
  - o Sadeq Abbas Fawaz is a shareholder (holds 3,000 shares), co-founder and member of the board of directors;
  - o Farah Abbas Fawaz is a shareholder (holds 3,000 shares) and co-founder of the company;
  - o Ali Yussuf Charara is a co-founder of the company;
  - o Abd al-Reda Abdallah Khorshid is co-foudner of the company;
  - o Hoda for Touristic Services & Management Holding SAL is a minor shareholder in the company;
  - o Wassim Hatem Shahin serves as the company's statutory auditor for the company; and
  - o Muhammad Farid Mattar is the attorney for the company.

- **Medical Aid (Offshore) SAL** (MEDAID) was founded on December 12, 2002. The following individuals are involved with the company:

  o  Ali Yussuf Charara (SDGT) is a co-founder of the company; and
  o  Mohammed Samir Ali Ahmed is a co-founder of the company.

- **EBD Teltac (Offshore) SAL**, founded in 2003, operates in Iran as well as Lebanon. The following individuals are involved with the company:

  o  Ali Yussuf Charara (SDGT) is a co-founder of the company;
  o  Ali Ibrahim Charara is a co-founder of the company;
  o  Mohammad Farid Mattar is a co-founder of the company;
  o  Wajih Masoun al-Maliki is a co-founder of the company;
  o  Abd al-Halim Charara is a co-founder of the company;
  o  One Globe Operator Holding SAL holds 900 shares;
  o  Spectrum Investment Group Holding SAL (SDGT) holds 73 shares; and
  o  EBD Group (Holding) SAL holds 25 shares.

### E.  The Tajideen Family (a/k/a "Taj al-Din")

302.    The Tajideen family owns many businesses in Lebanon and several other countries.

303.    There were originally eleven siblings, of which nine are or were active in the Tajideen Network in some fashion:

- Kassim Muhammad Tajideen;
- Mahmoud Muhammad Tajideen;
- Hassan Muhammad Tajideen (deceased);
- Ali Muhammad Tajideen;
- Hussein Muhammad Tajideen;
- Fatimah Muhammad Tajideen;
- Yussuf Muhammad Tajideen;
- Ibrahim Muhammad Tajideen;
- Ahmad Muhammad Tajideen;
- Jaffar Muhammad Tajideen; and
- Mariam Muhammad Tajideen.

304.    The Tajideen brothers Kassim Tajideen, Ali Tajideen and Hussein Tajideen are Lebanese businessmen who have been designated as SDGTs for their role as Hezbollah fundraisers, money launderers, and financial contributors. Further, the other Tajideen family

members listed above, though not (yet) designated as SDGTs, play supporting roles in the Tajideen Network.

### (1) Kassim Tajideen

305.    The eldest brother, Kassim Tajideen, has built a global network of food-trading companies and real-estate holdings in Lebanon and Africa.

306.    In 2003, Kassim Tajideen was arrested in Belgium in connection with fraud, money laundering, and diamond smuggling.

307.    On May 27, 2009, Kassim Tajideen was designated as an SDGT and identified by the U.S. Department of the Treasury as "an important financial contributor to Hizballah who operates a network of businesses in Lebanon and Africa. He has contributed tens of millions of dollars to Hizballah and has sent funds to Hizballah through his brother, a Hizballah commander in Lebanon. In addition, Kassim Tajideen and his brothers run cover companies for Hizballah in Africa."

308.    Kassim Tajideen owns or controls several companies designated as SDGTs, including the following entities:

- **Tajco Company** (LTD; SARL; LLC). On December 9, 2010, Tajco was designated as an SDGT. Tajco is a multinational company involved with real estate, international trade, and merchandising based in The Gambia. It manages a series of grocery stores in The Gambia called "Kairaba Shopping Centre" (an SDGT), as well as other organizations throughout Lebanon, Sierra Leone, the Democratic Republic of Congo, Angola, and the British Virgin Islands. In 2013, it was reported that the company's name was changed to "Senesco Banjul." The following individuals are involved with the company:

  o  Kassim Tajideen is owner and founder (as of 2007);
  o  Ali Tajideen is a co-owner and director general of the company;
  o  Hassan Ali Tajideen is executive director of the company; and
  o  Hussein Tajideen is a co-owner and managing director in The Gambia.

- **Kairaba Supermarket** (a/k/a Kairaba Shopping Center). Kairaba Supermarket is a subsidiary business of SDGT Tajco Ltd. Both companies name Hussein Tajideen as the same point of contact and manager, and both use the same primary business address.[20]

- **Ovlas Trading SA**. Ovlas Trading SA is the parent company of Ovlas Trading (Offshore) SAL and Beton Liban SAL (a/k/a BL SAL). The company deals with general trading and food manufacturing. Ovlas Trading SA was designated as an SDGT by the U.S. Department of the Treasury on December 9, 2010. Ovlas Trading SA opened a branch in the British Virgin Islands in 2005, shortly after being founded in Lebanon. The company has held accounts in the following Defendant banks: BLOM BANK, LEBANESE SWISS BANK, BANQUE LIBANO-FRANCAISE SAL, BANK OF BEIRUT AND THE ARAB COUNTRIES SAL, and LEBANON AND GULF BANK. The following individuals are involved with the company:

  o Kassim Tajideen is the owner, according to the U.S. Department of the Treasury;
  o Hassan Muhammad Tajideen was the founder, managing director and a shareholder;
  o Ahmad Hassan Tajideen is a shareholder;
  o Najma Hassan Jabir (Hassan's wife) is a shareholder; and
  o Nadin Hassan Tajideen (Hassan's and Najma's daughter) is a shareholder.

- **Golfrate Holdings (Angola) LDA**. Owned by Kassim Tajideen, Golfrate is a wholly owned subsidiary of Ovlas Trading, with part of its main operations located in Angola.

- **Afri Belg Commercio E Industria LDA**. Afri Belg Commercio E Industria LDA, is a subsidiary of Ovlas Trading, and is presided over by Kassim Tajideen.

- **Grupo Arosfran Empreendimentos E Participacoes SARL** (Grupo Arosfran). Kassim Tajideen founded Grupo Arosfran in Luanda, Angola, in November 1991. He has been the primary decision-maker and leader of Grupo Arosfran, and a member of the Board of Directors. Grupo Arosfran is listed as either a branch or a subsidiary of Ovlas Trading on multiple international business websites.

---

[20]     A December 17, 2013 OFAC enforcement action demonstrates the way the Tajideen Network conducts its operations between Africa and Lebanon via U.S. dollar-clearing in the U.S. *See e.g.* https://www.U.S. Department of the Treasury.gov/resource-center/sanctions/CivPen/Documents/20131217_hsbc.pdf.

309.    Kassim's brothers, Ali and Hussein Tajideen, were designated as SDGTs by the U.S. Department of the Treasury. Ali Tajideen and Hussein Tajideen were business partners of Kassim Tajideen.

### (2) Ali Tajideen

310.    Ali Tajideen was a Hezbollah commander in southern Lebanon, providing cash to Hezbollah in tranches as large as $1 million (U.S.) each.

311.    Ali Tajideen is also a major player in Jihad al-Bina, the Lebanon-based construction company formed and operated by Hezbollah (described above), which was designated as an SDGT by the U.S. Department of the Treasury in February 2007.

312.    As of December 2010, and since at least December 2007, Ali Tajideen used Tajco SARL, operating as Tajco Company LLC, as the primary entity to purchase and develop properties in Lebanon on behalf of Hezbollah.

313.    Under the name of Tajco Company LLC, Ali Tajideen developed the properties, established mortgage loans, and acquired mortgage-life insurance to cover the mortgage borrowers.

314.    Ali Tajideen was designated by OFAC as an SDGT on December 9, 2010.

315.    Ali Tajideen controls or is affiliated with the following companies in Lebanon:

- **Al-Omran SARL**, which deals mainly with the buying and selling of ready-made concrete. The following individuals are involved with the company:

  o   Hassan Ali Tajideen was its authorized signatory before his death;
  o   Ali Muhammad Tajideen is a partner holding 100 shares;
  o   Hassan Ali Tajideen is a partner holding 100 shares; and
  o   Muhammad Ni'mah Shams al-Din is a partner holding 100 shares.

- **Al-Ataa Company**. Hassan Bazoun and Partners, which deals with import and export of real estate-related materials and products. The following individuals are involved with the company:

- o Ali Tajideen is a partner, holding 3,729 shares;
- o Ali Ibrahim Tajideen (Ali Tajideen's nephew, Ibrahim Tajideen's son) is a partner, holding 648 shares;
- o Reda Ali Atawi is another prominent partner in the company;
- o Ibrahim Muhammad Rakin is the company's auditor. He also serves as auditor for General Medical Provider (Offshore) SAL (a/k/a GMP Offshore SAL) – a company belonging to the Qauq family, specifically to Zuhayr Yahya Qauq and his daughters. Zuhayr Qauq is Nabil Qauq's brother – the latter is a deputy of Hashem Safieddine's, Head of Hezbollah's Executive Council.

- **Advanced Sports Center SAL** (ASC), which runs a sports center located in Beirut. The following individuals are involved with the company:

  - o Yussuf Muhammad Tajideen is a co-founder; and
  - o Ali Tajideen is a co-founder.

- **Ad-Diyar Trading and Contracting SARL**, which deals with general trading, contracting, and real estate. The following individuals are involved with the company:

  - o Ali Tajideen is a partner in the company, owning 33 percent of the shares;
  - o Hassan Ali Suwaydan is another partner in the company, owning 33 percent of the shares; and
  - o Ibrahim Mahmoud Yussuf is a partner in Ad-Diyar, owning 33 percent of the shares. He is another prominent member of the Tajideen Network, as partner and board member in BMC SAL and Société Orientale Libanaise d'Investissement et Développement SAL.

- **Al-Izdihar for Contracting SARL**, which deals with real estate and construction. The following individuals are involved with the company:

  - o Ali Tajideen is the founder;
  - o Hassan Ali Abbas is a co-founder and a partner (holding 100 shares). He is also a partner in the Tajideen company Atwi and Abbas Trading Company, alongside Hassan Ali Tajideen and Amir Afif Abu Khalil;
  - o Hassan Ali Suwaydan is a partner; and
  - o Amir Afif Abu Khalil is the company's attorney.

- **Company for Development and Prosperity**, which deals mainly with the establishment, construction, and investment in parks, hotels, restaurants, and swimming pools. The following individuals are involved

with the company:

- o Yussuf Muhammad Tajideen owns 17 percent of the company (5,000 shares);
- o Samiha Ibrahim Tajideen (Yussuf's wife) owns 17 percent of the company and is a member of the board of directors;
- o Ali Muhammad Tajideen is chairman, signed commissioner, and holds 10,000 shares;
- o Shawqi Ra'if Abu Khalil is registered as auditor, shareholder, and member of the board of directors; and
- o Amir Afif Abu Khalil is the attorney for the company.

- **Hyram Maritime SAL**, which was involved in transportation and logistics. According to its auditor, the company was closed down and has not been operational since 2013. The following individuals were involved with the company:

  - o Ali Tajideen was co-founder;
  - o Yussuf Tajideen was co-founder;
  - o Ali Hussein Saad was shareholder (held 4,000 shares), signed commissioner and chairman;
  - o Khadijah Amin Mahmoud was the company's vice-president, shareholder (owned 4,000 shares), and board member;
  - o Elissar Hussein Sayegh (Fatimah Tajideen's daughter, Ali Tajideen's niece) was a shareholder (owns 2,000 shares) and board member;
  - o Shawqi Ra'if Abu Khalil was auditor and held 4,000 shares; and
  - o Amir Afif Abu Khalil was the company's attorney.

- **Tajco Company SAE**. Tajco Company SAE is the Lebanese sister company of Tajco. Tajco Company SAE has been used for many years as Hezbollah's conduit for purchasing land in Lebanon to expand its areas of control and to acquire strategic parcels for political and strategic purposes. The following individuals are involved with the company:

  - o Kassim Tajideen (SDGT) is a co-founder;
  - o Ali Tajideen (SDGT) is a partner and co-founder;
  - o Nur al-Ayn Muhammad Ali Utwah (Ali Tajideen's wife) is a partner;
  - o Hussein Tajideen (SDGT) is a partner;
  - o Hassan Ali Tajideen is a partner;
  - o Mahmoud Tajideen is a partner and co-founder;
  - o Ibrahim Tajideen is a co-founder;
  - o Yussuf Tajideen is a co-founder; and
  - o Amir Afif Abu Khalil serves as the attorney.

- **Tajideen Building and Construction Enterprise** (a/k/a Tajideen Establishment for Building & Construction), which was established in

2004. The following individual, among others, is involved with the company:

○  Ali Tajideen is listed as a dealer.

### (3) Hussein Tajideen

316.    Both Ali and Hussein Tajideen are among Hezbollah's top financiers in Africa. Hussein Tajideen is a primary Hezbollah fundraiser and prominent Hezbollah supporter in The Gambia.

317.    As of December 2010, and since at least March 2006, Hussein Tajideen owned 50 percent of Tajco Ltd, in Banjul, The Gambia, and served as the managing director of the company.

318.    Hussein Tajideen was designated an SDGT by the U.S. Department of the Treasury on December 9, 2010 together with his brother, Ali.

319.    Tajideen resided in The Gambia for 15 years until he was expelled on June 7, 2013.

### (4) Ahmad Tajideen

320.    Ahmad Tajideen manages the family's businesses and money laundering operations in the Congo.

321.    His food and diamond trade company Congo Futur is a front organization for Hezbollah and has been designated by OFAC as an SDGT.

322.    One of Congo Futur's subsidiary companies is Trans-M,[21] which won lucrative contracts from the Congolese government for forestry rights, contracts that netted Mr. Tajideen hundreds of millions of U.S. dollars in revenue and profits.

323.    Ahmad Tajideen controls or is affiliated with the following companies in Lebanon:

- **Al-Massar Real Estate SAL**. Although not (yet) designated as an SDGT, Al-Massar Real Estate SAL is clearly controlled by the Tajideen family. The following individuals are involved with the company:

---

[21]      Trans-M has changed its name to Cotrefor.

- o Ahmad Muhammad Tajideen is a member of the board of directors;
- o Jaffar Muhammad Tajideen is a member of the board of directors;
- o Yussuf Muhammad Tajideen is the company's chairman and a member of the board of directors;
- o Qassem Hassan Tajideen (their nephew) is a shareholder and board member;
- o Shawqi Ra'if Abu Khalil is the auditor;
- o Bassam Zafir Tamim is the accountant; and
- o Amir Afif Abu Khalil serves as the attorney.

- **Bream Star Line SAL Offshore**. The following individuals are involved with the company:

  - o Ahmad Tajideen is a shareholder and co-founder;
  - o Ali Hussein Saad is a founder, chairman, shareholder and signed commissioner; and
  - o Khadijah Amin Mahmoud is deputy chairman, shareholder, co-founder and member of the board of directors.

### (5) Jaffar Muhammad Tajideen

324.    Jaffar Muhammad Tajideen is a member of the board of directors of Al-Massar Real Estate SAL (discussed above), together with his brothers Ahmad and Yussuf Muhammad Tajideen (the company's chairman).

### (6) Fatimah Tajideen

325.    Fatimah Tajideen was born in 1966. Fatimah Tajideen is the sister of the aforementioned Tajideen brothers. Although not directly involved in the Tajideen Network, her husband, Hussein Tawfiq Sayegh, and their daughter, Elissar Hussein Sayegh, are involved in several Tajideen holdings:

- **Afrimex (Offshore) SAL**. The following individuals are involved with the company:

  - o Hussein Tawfiq Sayegh is a founder, vice president/vice chairman, member of the board of directors and shareholder;
  - o Yussuf Muhammad Tajideen is a founder;
  - o Elissar Hussein Sayegh is chairwoman and shareholder;
  - o Hana Abdelkarim Jawad (Fatimah Tajideen's sister-in-law, Ibrahim Tajideen's wife) is a member of the board of directors;

- Amir Afif Abu Khalil serves as the attorney; and
- Shawqi Ra'if Abu Khalil serves as statutory auditor.

- **Union Real Estate Development Company SAL**. Deals with real estate, construction, and tourism. The company is owned wholly by members of the Tajideen family. The following individuals are involved with the company:

  - Hussein Tawfiq Sayegh is chairman, co-founder, signed commissioner and a shareholder (holds 75 shares);
  - Mahmoud Muhammad Tajideen is a majority shareholder (holding 750 shares), board member and co-founder;
  - Yussuf Muhammad Tajideen is vice president and co-founder, holding 100 shares;
  - Khadijah Hassan Matar (Mahmoud Tajideen's wife, Yussuf's sister in law) is a board member, co-founder, and holds 75 shares;
  - Shawqi Ra'if Abu Khalil is the company's auditor; and
  - Amir Afif Abu Khalil serves as the attorney.

- **Hyram Maritime SAL** (discussed above).

### (7) Mahmoud Muhammad Tajideen

326.  Mahmoud Muhammad Tajideen is the brother of the aforementioned Tajideen brothers (SDGTs).

327.  Mahmoud Muhammad Tajideen is directly involved in the Tajideen Network through two Tajideen holdings:

- **Union Real Estate Development Company SAL** (discussed above); and

- **Tajco Company SAE** (discussed above).

### (8) Yussuf Muhammad Tajideen

328.  Yussuf Muhammad Tajideen was born in 1967. He is the brother of the aforementioned Tajideen brothers (SDGTs).

329.  Yussuf Muhammad Tajideen is directly involved in the Tajideen Network through more than a dozen Tajideen holdings, including the following Hezbollah entities:

- **Tajco Company SAE** (discussed above).

- **Hyram Maritime SAL** (discussed above).

- **Al-Massar Real Estate SAL** (discussed above).

- **Afrimex (Offshore) SAL** (discussed above).

- **Al-Dalhamiya Country Club Company**. The following individuals are involved with the company:

  o Yussuf Muhammad Tajideen serves as general manager, chairman of the board, and shareholder;
  o Abdallah Tajideen (his son) serves as vice-chairman and a major shareholder;
  o Ibrahim Muhammad Tajideen is a principal shareholder;
  o Najmah Hassan Jabir (late Hassan Muhammad Tajideen's wife) is a principal shareholder;
  o Wafa Muhammad Nussar Alamah is a shareholder;
  o Wissam Hussein Hammoud is the attorney for the company;
  o Hussein Abd al-Muttalib Jawad is a shareholder; and
  o Shawqi Ra'if Abu Khalil serves as statutory auditor.

- **Rifieh Pour L'amélioration** (a/k/a Rural Real Estate Improvement SARL), which is a Lebanese real estate company founded in 1975. The company's offices are located in the Tajco building in Beirut. The following individuals are involved with the company:

  o Ibrahim Muhammad Tajideen is the majority shareholder, holding 69 percent of the company's shares;
  o Yussuf Muhammad Tajideen is a partner and shareholder;
  o Abduallah Yussuf Tajideen (Yussuf's son) is a partner and shareholder;
  o Hussein Abd al-Muttalib Jawad is a partner; and
  o Wissam Hussein Hammoud is the company's lawyer.

- **Union Real Estate Development Company SAL** (discussed above).

- **Advanced Sports Center - ASC SAL** (discussed above).

- **Lebanese Real Estate Development & Investment Company SAL**, which deals with purchasing real estate and the rights to it, leasing, investments, construction and tourism. The following individuals are involved with the company:

  o Yussuf Muhammad Tajideen is member of the board of directors and holds 12.5 percent of its shares (125 shares);

- o Najmah Hassan Jabir (Yussuf's sister-in-law, Hassan Muhammad Abd al-Hassan Tajideen's wife) is registered as founder, signed commissioner, head of board of directors, and holds 50 percent of the shares;
  - o Shawqi Ra'if Abu Khalil is registered as auditor and supervising commissioner; and
  - o Amir Afif Abu Khalil is the attorney for the company.

- **Company for Development and Prosperity** (discussed above).

- **Distributions and Agencies Company SAL**, which deals with commercial works such as selling, buying, exporting, importing, and renting. The following individuals are involved with the company:

  - o Yussuf Muhammad Tajideen is the vice-president, signed commissioner, member of the board of directors, and owns 1,000 shares;
  - o Ahmad Hassan Tajideen is head of the board of directors, signed commissioner, and shareholder (26,500 shares);
  - o Hassan Ali Tajideen is a shareholder (2,000 shares);
  - o Ahmad Abd al-Karim Said Muhammad Jawad (Ibrahim Muhammad Tajideen's brother-in-law) is a shareholder (500 shares) and a member of the board of directors;
  - o Shawqi Ra'if Abu Khalil is the auditor; and
  - o Amir Afif Abu Khalil is the attorney for the company.

### (9) Hassan Muhammad Tajideen

330.   Hassan Muhammad Tajideen was born in 1960. He was the third oldest brother after Kassim and Mahmoud.

331.   Hassan was on board Ethiopian Airlines Flight 409 when it crashed into the Mediterranean Sea shortly after take-off from Beirut, Lebanon, in January 2010.

332.   Hassan Muhammad Tajideen was also heavily involved in the following Hezbollah-controlled companies:

- **Ovlas Trading SA** (discussed above); and

- **Al-Omran SARL** (discussed above).

### (10)   Ibrahim Muhammad Tajideen

333.   Ibrahim is the younger brother of the aforementioned Tajideen brothers. Ibrahim, alongside his wife Hana Abd al-Karim Jawad and their two adult children, Duaa and Ali, is involved with prominent companies and business of the Tajideen Network, directly linked to Hezbollah.

334.   Ibrahim Tajideen is directly affiliated with the following Hezbollah-controlled companies:

- **Tajco Company SAE** (discussed above).

- **Enmaa Dalhamiya Company SAL** (a/k/a Deliku), which deals with real estate and construction. The following individuals are involved with the company:

  - Najmah Hassan Jabir (Hassan Muhammad Tajideen's wife) is the manager, a board member and partner (holds 785 shares);
  - Yussuf Muhammad Tajideen is chairman and partner (holds 829 shares);
  - Abdallah Yussuf Tajideen (Yussuf Muhammad Tajideen's son) is vice-president, a board member and partner (holds 536 shares);
  - Ibrahim Tajideen is the majority shareholder (holding 13,510 shares) and a board member;
  - Wafa Muhammad Nussar Alamah is a shareholder;
  - Hussein Abd al-Muttalib Jawad is a shareholder;
  - Shawqi Ra'if Abu Khalil is auditor; and
  - Wissam Hussein Hammoud is the attorney for the company.

- **Al-Dalhamiya Country Club Company** (discussed above).

- **Rifieh Pour L'amélioration** (discussed above).

### F.  Muhammad Ibrahim Bazzi

335.   Muhammad Ibrahim Bazzi is a Hezbollah financier who has fundraised millions of dollars for Hezbollah through his business activities in Belgium, Lebanon, Iraq, and West Africa.

336.   On May 17, 2018, Mr. Bazzi was designated as an SDGT by the U.S. Department of the Treasury. Five companies owned or controlled by Mr. Bazzi were also designated by the

U.S. Department of the Treasury on the same date.

337.    The following OFAC designated companies are owned or controlled by Mr. Bazzi:

- **Global Trading Group NV**;

- **Euro African Group**;

- **Africa Middle East Investment Holding SAL**;

- **Premier Investment Group (Offshore) SAL**; and

- **Car Escort Services (Offshore) SAL** (discussed above).

338.    Between 2009 and 2011, Mr. Bazzi had business connections with Abdallah Safieddine, the head of Hezbollah's External Security Organization Business Affairs Component (BAC) and Hezbollah's representative to Iran.

339.    In 2011, Mr. Bazzi and Mr. Safieddine worked to resolve a dispute and reestablish relations between Iran and the state of Gambia. According to the U.S. Department of the Treasury, Mr. Bazzi is a "close associate" of Yahya Jammeh, the former president of The Gambia who was sanctioned by the United States in December 2017 for his record of human rights abuses and money laundering.

340.    Mr. Bazzi maintains ties to other U.S. designated individuals, including Hezbollah financiers Adham Tabaja and Ali Yussuf Charara. He also has links to drug dealers and the U.S.-designated Ayman Joumaa, who runs Hezbollah's premiere drug trafficking network.

### G.  Kamel Amhaz

341.    Kamel Muhammad Amhaz and his brother Issam Muhammad Amhaz were designated SDGTs by the U.S. Department of the Treasury in July 2014 for aiding the procurement of sophisticated electronics for military equipment, including unmanned aerial vehicles ("UAVs") used in Hezbollah military operations in Syria and Israel.

342.    The brothers acquired these electronics using their Lebanon-based company, Stars Group Holding, and its six subsidiaries, which are listed below and were included in the OFAC designation:

- **Stars Group Holding**, which sells cell phones and tablets. It owns several consumer electronics businesses in Beirut and elsewhere. The following individuals are involved with the company:

    o Kamel Amhaz is a board member and owns 40 percent of the company;
    o Issam Amhaz is the chairman and owns 40 percent of the company; and
    o Hani Amhaz, the youngest brother, is a board member and owns 20 percent of the company.

- **Unique Stars Mobile Phones LLC** (UAE) (Stars Group Holding subsidiary). The following individuals are involved with the company:

    o The company is owned by the Amhaz brothers; and
    o Ayman Ahmad Ibrahim is general manager; he was designated by OFAC on July 10, 2014, along with the Amhaz brothers.

- **Stars International Ltd** (Stars Group Holding subsidiary). The following individuals are involved with the company:

    o The company is owned by the Amhaz brothers; and
    o Ali Zuaytar is the general manager; he was designated on July 10, 2014, along with the Amhaz brothers.

- **Stars Communications Ltd** (Stars Group Holding subsidiary), which sells cell phones and other consumer electronics. The following individuals are involved with the company:

    o Kamel Amhaz is its founder, director and signed General commissioner;
    o Ali Yusif Tarhini is a director;
    o Hussein Ahmad Amhaz is its founder and partner (owns 1 percent of the company);
    o Abdallah Zuhayr al-Sahili is majority shareholder and owns 98 percent of the company; and
    o Samira Muhammad al-Sahili is a partner and owns 1 percent of the company.

- **Teleserve Plus SAL** (Stars Group Holding subsidiary), which deals

with communication and computers and was designated an SDGT on July 10, 2014. The following individuals are involved with the company:

- o Hani Amhaz is the general manager, chairman and majority shareholder; he owns 70 percent of the company;
- o Michel Gabriel Ma'rawi is a board member and partner; he owns 25 percent of the company;
- o Ahmad Hisham Amhaz is a board member; he owns 5 percent of the company; and
- o Ibrahim Muhammad Rakin is auditor.

- **Stars Communications (Offshore) SAL** (Stars Group Holding subsidiary), which imports electronics into Lebanon. The following individuals are involved with the company:

  - o Kamel Amhaz is chairman and majority shareholder; he owns 90 percent of the company;
  - o Fatima Ahmad Qubaysi is a board member and shareholder; she owns 5 percent of the company;
  - o Hani Amhaz is a board member and shareholder; he owns 5 percent of the company; and
  - o Ali Muhammad Amhaz is the general manager of the company.

- **Fastlink SAL** (Lebanon) (also identified as "Fastlink SARL" by the U.S. Department of the Treasury) (Stars Group Holding subsidiary), which imports electronics into Lebanon. The following individuals are involved with the company:

  - o Ali Muhammad Salem Abu Adas is Director, Founder and former partner.
  - o Louie Muhammad Khamis al-Natur is a previous partner;
  - o Muhammad Jawdat Ayyash Mustafa al-Barghuti is Director, Founder, Authorized Signatory and previous partner;
  - o Bashar Ibrahim Kamal is Director General and Authorized Signatory; and
  - o Kamel Amhaz is a majority shareholder and owns 99 percent of the company.

343. Another prominent member of the Amhaz brothers' network is Hanna Elias Khalifa, a Hezbollah operative and Lebanese businessman who has worked directly with Stars Group Holding network managers to facilitate these procurement activities on behalf of Hezbollah.

### H.  Hassan Shateri

344.    Hassan Shateri (a/k/a Khoshnevis) was a senior commander in the IRGC–QF. After the 2006 conflict between Hezbollah and Israel, Mr. Shateri was sent to Lebanon under the alias of "Hussam Khoshnevis" and was put in charge of the Iranian Committee for the Reconstruction of Lebanon (ICRL).

345.    According to *Asharq al-Awsat*'s report, Shateri received $200 million (U.S.) a year to restore Hezbollah's military capabilities and its position within Lebanon.

346.    With these funds, he created a business empire including banks, shopping malls, hotels, transport companies, radio and television networks, newspapers, and travel agencies.

347.    Mr. Shateri was designated as an SDGT by the U.S. Department of the Treasury in August 2010.

348.    According to the U.S. Department of the Treasury, Mr. Shateri also operated as then-Iranian President Ahmadinejad's personal representative in Lebanon.

349.    Mr. Shateri was killed by Syrian rebels at the beginning of 2013.

350.    He was partner and founder of several companies linked to the Tajideen family, including the following entities:

- **New Roads SARL**, which deals with building materials, particularly cement. It is based in Nabatieh, South Lebanon. The following individuals are involved with the company:

  o  Hassan Shateri was a partner;
  o  Reda Ali Atawi of the Tajideen Network is a partner (through al-Ataa company, *see* below); and
  o  Muhammad Ali al-Sablani is a partner.

- **National Crushers Company SAL**, which deals with cement production. The following individuals are involved with the company:

  o  Muhammad Ali al-Sablani is chairman of the company;
  o  Hassan Shateri was the company's general director;

- o Muhammad Haidar Qansu (a senior leader of Jihad al-Bina's network of commercial companies; specifically, Arch Consulting SAL) is a partner; and
- o Kazem Abbas Darabi is a board member and partner.

- **Cleany & Company SARL**, which deals mainly with maintenance and repairing of houses, offices, real estate and buildings. The following individuals are involved with the company:

  - o Hassan Shateri founded the company and was a partner, holding 100 shares;
  - o Muhammad Haidar Qansu is a co-founder and a shareholder, holding 100 shares; and
  - o Jihad George Lutfi is the attorney for the company.

## 2. BAC'S STABLE OF LAWYERS

351. Hezbollah utilizes a small subset of Lebanese lawyers to help set up its network of companies. The association of one of these attorneys with an entity constitutes additional evidence that an entity or account is controlled by Hezbollah.

352. Hezbollah's list of preferred attorneys includes the following individuals:

### A. Ali Hassan Berro

353. Ali Hassan Berro is an attorney for many of the companies associated with Hezbollah's money laundering network. In 2017, he even ran on behalf of Hezbollah for the post of Head of Beirut's Bar Association. Mr. Berro is affiliated with the following Hezbollah-controlled companies:

- **The Lebanese Arab Company for Touristic Services SARL**, which is owned and co-founded by the Al-Mabarrat Charitable Society. The following individuals are involved with the company:

  - o Hamzah Safieddine (brother of Hashem and Abdallah Safieddine, both SDGTs) is a co-owner, co-founder and authorized signatory for the company;
  - o Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah is a co-founder and authorized signatory;
  - o Jamal Ali Makke is a co-owner, co-founder and authorized signatory for the company;

- o Ali al-Sayyid Muhammad Hussein Fadlallah is a co-owner, authorized signatory and co-founder of the company;
- o Ra'fat Yunas Sa'id is an authorized signatory of the company; and
- o Ali Hassan Berro is the attorney for the company.

- **Société Orientale Libanaise d'Investissement et Développement SAL (SOLID)**, which was founded by Atlas Holding. It imports readymade gardens, prefabricated houses and building materials. The following individuals are involved with the company:

  - o Hassan Ali Tajideen is chairman, majority shareholder (holds 50 percent of the shares), is a co-founder and authorized signatory of the company;
  - o Nur al-Ain Muhammad Ali Atwi (Hassan's mother) is a shareholder (holds 35 percent of the shares), co-founder and member of the board of directors;
  - o Jihad Muhammad Qansu (SDGT) is listed as the company's auditor;
  - o Ibrahim Mahmoud Yussuf is a partner and board member; and
  - o Ali Hassan Berro is listed as the company's attorney.

- **Shahed Pharm Drugstore SARL**, which was co-founded and co-owned by Martyrs Foundation–Lebanon / Atlas Holding SAL sub-company (holds 2,700 shares). The following individuals are involved with the company:

  - o Bilal Muhammad Ta is a manager, co-founder, authorized signatory and a shareholder (holds 150 shares);
  - o Muhammad Ali Bashir is a co-founder of the company;
  - o Shawki Nur al-Din is a co-founder of the company;
  - o Qassem Muhammad Ali Bazzi is a manager, authorized signatory and a shareholder (holds 150 shares);
  - o Mashhur Abd al-Nabi Hamqa serves as the company's statutory auditor for the company; and
  - o Ali Hassan Berro is the attorney for the company.

- **Global Touristic Services SAL**. The company was founded in 2008, and it is almost entirely owned by Atlas Holding SAL and the Martyrs Foundation. The following individuals are involved with the company:

  - o Muhammad Ali Bashir is a co-founder of the company;
  - o Shawki Nur al-Din is a co-founder of the company;
  - o Qassem Muhammad Ali Bazzi is a co-founder of the company;
  - o Jihad Muhammad Qansu (SDGT) is listed as the company's auditor; and
  - o Ali Hassan Berro is listed as the company's attorney.

- **Atlas Holding SAL**. The company was formally established in 2006; founded by SDGT Martyrs Foundation – Lebanon. The following individuals are involved with the company:

  o Muhammad Ali Bashir is a co-founder of the company;
  o Qassem Muhammad Ali Bazzi is general manager, chairman, majority shareholder (holds 24,000 shares) and authorized signatory;
  o Bilal Muhammad Ta is a shareholder (holds 3,000 shares) and member of the board of directors;
  o Osama Muhammad Aliq is a shareholder (holds 3,000 shares) and member of the board of directors;
  o Yussuf Abd al-Reda 'Asi is a co-founder of the company;
  o Ali Hassan Berro is the attorney for the company; and
  o Mashhur Abd al-Nabi Hamqah serves as statutory auditor for the company.

- **Assaha Travel and Tourism SARL**. The company is owned by Al-Mabarrat Charitable Society. The following individuals are involved with the company:

  o Jaafar Saleh Aqil is the manager and authorized signatory;
  o Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah is a co-founder and partner (5 percent of the shares);
  o Jamal Makke is a co-founder and shareholder (5 percent of the shares); and
  o Ali Hassan Berro is the attorney for the company.

- **Amana Sanitary and Paints Company LLC** (ASPCO).

- **Amana Plus Company**. The company operates gas stations in Lebanon and sells fuel. The following individuals are involved with the company:

  o Atlas Holding SAL is a co-founder, member of the board of directors and shareholder (holds 9,997 shares);
  o Mashhur Abd al-Nabi Hamqah serves as statutory auditor;
  o Sharbel Yaqub Tarabiyah serves as statutory auditor;
  o Osama Muhammad Aliq is a shareholder and member of the board of directors;
  o Muhammad Ali Bashir is a co-founder of the company;
  o Shawki Nur al-Din is a co-founder of the company;
  o Qassem Muhammad Ali Bazzi is a co-founder, manager, chairman and authorized signatory of the company; and
  o Ali Hassan Berro is the attorney for the company.

- **Live Energy SAL**. The following individuals are involved with the company:

  o Ra'fat Sa'id Yunas is the general manager, a shareholder (holds 1,500 shares), co-founder, member of the board of directors, and authorized signatory for the company;
  o Jamal Ali Makke is a board member, majority shareholder (holds 5,500 shares), and authorized signatory of the company;
  o Muhammad Khair Issam Amru is a board member, shareholder (holds 1,500 shares) and co-founder of the company;
  o Ali Hussein al-Hajj is a shareholder (holds 1,500 shares) and co-founder of the company;
  o Samir Muhammad Nussar serves as statutory auditor of the company; and
  o Ali Hassan Berro serves as attorney for the company.

- **Arab American Company (Offshore) SAL**. The following individuals are involved with the company:

  o Fuad Tawfiq Baydun is chairman, co-founder, authorized signatory, and a shareholder of the company (holds 6,000 shares);
  o Nabil Abd al-Fattah is a co-founder, authorized signatory, member of the board of directors and shareholder of the company (holds 6,000 shares);
  o Jamal Ali Makke is a co-founder, authorized signatory, member of the board of directors and majority shareholder of the company (holds 18,000 shares);
  o Samir Muhammad Nussar serves as statutory auditor of the company; and
  o Ali Hassan Berro serves as attorney for the company.

- **Sanabel for Urban Studies and Architectural Design SAL** (discussed above).

- **Al-Kawthar**. The company runs a clothing store chain in Lebanon and was co-founded (and owned) by the Martyrs Foundation–Lebanon through Atlas Holding SAL. The following individuals are involved with the company:

  o Muhammad Ali Bashir a co-owner (1 percent of the shares) and co-founder of the company;
  o Shawki Nur al-Din a co-owner (1 per cent of the shares) and co-founder of the company;
  o Qassem Muhammd Ali Bazzi is an authorized signatory for the company; and
  o Ali Hassan Berro is the attorney for the company.

90

- **Al-Amana SARL**. The company operates twelve gas stations under the name of Al-Amana in Beirut, South Lebanon and the Bekaa Valley in Lebanon and is owned by the Martyrs Foundation–Lebanon through Atlas Holding SAL, which holds 98 percent of Al-Amana SARL. The following individuals are involved with the company:

  o Qassim Muhammad Ali Bazzi is the general manager, co-founder, authorized signatory and owns 1 percent of the company;
  o Ahmad Hussin Haidar is a co-founder of the company;
  o Osama Muhammad Aliq owns 1 percent of the company;
  o Muhammad Ali Bashir is listed as a founder of the company; and
  o Ali Hassan Berro is the attorney for the company.

### B. Ali Hussein al-Ashi

354.   Ali Hussein al-Ashi is the attorney for many companies associated with Hezbollah's network, specifically the Tabaja Network; most prominent among them are Adham Tabaja's designated companies:

- **Al-Inmaa Engineering and Contracting** (discussed above); and
- **Al-Inmaa Group for Tourism Works** (discussed above).

### C. Amir Afif Abu Khalil

355.   Amir Afif Abu Khalil is an attorney in Tyre who is closely associated with the Tajideen Network. He is the attorney for the following OFAC-designated Tajideen companies:

- **Tajco Company SAE** (discussed above).

- **Ovlas Trading SAL Off Shore**. The company was designated by the U.S. Department of the Treasury on December 9, 2010. The following individuals are involved with the company:

  o Ahmad Hassan Tajideen is the chairman, majority shareholder (holds 3,000 shares), and authorized signatory for the company;
  o Najmah Hassan Jaber (Ahmad's mother) is a shareholder (holds 1,250 shares), co-founder, and member of the board of directors;
  o Anwar Hussein Sa'ad is a shareholder (holds 750 shares), co-founder, and member of the board of directors;
  o Hassan Muhammad Abd al-Hassan Tajideen is a co-founder of the company (his wife remains on the board of directors after he died in a 2010 plane crash);

      o  Shawqi Ra'if Abu Khalil is auditor for the company; and

      o  Amir Afif Abu Khalil is the attorney for the company.

356.    In addition, he is the attorney for several more Tajideen companies, which are part of Hezbollah.

### D.  Ashraf Assem Safieddine

357.    Ashraf Assem Safieddine is the attorney most associated with the Amhaz Network of companies. Among others, he is the attorney for:

- **Teleserve Plus SAL** (discussed above);

- **West Oil Investments Company (Offshore) SAL**: Involved in illicit activity; and

- **Creative Investment (Offshore) SAL**, a company that originated a fraud and corruption scheme, through which its staff, among them Ashraf Safieddine, were accused of money laundering.

### E.  Dima Hussein Dakrub

358.    Dima Hussein Dakrub is one of the attorneys affiliated with Muhammad Abdallah al-Amin's Network, which provides funds for Adham Tabaja. She is notably the attorney of Impulse SARL (owned by Mr. al-Amin), a company designated as an SDGT on October 4, 2018.

### F.  Faruq Muhammad Raef Hammoud

359.    Faruq Muhammad Raef Hammoud is an attorney for companies affiliated with the al-Amin and Tabaja Networks; most prominent among them is the African Fish Company (Offshore) SAL, which Jihad Muhammad Qansu (SDGT), Ali Muhammad Qansu (SDGT), and Khalil Hassan Faqih (highly involved in all of Mr. al-Amin's designated companies) are part of.

### G.  Hadi Ali Zabib

360.    Hadi Ali Zabib is the attorney for three companies involving Jihad Muhammad Qansu and other members of the Tabaja-Amin Networks.

### H.  Hiba Shawqi Shadhbek

361.    Hiba Shawqi Shadhbek is an attorney who participates in the Amhaz Network by way of affiliation with Ashraf Assem Safieddine.

### I.  Ibrahim Abd al-Manam Awada

362.    Ibrahim Abd al-Manam Awada was a former president of Hezbollah's Lawyers Group, as well as its candidate to the Bar Association Council. He was part of the Association of the Qana Observatory for Human Rights, which is affiliated with Hezbollah alongside Osama Abbas Ramal (a prominent Hezbollah operative).

### J.  Muhammad Farid Mattar

363.    Muhammad Farid Mattar is an attorney for several companies that are controlled by Hezbollah, including the following entities that have been designated by the U.S. Department of the Treasury:

- **Car Escort Services (Offshore) SAL** (SDGT, discussed above);
- **Spectrum International Investment Holding SAL** (SDGT, discussed above);
- **Spectrum Investment Group Holding SAL** (SDGT, discussed above);
- **Hoda for Touristic Services & Management Holding SAL** (discussed above);
- **International Group Holding SAL** (discussed above);
- **One Globe Operator SAL Off Shore** (discussed above); and
- **B.I. Group Holding SAL**.

### K.  Muhammad Hussein Dakrub

364.    Muhammad Hussein Dakrub is the attorney for many of al-Amin's companies; prominent among them are the following entities designated as SDGTs by OFAC:

- **M. Marine (Offshore) SAL**;
- **Lama Food International (Offshore) SAL**;
- **Sierra Gas (Offshore) SAL**;
- **Lama Foods SARL**; and
- **Shanghai (Offshore) SAL**.

### L.  Nabil Kamil al-Akhras

365.    Nabil Kamil al-Akhras is a lawyer and related to the following list of companies affiliated with Jihad Muhammad Qansu (SDGT):

- **Amigo Travel and Transport SAL**;
- **Al-Ansab Lebanese for International Trading (Offshore) SAL** (a/k/a ALIT);
- **United Company (Offshore) SAL**;
- **Golden Fish (Offshore) SAL**;
- **Ifriqiya General Trading (Offshore) SAL**;
- **Al-Ghadaf Company for Trading & General Supplies (Offshore) SAL**;
- **Al-Twazon al-Handasy for General Contracting Company (Offshore) SAL**;
- **Mega Investment Group (Offshore) SAL** (a/k/a MIG);
- **Interafrica Trading Company (Offshore) SAL** (a/k/a ITC);
- **International Management & Finance Holding SAL** (a/k/a IMF); and
- **Blue Sky Holding SAL**.

### M.  Osama Abbas Ramal

366.    Between 2001 and 2010, Osama Abbas Ramal was mayor of Adaisseh village on behalf of the Hezbollah and Amal joint list. Mr. Ramal serves as the attorney for the following list of Hezbollah-related companies in Lebanon:

- **Seasons Corporation for Agricultural Projects and Services SARL**. The company provides agricultural services and establishes projects in the field of agriculture. The following individuals are involved with the company:

  - Ibrahim Abdallah Ismail is an authorized signatory, co-founder and shareholder (holds 1,220 shares) of the company;
  - Muhammad Ni'mah al-Hajj is an authorized signatory and shareholder (holds 260 shares);
  - Qassem Aliq is a co-founder of the company;
  - Abbas Muhammad Raslan is a co-founder of the company;
  - Fawzat Abdallah Ibrahim al-Hajj is a co-founder of the company;
  - Adel Mahmud Salim is a shareholder (holds 260 shares);
  - Tareq Muhammad al-Musawi is a shareholder (holds 260 shares); and
  - Osama Abbas Ramal is the company's attorney.

- **Dar al-Manar for Artistic Production and Distribution**.

- **Meamar Company for Engineering and Development**. The company was founded in 1988 and deals with constructing and building sporting facilities, Shi'a religious institutions, schools and hospitals. The following individuals are involved with the company:

  o Sultan Khalifa As'ad is the founder of the company;
  o Burhan Hassan Qataya is the manager, a shareholder (holds 10 shares), and authorized signatory for the company;
  o Hassan Suleiman Mudlej is a shareholder (holds 10 shares);
  o Mahmud Abbas Qassem is a shareholder (holds 5 shares);
  o Ali Yussuf Farhat is a shareholder (holds 5 shares);
  o Hussein Muhammad Kheir al-Din is manager and authorized signatory for the company;
  o Abbas Ibrahim Nasser is a co-founder of the company;
  o Hissan Ali al-Balaghi is a co-founder of the company;
  o Qassem Aliq is a co-founder of the company; and
  o Osama Abbas Ramal is the attorney.

- **Beton Plus SAL**.

- **Media Publi Management SAR**.

- **Arch Consulting SARL**. The company has built hospitals, schools and religious institutions in the Hezbollah-controlled areas in Beirut, South Lebanon and the Bekaa. The company is also involved in tourism, infrastructure, and hydraulic projects, and was registered in early 2005 (operating previously under the name Research Institute of Jihad al-Bina). The following individuals are involved with the company:

  o Walid Ali Jaber is the general manager, co-founder, authorized signatory and owns 40 percent of the company;
  o Jaafar Mussa is a co-founder and owns 30 percent of the company;
  o Muhammad Haidar Qansu is a co-founder and owns 30 percent of the company; and
  o Osama Abbas Ramal is the company's attorney.

### N. Wissam Hussein Hammoud

367.    Wissam Hussein Hammoud is a Lebanese lawyer and a local politician who is the mayor of a village near Tyre named Shihin. He is the attorney for the following list of companies related to the Tajideen Network, which supports Hezbollah financially and operationally:

- **Enmaa Dalhamiya Company SAL** (discussed above);
- **Rifieh Pour L'amélioration** (discussed above);
- **Al-Dalhamiya Country Club Company** (discussed above);
- **Shatha Investment & Contracting Company SAL**;
- **JST Sunset Real Estate Development & Development SAL**;
- **Cedar Man (Offshore) SAL**; and
- **Murex Investment and Development (Offshore) SAL**.

### O.  Butrus Michel Ghanimah

368.    Butrus Michel Ghanimah is the attorney for Adham Tabaja's company, City Park SARL.

### P.  Marwan Saqr

369.    Marwan Saqr is the attorney of OGO Lebanon SAL, one of Ali Ibrahim Charara's more prominent companies.

### Q.  Adib Yusif Tu'mah

370.    Adib Yusif Tu'mah (or Tohme) is the main lawyer of the Charara Network.

### R.  Jihad George Lutfi

371.    Jihad George Lutfi is the attorney for Cleany & Company SARL, a company affiliated with Hezbollah (two of its founders and shareholders are Hassan Shateri, SDGT, and Muhammad Haidar Qansu).

### 3.  BAC'S STABLE OF ACCOUNTANTS / AUDITORS

372.    Hezbollah utilizes a small subset of Lebanese accountants and auditors to help maintain and "audit" its network of companies. The association of one of these accountants or auditors with an entity or account provides additional evidence that the entity or account is controlled by Hezbollah.

### A.  Jihad Muhammad Qansu

373.    Jihad Muhammad Qansu serves as statutory auditor of numerous companies

associated with Hezbollah.

374.    On February 2, 2018, Mr. Qansu was designated as an SDGT by the U.S. Department of the Treasury for his role as financial manager of Al-Inmaa Engineering and Contracting (SDGT).

375.    Mr. Qansu is a business associate of Hezbollah operative and financier Adham Tabaja (SDGT), and assists Mr. Tabaja "in accounting matters, including resolving bank account issues."

376.    As part of his role in Al-Inmaa, Mr. Qansu worked on the company's operations together with Muhammad Al-Mukhtar Kallas (SDGT). He is affiliated, as founder or shareholder, with several companies that are part of the Tabaja Network.

377.    Jihad Muhammad Qansu is statutory auditor of the following companies:

- **Amigo Travel and Transport SAL** (aided and abetted by Defendant BYBLOS BANK).

- **Global Touristic Services SAL (GTS)** (aided and abetted by Defendant BYBLOS BANK) (discussed above).

- **Golden Fish (Offshore) SAL** (SDGT). Mr. Qansu is also a shareholder (holds 495 shares), co-founder, and board member of the company.

- **Rayan Foods SAL**. An import and export company that is part of the Al-Mabarrat / Fadlallah Network. The following individuals are involved with the company:

  o  The Lebanese-Arab Company for Touristic Services is a shareholder (63 percent);
  o  Ali Radwan Aidibi is a shareholder (31.81 percent);
  o  Ali Muhammad Hussein Fadlallah holds thirty shares and is the chairman;
  o  Jihad Muhammad Qansu (SDGT) is its auditor;
  o  Jamal Ali Makke is a board member and holds ten shares;
  o  Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah is a board member and holds ten shares; and
  o  Ali Hassan Berro is the attorney.

- **Société Orientale Libanaise d'Investissement et Développement SAL** (a/k/a Solid) (aided and abetted by Defendant BYBLOS BANK) (discussed above).

### B. Abd al-Halim al-Shaykh Mussa Charara

378. Abd al-Halim al-Shaykh Mussa Charara serves as statutory auditor of numerous companies associated with the "Charara Network," including the following Hezbollah-controlled entities:

- **Jumi Properties SAL**. The company's chairman, Ali Ibrahim Charara, is also co-founder of Spectrum Investment Group Holding SAL (SDGT, discussed above). The company's other key members include Nadir Ibrahim Charara, Dana Samir Hasbeini, and Nabil Faruq Ma'd.

- **Verdun 2523 SAL**. The company's chairman and owner, Ali Ibrahim Charara, is also co-founder of Spectrum Investment Group Holding SAL (SDGT, discussed above). The company's other key members include Rami Ibrahim Charara and Nadir Ibrahim Charara – brothers of Ali Ibrahim Charara, and attorney Mazin Nabil al-Husami.

- **Hamra 896 SAL**. The company's chairman, Ali Ibrahim Charara, is also co-founder of Spectrum Investment Group Holding SAL (SDGT, discussed above). The company's other key members are Nadir Ibrahim Charara, Jan Sulayman Abbud, Aydi Hizqiyal al-Hajj, Kamal Yussuf al-Haddad, and attorney Adib Yusif Tu'mah.

- **Spacenet (Offshore) SAL**. The company's key members are Rami Ibrahim Charara, Nadir Ibrahim Charara, Fawzi Zuhayr Abbud, Elias Antoine Atieh, Rami Rafiq Eitani, and attorney Adib Yusif Tu'mah.

- **Tel2 Media (Offshore) SAL**. The company's chairman, Ali Ibrahim Charara, is also co-founder of Spectrum Investment Group Holding SAL (SDGT, discussed above). The company's other key members are Rami Ibrahim Charara, Nadir Ibrahim Charara, Hisham Makki and attorney Adib Yusif Tu'mah.

- **Consortium Holding SAL Holding Company**. The company's chairman, Ali Ibrahim Charara, is also co-founder of Spectrum Investment Group Holding SAL (SDGT, discussed above). The company's other key members are Rami Ibrahim Charara, Nadir Ibrahim Charara, and Mazin attorney Nabil al-Husami.

- **One Globe Operator SAL Holding** (discussed above).

### C. Mashhur Abd al-Nabi Hamqah

379. Mashhur Abd al-Nabi Hamqah serves as statutory auditor of the following Hezbollah-controlled entities:

- **Atlas Holding SAL** (discussed above): The company reportedly manages its bank accounts at Defendant SGBL; and

- **Shahed Pharm Drugstore SARL** (discussed above) (aided and abetted by Defendant LEBANON AND GULF BANK).

### D. Shawqi Ra'if Abu Khalil

380. Shawqi Ra'if Abu Khalil serves as statutory auditor of numerous companies associated with the Tajideen Network, including the following list of Hezbollah-controlled entities:

- **Ovlas Trading (Offshore) SAL** (SDGT, discussed above) (aided and abetted by Defendants BANK AUDI SAL and LEBANON AND GULF BANK);

- **Afrimex (Offshore) SAL** (discussed above): The company was founded by Yussuf Muhammad Tajideen – brother of Ali, Hussein and Kassim Tajideen – all SDGTs (aided and abetted by Defendant BYBLOS BANK);

- **Hyram Maritime SAL** (discussed above): The company was founded by Ali Muhammad Abd al-Hassan Tajideen (SDGT) (aided and abetted by Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES);

- **Al-Dalhamiya Country Club Company** (discussed above): The company was founded by Yussuf and Ibrahim Tajideen, brothers of Hezbollah fundraisers Ali, Hussein and Kassim Tajideen – all SDGTs;

- **Company for Development and Prosperity** (discussed above): Hezbollah financier SDGT Ali Tajideen is chairman and partner of the company;

- **Distributions and Agencies Company SAL** (discussed above): Hassan Ali Tajideen, executive manager of Tajco (SDGT), and shareholder in Tajco SAE, is a shareholder; and

- **Al-Burhan Growth and Development Company SAL**: The company was founded by Hassan Ali Tajideen.

### E.  Samir Muhammad Nassar

381.    Samir Muhammad Nassar serves as statutory auditor of the following Hezbollah-controlled entities:

- **Arab American Company SAL Off Shore** (discussed above); and
- **Live Energy SAL** (discussed above).

### F.  Edmond Yussuf Saadeh

382.    Edmond Yussuf Saadeh serves as statutory auditor of the following Hezbollah-controlled entities:

- **Car Escort Services (Offshore) SAL** (SDGT, discussed above);
- **Spectrum International Investment Holding SAL** (SDGT, discussed above); and
- **Spectrum (Offshore) SAL**: Part of the Charara network (discussed above).

### G.  Fadi Muhammad Ni'ma

383.    Fadi Muhammad Ni'ma serves as statutory auditor of two companies affiliated with pro-Hezbollah channel *Al-Mayadeen*:

- **Amir (Offshore) SAL**: The company is headed by Ghassan bin Jeddo, the director of *Al-Mayadeen* channel. The company's other key members are his wife and son: Nada Qaimaqami (Iranian citizen) and Amir bin Jeddo, respectively; and

    **Al-Mayadeen (Offshore) SAL**: The company is headed by Ghassan bin Jeddo. The company's other key members are Nada Qaimaqami and Amir bin Jeddo.

### H.  Hussein Adel Izz al-Din

384.    Hussein Adel Izz al-Din serves as statutory auditor of numerous companies associated with Hezbollah, including the following entities:

- **Stars Group Holding** (SDGT, discussed above);

- **KAF Investment SAL**, founded by Kamel Muhammad Amhaz (SDGT); and
- **Stars Communications Ltd** (SDGT, discussed above).

### g.  HEZBOLLAH'S "SOCIAL WELFARE" SECTOR – THE *DA'WA*

385.    Hezbollah has developed a network of social welfare institutions or *da'wa* that it uses as an instrument of its political, psychological and military strategy.

386.    For example, Hezbollah provides welfare benefits to the families of its martyrs (*shahid*, or *shuhadaa*, plural), particularly their children.

387.    The children of Hezbollah's *shuhadaa* are privileged because they are educated in Hezbollah-subsidized schools and receive free health care in a country where for many years Lebanese citizens spent an estimated 40 percent of their income on medical expenses.

### 1.  IRSO – THE ISLAMIC RESISTANCE SUPPORT ORGANIZATION (*HAY'AT DA'AM AL-MUQAWAMA AL-ISLAMIYA FI LUBNAN*)

388.    The Islamic Resistance Support Organization (IRSO), officially known in Arabic as *Hay'at Da'am al-Muqawama al-Islamiya Fi Luban*, is an umbrella organization that is used to solicit, collect and disperse donations in support of Hezbollah's terrorist activities.

389.    In 2016, Sheikh Nasrallah said that IRSO's mission is to provide Hezbollah with a "kind of financial and material support" as well as moral and political support.[22]

---

[22]    Interestingly, at an IRSO event in 2013, Hassan Nasrallah gave a speech denying Hezbollah's involvement in any commercial activities, stating:

> I would like to reiterate that we do not have economic or investing projects in Lebanon or abroad. Well yes, we have service projects. However, we do not have projects that bring in profits and money. I will even make use of this occasion to tell the Lebanese that if anyone tells you that I have a commercial project in which he invested a capital and ask you to share with him or partake with him claiming that its returns are for the party or the party has a share in it, be sure that he is a liar.

390.    IRSO was established in 1989 to professionalize Hezbollah's fund-raising campaigns. The money collected by IRSO is earmarked primarily for the purchase of weapons for Hezbollah terrorist-operations and support for its cadres.

391.    IRSO collects considerable sums of money in Lebanon from both private and public entities, including businesses, mosques, educational institutions, gas stations, shopping centers and road blocks.

392.    The IRSO maintains branches across Lebanon as well as a women's division and an international division.

393.    Funds are raised in Lebanon and Muslim communities – especially Shi'a communities– around the world, mainly in the Gulf States and Western countries.

394.    A pamphlet recovered by Israeli forces in Lebanon in 2006 states: "The resistance collection box is small and placed inside the house so that all members of the family will sense the importance of participating in supporting the resistance by contributing."

395.    The IRSO also maintains the website www.moqawama.org, one of the official media organs of Hezbollah.

396.    The IRSO is currently headed by Sayeed Qassem Tawil.

397.    Previously, the IRSO was headed by Hussein al-Shami (a designated SDGT).

398.    Al-Shami is a senior Hezbollah officer in several Hezbollah controlled-organizations, such as Bayt al-Mal and al-Qard al-Hassan, which also help Hezbollah fund its activities. He was also the director of Hezbollah's social services division.

399.    Mr. Al-Shami was designated as an SDGT by the U.S. Department of the Treasury on September 7, 2006.

400.    As mentioned above, Mr. Al-Shami is a Shura Council member due to his prominent position in Hezbollah's fundraising institutions.

401.    IRSO was designated as an SDGT by the U.S. Department of the Treasury in August 2006.

402.    According to the U.S. Department of the Treasury, IRSO solicited donations through Hezbollah's *al-Manar* satellite television in Lebanon.

403.    In its 2006 press release, the U.S. Department of the Treasury noted that: "[s]olicitation materials distributed by IRSO inform prospective donors that funds will be used to purchase sophisticated weapons and conduct operations. Indeed, donors can choose from a series of projects to contribute to, including, supporting and equipping fighters and purchasing rockets and ammunition."

404.    Furthermore, the U.S. Department of the Treasury provided a copy of IRSO's donation form (allowing a donor to specify the Hezbollah program that the donation should be directed toward).

405.    IRSO openly offered prospective donors the opportunity to earmark funds toward different types of terrorist activities, including the acquisition of missiles and ammunition, and payments to terrorists. Both English and Arabic copies of IRSO's donation program form are appended hereto as **Exhibit 2**.

406.    Stuart Levey, then-U.S. U.S. Department of the Treasury Under Secretary for Terrorism and Financial Intelligence, noted in testimony before Congress that IRSO does not attempt to conceal its purpose:

> While some terrorist-supporting charities try to obscure their support for violence, *IRSO makes no attempt to hide its true colors*. IRSO's fundraising materials present donors with the option of sending funds to equip Hezbollah fighters *or to purchase missiles that Hezbollah uses to target*

*civilian populations. IRSO works to inflict suffering rather than alleviate it.* (Emphasis added.)

407.    In fact, prior to IRSO's 2006 designation, Hezbollah used its television station, *Al-Manar*, to raise money through IRSO in support of Hezbollah's terror campaign by running commercials requesting wire transfers be sent to four Lebanese commercial banks (specifying the account numbers for donations, including an account at Defendant BYBLOS BANK.[23]

408.    The following bank accounts were held by IRSO for supporting and funding Hezbollah:

- FRANSABANK,      Al-Shiyah      Branch,      account      number: 252010/692830.21;

- FRANSABANK,      Al-Shiyah      Branch,      account      number: 78.02.251.133553.0.8;

- BYBLOS BANK, Hreik Neighborhood Branch, account number: 78-2-252-133521-1-5;

- BANQUE LIBANO-FRANÇAISE SAL, Hreik Neighborhood Branch, account numbers: 657409.17 and 657469.171;

- LEBANON AND GULF BANK, Mazra'a Branch, account number: 202-336254;

- LEBANON AND GULF BANK, Mazra'a Branch, account number: 202-329665; and

- JAMAL TRUST BANK, Ghobeiry Branch, account number: 140-028355.28/0/5 (published in Al-Ahed Newspaper on February 21, 1986).

409.    A July 25, 2006 report that aired on MSNBC demonstrated that: *first*, Hezbollah used U.S. currency to support its activities; and *second*, often did so openly, including in its appeals for donations. During the MSNBC broadcast, an NBC reporter contacted a number advertised on

---

[23]    Beirut Riyadh Bank was explicitly mentioned.

*Al-Manar*, the Hezbollah-owned and -controlled Lebanese television network, posing as a prospective Hezbollah donor:

> NBC Reporter: I want to donate money to the Mujahideens [Hezbollah resistance], is this the right number?
>
> Hezbollah Facilitator: You have to send to The Lebanese-French Bank [Defendant BANQUE LIBANO–FRANCAISE SAL].
>
> NBC Reporter: Do you have the number?
>
> Hezbollah Facilitator: There is an account number. You deposit the money and wire it to the Lebanese French Bank.
>
> NBC Reporter: How can I know that this is accurate? I'm so worried to deposit the money, can you tell me and confirm that this money will be sent to the Mujahideen?
>
> Hezbollah Facilitator: Yes, sure.
>
> NBC Reporter: And where are you from? Are you from the bank or no?
>
> Hezbollah Facilitator: No. I'm from the resistance.
>
> NBC Reporter: How would we know? I'm so worried when I deposit the money it will reach Mujahideen.
>
> Hezbollah Facilitator: You go to the bank and deposit the money, and they will wire it to the Lebanese French Bank. You have to go the bank. Where are you calling from?
>
> NBC Reporter: I am from America.
>
> Hezbollah Facilitator: You have to go to the bank—any bank.
>
> NBC Reporter: That for sure will reach the Mujabideen?
>
> Hezbollah Facilitator: For sure. Do not mention resistance or anything like that. If you do, they won't wire them.
>
> NBC Reporter: Thank you—God be with you. Bye.
>
> Hezbollah Facilitator: You are welcome. God be with you.[24]

---

[24]     Adam Ciralsky and Lisa Myers, *Hezbollah Banks Under Attack in Lebanon* (NBC News, July 25, 2006), archived at https://web.archive.org/web/20060809013901/http://www.msnbc.msn.com:80/id/14015377/page/2/.

## 2.  JIHAD AL-BINA (A/K/A CONSTRUCTION JIHAD)

410.    Jihad al-Bina (a/k/a Jihad al-Binaa, a/k/a Jihad al-Bina'a, a/k/a Construction Jihad) was established in September 1988 and registered in Lebanon as a charitable organization.

411.    The Foundation's general manager, who is selected by Hezbollah's Shura Council, is responsible for Jihad al-Bina's operation.

412.    At the time, its founder and first general manager was Sultan Khalifa As'ad, who serves as Deputy Chairman of the Executive Council for Municipal Affairs for Hezbollah and formerly headed the Finance Unit of Hezbollah.

413.    Muhammad Said Khansa, one of Hezbollah's "Founding Fathers," serves as Director of agricultural and environmental affairs at Jihad al-Bina. Since 1998, he has been elected three times as the mayor of Ghobeiry (a Hezbollah-dominated suburb of Beirut) as Hezbollah's candidate. He has also served as the President of the Union of the Dahiya Municipalities.

414.    Qassem Aliq, who was designated as an SDGT on July 24, 2007, served as the director of Jihad al-Bina.

415.    Ibrahim Abdallah Ismail, another prominent Hezbollah leader, also served on the board of Jihad al-Bina.

416.    In 2006, Walid Ali Jaber was named the Beirut director for Jihad al-Bina and was given responsibility for the rebuilding and reconstruction of the Dahiyeh area – a large quarter populated by Shi'a and situated in south Beirut.

417.    Walid Ali Jaber was also Hezbollah's candidates in the Burj al-Barajneh's (municipality located in the southern suburbs of Beirut between Rafic Hariri International Airport and Haret Hreik neighborhood) municipal elections.

418.    Ali Tajideen, a key Hezbollah financier and Hezbollah's commander in Hanouay,

Tyre, Lebanon (who, as described above, was designated as an SDGT on December 9, 2010) was described by the U.S. Department of the Treasury as "a major player in Jihad Al-Bina."

419.    The organization was modeled on its Iranian counterpart, the Construction Jihad Movement—a perverse "Habitat for Humanity"-style charity working to support the holy war waged by Hezbollah against Israel and other of Iran's external enemies.

420.    Hezbollah's Jihad al-Bina rehabilitates and builds schools in remote villages and towns, subsidizes education in poor Shi'a areas, and is responsible for numerous infrastructure projects that help solidify Hezbollah's hold on the Shi'a populace in Lebanon.

421.    In exchange for improving their quality of life, Jihad al-Bina expects its Shi'a beneficiaries to pledge their allegiance to Hezbollah.

422.    According to the U.S. Department of the Treasury's February 20, 2007, designation of Jihad al-Bina as an SDGT, Hezbollah operates the organization for its own construction needs as well as to attract popular support in Lebanon by sponsoring civilian construction projects.

423.    The U.S. Department of the Treasury described the organization as "a Lebanon-based construction company formed and operated by Hizballah. Jihad al-Bina receives direct funding from Iran, is run by Hizballah members, and is overseen by Hizballah's Shura Council, at the head of which sits Hezbollah's Secretary General Hassan Nasrallah."

424.    The U.S. Department of the Treasury further noted that "[i]n cases when intended solicitation targets were thought to object to the group's relationship with Hezbollah and the Iranian government, the organization employed deceptive practices, applying in the name of proxies not publicly linked to Hezbollah."

425.    Jihad al-Bina, as part of its efforts to continue its large-scale operations in Lebanon after it was designated by the United States, diversified into several private construction

companies, principally to protect its bankers and major suppliers from any negative repercussions from openly doing business with Hezbollah's construction arm.

426. The companies that Jihad al-Bina established and controlled for this sanctions evasion purpose include the following entities:

### A. Meamar Company for Engineering and Development

427. Since its founding in 1998, Meamar Company for Engineering and Development has been involved with more than 150 projects, including constructing and building sporting facilities, Shi'a religious institutions, schools and hospitals.

428. For these projects, Meamar's clients are almost exclusively organizations linked to Hezbollah, including the Islamic Health Society, the Iranian Committee for the Reconstruction of Lebanon ("ICRL"), the Mehdi Scouts, the Shahid Association, the Islamic Religious Education Association ("IREA") and municipalities controlled by Hezbollah Mayors (such as Ghobeyri in Beirut and Bint Jbeil in South Lebanon).

429. As detailed previously, among its founders are the SDGT Qassem Aliq, and Sultan Khalifa As'ad, who was the director of Jihad al-Bina itself. The construction company is currently headed by Hussein Muhammad Kheir al-Din and Burhan Hussein Qataya. Its attorney, as previously mentioned, is Osama Abbas Ramal.

### B. Seasons Corporation for Agricultural Projects and Services SARL

430. As its name suggests, the company (discussed above) provides agricultural services and establishes projects in the field of agriculture. According to an agreement made between Jihad al-Bina and the Lebanese University's School of Agriculture, Seasons is obligated to provide courses for the school's students. As in the case of Meamar, SDGT Qassem Aliq is one of its founders.

## C.  Arch Consulting SARL

431.    Arch Consulting (discussed above) is one of Hezbollah's main construction partners. The company has built hospitals, schools and religious institutions in the Hezbollah-controlled areas in Beirut, South Lebanon and the Bekaa Valley.

432.    Arch Consulting is also involved in tourism, infrastructure, and hydraulic projects.

433.    In international markets, the company built the Abidjan Islamic Cultural Center in the Ivory Coast, a Shi'a religious association established by a supporter of Hezbollah. Before registering in early 2005, Arch Consulting operated under the name of Research Institute of Jihad al-Bina. Arch Consulting cooperates with more than 30 municipalities in South Lebanon and Beqaa, for which they consult and draw up engineering researches.

434.    The aforementioned Walid Ali Jaber is the general manager of Arch Consulting and owns 40 percent of it.

435.    Jaafar Mussa, another founder of Arch Consulting, owns 30 percent of it. Additionally, in 2016, he was a candidate in the municipal elections in his hometown Houmine al-Faouqa and won a seat.

436.    Muhammad Haidar Qansu is another founder of Arch Consulting and owns 30 percent of it. Additionally, Qansu was a Hezbollah candidate in the municipal elections in the Lebanese town Doueir in 2016.

437.    He was named a member in a municipal committee later that year.

438.    Mr. Qansu also works with the aforementioned Hassan Shateri in National Crushers Company SAL and Cleany & Company SARL.

439.    The company's attorney is Osama Abbas Ramal.

### 3. THE MARTYRS FOUNDATION–LEBANON (THE *SHAHID* FOUNDATION OR *MUA'ASSAT AL-SHAHID*)

440. The Martyrs Foundation–Lebanon (a/k/a *Shahid* Foundation, a/k/a *Mua'assat al-Shahid*) is a branch of the Iranian Martyrs Foundation. It was established after the Israeli incursion into Lebanon in 1982, with the goal of supporting the families of Hezbollah fighters who died as a result of their attacks on the IDF.

441. Martyrs Foundation–Lebanon is controlled and operated by Hezbollah and is one of the most open and notorious Hezbollah institutions in Lebanon.

442. One of the Martyrs Foundation–Lebanon's associated organizations is the U.S.-based **Goodwill Charitable Organization** ("GCO").

443. GCO was founded by the Martyrs Foundation-Lebanon as a fundraising office in Dearborn, Michigan.

444. GCO was designated as an SDGT on July 24, 2007 by the U.S. Department of the Treasury as a "front organization that reports directly to the leadership of the Martyrs Foundation in Lebanon."

445. According to the U.S. Department of the Treasury, Hezbollah's leaders in Lebanon instructed Hezbollah operatives in the United States to send their contributions to GCO and to contact the GCO for the purpose of contributing to the Martyrs Foundation–Lebanon.

446. Since its founding, GCO has sent a significant amount of money to the Martyrs Foundation in Lebanon.

447. The Martyrs Foundation–Lebanon glorifies death in jihad by cultivating Hezbollah's 'cult of the martyr'.

448. The foundation's purpose since its inception has been to help Hezbollah wage jihad against the perceived enemies of Shi'a Islam.

110

449.    The Director of the Foundation is a Hezbollah operative named Shawki Nur al-Din and its former chairman was Hussein al-Shami, an SDGT (current head of the IRSO; discussed above).

450.    The Martyrs Foundation–Lebanon is made up of five institutes: The Culture Institute promotes Hezbollah's ideology of the shahid (or martyr); the Check and Balance Institute monitors and provides aid to the families of Hezbollah's martyrs; the Health Institute overseas Hezbollah's hospitals and clinics for the families of the martyrs; the Social Institute is responsible for martyrs' children's education; and the most important of the five institutes is the Takaful Institute, whose director for much of the relevant period was Hussein al-Shami (also the director of the Foundation at the time).

451.    The Takaful Institute is essentially the fundraising arm of the foundation responsible for identifying *kafils* (benefactors) who will sponsor families of the martyrs.

452.    The Takaful Institute used Hezbollah media to recruit these *kafils,* printing photographs of the children of recently-deceased martyrs in its *Al Safir* publication.

453.    The Takaful Institute also targets the Lebanese Shi'a expat communities living in the Persian Gulf and in Africa.

454.    The Culture Institute aims at preserving the legacy of individual Hezbollah "martyrs" by transforming artifacts and their personal effects into icons. To this end, the Institute has established several local "museums," converting apartments located in Hezbollah quarters or villages and redesigning them as a kind of shrine in the hometown of the martyr.

455.    The shrines often include pieces of bloodied clothes the martyr wore when he was killed as well as photographs of the decedent in Hezbollah gear placed with family photos of the fallen, posing with his children or wife, or if unmarried, featured with his parents.

456.    The Culture Institute shrines often feature the Koran the martyrs allegedly used, opened to the page of *fatiha* (first sura of the Koran) and prayers said for the souls of the dead.

457.    As of November 2009, there were approximately 800 employees and volunteers working in the Foundation.

458.    The Martyrs Foundation–Lebanon claims to take care of approximately 5,000 people, including the families of Hezbollah's "martyrs" who died during the 2006 conflict with Israel.

459.    According to the Martyrs Foundation–Lebanon's spokesman, Muhammad al-Husseini, the Foundation assists only people who are affiliated with Hezbollah.

460.    The Martyrs Foundation–Lebanon has established a large hospital in Hezbollah's stronghold in Beirut—the Dahiya (or southern suburbs of Beirut).

461.    There are several branches all over Lebanon. The main branches are located in Beirut, Baalbek (the western Beqaa), Tripoli, and Tyre.

462.    The Martyrs Foundation–Lebanon was designated as an SDGT on July 24, 2007.

463.    According to the U.S. Department of the Treasury, "Martyrs Foundation branches in Lebanon has also provided financial support to the families of killed or imprisoned Hizballah [sic]… In addition to fundraising responsibilities, senior Martyrs Foundation officials were directly involved in Hizballah operations against Israel during the July-August 2006 conflict."

464.    The U.S. Department of the Treasury also found that:

> [T]he Martyrs Foundation is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hezbollah, Hamas, and the Palestinian Islamic Jihad (PIJ). To this end, the Martyrs Foundation established branches in Lebanon staffed by leaders and members of these same terrorist groups. Martyrs Foundation branches in Lebanon has also provided financial support to the families of killed or imprisoned Hezbollah and PIJ members, including suicide bombers in the Palestinian territories.

465.    The Martyrs Foundation–Lebanon does not conduct itself like any recognizable charity in the United States. As detailed below, Defendant LCB exempted the Martyrs Foundation–Lebanon from signing cash transaction slips disclosing the source of funds for transactions up to $100,000 per day at its Airport Road branch in Beirut.[25]

466.    The Martyrs Foundation–Lebanon imports and distributes cash (usually in U.S. dollars) at volumes that are unthinkable for a legitimate and ordinary charitable institution.

467.    The Martyrs Foundation owns and operates, among other facilities:

## A.  Al-Rasul al-Azam Hospital

468.    The hospital is located in one of Beirut's southern suburbs, Burj al-Barajneh, which is effectively controlled and governed by Hezbollah.

469.    The Martyrs Foundation–Lebanon receives funding from the Imam Khomenei Relief Foundation (an SDGT discussed later in the Complaint), which pays all medical expenses for Hezbollah's wounded operatives and an estimated 70 percent of the cost of caring for civilians injured in "resistance"-related fighting.

470.    Al-Rasul al-Azam Hospital and the new Hezbollah hospitals recently built in the South and in Baalbek employ large staffs and maintain substantial pools of medical professionals whose livelihood depends on Hezbollah.

---

[25]    The Financial Action Task Force (FATF), an independent inter-governmental body that develops and promotes policies to protect the global financial system against money laundering, terrorist financing and the financing of proliferation of weapons of mass destruction, issued a guide in 2015 titled *Combating The Abuse of Non-Profit Organisations*. It notes:

> There may be circumstances in which cash may be the only means possible for the NPO to operate, for example, to provide assistance to a particularly remote region where financial services are not available. While cash is inherently more risky to terrorist abuse, when cash is used, *it should be used appropriately in line with international and national laws and regulations, including cash declaration and/or cash disclosure requirements to promote greater transparency and accountability of the funds*. (Emphasis added.)

471.    The Lebanese Syndicate of Hospitals lists the Martyrs Foundation as having established the hospital and opened its doors in 1988.

472.    Dr. Muhammad Ali Bashir serves as the hospital's CEO, and Shawki Nur al-Din serves as the hospital's chairman.

473.    Al-Rasul al-Azam Hospital has a list of 1,800 Hezbollah martyrs' family members who receive preferential treatment, including priority appointments, superior rooms and nurses dedicated to their treatment.

474.    This happens even though Al-Rasul al-Azam claims to be committed to treating all Lebanese citizens; it is common knowledge that Hezbollah fighters and their families receive top priority.

475.    For example, a May 2013 article in *The New York Times* quotes a nurse from the hospital who stated that the facility was closed to civilian patients because it was "full of Hezbollah fighters." The article continues: "A Hezbollah militiaman stood guard with a walkie-talkie, near a large poster of a fighter who died recently and was commemorated as a martyr."

476.    In honor of the hospital's 25th anniversary, Hezbollah's leader, Hassan Nasrallah, delivered a speech at the hospital. He acknowledged the role of the Martyrs Foundation–Lebanon in establishing the hospital and went on to describe the hospital as part of the jihad, of the resistance.

477.    In July 2015, several sources published reports that an Iranian military delegation recovered the bodies of eight IRGC personnel after they were identified in, and transferred from, Al-Rasul al-Azam Hospital.

478.    In November 2015, ISIS claimed responsibility for twin suicide attacks near the hospital that left 43 dead. ISIS has declared such attacks are an attempt to exact revenge on

Hezbollah for its involvement in Syria.

479.    As a result of the ISIS attacks on the hospital, Hezbollah has erected walls and iron and concrete barriers in the vicinity of the hospital.

480.    Before the 2018 elections in Lebanon, the Hezbollah-affiliated publication *Al-Ahed* published an article calling Lebanese voters to support Hezbollah because of the services provided by Al-Rasul al-Azam Hospital.

481.    The article publicly noted that the hospital received over $1 million (U.S.) per month from the Imam Khomeini Foundation that subsidized costs to patients and urged voters to cast ballots for those who protect the country with "blood and medicine."

### B. Atlas Holding SAL

482.    The Martyrs Foundation–Lebanon also owns a holding company, Atlas Holding SAL, which it formally established in 2006 but operated in other forms previously.

483.    Atlas Holding SAL is effectively the investment arm of the Martyrs Foundation–Lebanon.

484.    As detailed previously, Atlas Holding SAL was co-founded by Hezbollah operative and Al-Rasul al-Azam Hospital CEO, Muhammad Ali Bashir; is managed by Hezbollah operative Qassem Muhammad Ali Bazzi; and was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro.

485.    Atlas Holding SAL makes no effort to conceal the fact that it is owned by the Martyrs Foundation–Lebanon, a U.S.-designated SDGT.

486.    Atlas Holding has a sister company (located at the same address) called **Atlas for Trade and Industry Ltd**.

487.    Atlas for Trade and Industry Ltd. was co-founded by Qassem Aliq, who was

designated as an SDGT on July 24, 2007, as "a Hizballah official who was previously the director for the Martyrs Foundation branch in Lebanon. In addition to overseeing Martyrs Foundation's operation, Aliq worked closely with senior Hizballah officials. Aliq currently serves as the director of Jihad al-Bina, a Lebanon-based construction company formed and operated by Hizballah and previously designated by the U.S. Department of the Treasury."

488.    Another founder of this company is Adnan Muhammad Ali Qassir, who served as the Hezbollah mayor of Deir Qanoun En Nahr.

489.    As with Atlas Holding, Atlas for Trade and Industry Ltd. lists one of Hezbollah's lawyers, Ali Hassan Berro, as the company's attorney.

490.    Atlas Holding SAL owns or controls a number of commercial enterprises. These include:

### (1) Shahed Pharm Drugstore SARL

491.    Shahed Pharm Drugstore SARL (discussed above) was co-founded by Hezbollah operative and Al-Rasul al-Azam Hospital CEO Muhammad Ali Bashir and Martyrs Foundation–Lebanon Director Shawki Nur al-Din; is managed by Hezbollah operative Qassem Muhammad Ali Bazzi; and was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro.

492.    Defendant LEBANON AND GULF BANK acts as the banker for Martyrs Foundation–Lebanon / Atlas Holding SAL sub-company Shahed Pharm Drugstore SARL.

### (2) Al-Amana SARL

493.    Al-Amana SARL (discussed above) is owned by the Martyrs Foundation–Lebanon through Atlas Holding SAL, which holds 98 percent of Al-Amana SARL.

494.    As detailed previously, Hezbollah operative Qassim Muhammad Ali Bazzi is the general manager and owns 1 percent, and the remaining one per cent is held by Osama Muhammad

Aliq. Muhammad Ali Bashir is listed as Founder of Al-Amana SARL. Al-Amana SARL was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro.

495.    Defendants LEBANON AND GULF BANK and BYBLOS BANK each provide banking services for this Hezbollah-controlled company.

### (3) Amana Plus Company

496.    Amana Plus Company (discussed above) was co-founded by Hezbollah operative and Al-Rasul al-Azam Hospital CEO, Muhammad Ali Bashir, Martyrs Foundation–Lebanon Director, Shawki Nur al-Din, and Qassem Muhammad Ali Bazzi. It is also managed by Hezbollah operative Qassem Muhammad Ali Bazzi, and was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro.

### (4) Société Orientale Libanaise d'Investissement et Développement SAL

497.    As detailed previously, Atlas Holding SAL is listed as a founder of the company (discussed above), but 50 percent of the registered shares belong to Hassan Ali Tajideen, executive manager of Tajco (SDGT), shareholder in Tajco SAE and son of Ali Tajideen—the U.S.-designated SDGT and Hezbollah financier, and his mother Nur al-Ain Muhammad Ali Atwi owns (35 percent) of the shares.

498.    Jihad Muhammad Qansu, a U.S.-designated SDGT associated with Adham Tabaja, is listed as the company's auditor. One of Hezbollah's lawyers, Ali Hassan Berro, is listed as the company's attorney. Defendant BYBLOS BANK acts as the banker for this Hezbollah-controlled company.

### (5) Medical Equipment and Drugs International Corporation SAL

499.    Medical Equipment and Drugs International Corporation SAL was established in

2013—*six years* after the U.S. designation of the Martyrs Foundation–Lebanon. It warehouses pharmaceutical products and medical equipment.

500.     Hezbollah operative Qassem Muhammad Ali Bazzi is the company's manager.

501.     Ninety percent of the company's shares are owned by Atlas Holding SAL, but at least four major Lebanese banks maintain accounts for it, including Defendants BYBLOS BANK SAL, JAMMAL TRUST BANK SAL, BANK AUDI SAL and BANK OF BEIRUT SAL.

### (6) Al-Kawthar

502.     Al-Kawthar is a clothing store chain in Lebanon. The company is owned by the Martyrs Foundation–Lebanon through Atlas Holding SAL, but 2 percent of the shares are owned by Hezbollah operative and Al-Rasul al-Azam Hospital CEO Muhammad Ali Bashir and Martyrs Foundation–Lebanon Director Shawki Nur al-Din (1 percent each). One of Hezbollah's lawyers, Ali Hassan Berro, is listed as the company's attorney.

503.     Al-Baraka Bank acts as the banker for this Hezbollah-controlled company.

### (7) City Pharma SARL

504.     City Pharma SARL is a Hezbollah-controlled pharmaceutical distributor also involved in counterfeit drug smuggling. As detailed previously, the company is owned by the Martyrs Foundation–Lebanon through Atlas Holding SAL, but 2 percent of the shares are owned by Hezbollah operative and Al-Rasul al-Azam Hospital CEO Muhammad Ali Bashir and Martyrs Foundation–Lebanon Director Shawki Nur al-Din. Defendant LEBANON AND GULF BANK acts as the banker for this Hezbollah-controlled company.

### (8) Global Touristic Services SAL (a/k/a GTS)

505.     Global Touristic Services SAL (discussed above) is owned by the Martyrs Foundation–Lebanon through Atlas Holding SAL. It was founded in 2008, after the Martyrs

Foundation–Lebanon was designated as an SDGT. The company claims to invest in tourism and hotel projects, hotels, restaurants, motels, furnished apartments, and restaurants in Lebanon and abroad. It also claims to invest in restaurants, cafes, snack bars, coffee and tea lounges of all grades as well as zoos, amusement parks and games, art museums, craft festivals and tourism festivals.

506. As previously detailed, Al-Rasul al-Azam Hospital's CEO Muhammad Ali Bashir and Martyrs Foundation–Lebanon Director Shawki Nur al-Din are co-founders of the company along with Hezbollah operative Qassem Muhammad Ali Bazzi.

507. Jihad Muhammad Qansu, a U.S.-designated SDGT associated with Adham Tabaja, is listed as the company's auditor, and one of Hezbollah's lawyers, Ali Hassan Berro, is listed as the company's attorney. Defendant BYBLOS BANK acts as the banker for this Hezbollah-controlled company.

### C. AL-MABARRAT CHARITABLE SOCIETY (A/K/A BENEVOLENT CHARITY SOCIETY)

508. Al-Mabarrat Charitable Society was established in 1978 and was founded by Hezbollah's spiritual leader, Sheikh Muhammad Hussein Fadlallah, who was designated as an SDT in 1995.

509. Al-Mabarrat operates a chain of schools, orphanages, clinics, educational and vocational centers, mosques and hospitals, including the Al-Hadi Institute.

510. Just as Sheikh Fadlallah provided "spiritual guidance" and Islamic legal justifications for Hezbollah's terrorist activities but denied being a formal member of the organization, Al-Mabarrat has long maintained the pretense that it is sympathetic to, but not part of, Hezbollah.

511. Sheikh Fadlallah's brother, Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah, serves as the organization's general manager.

119

512.    Sheikh Fadlallah's son, Ali al-Sayyid Muhammad Hussein Fadlallah, serves as the Association's president.

513.    Al-Mabarrat established a satellite organization in the United States known as "**Al-Mabarrat Society**," which was established in 1991 in Dearborn, Michigan.

514.    According to its English website, the charity's aim is to educate orphans and to secure sponsors and donations for fifteen schools and nine orphanages in Lebanon and Iraq.

515.    Talil Chahine, the former owner of the La Shish restaurant chain, was prominently linked to the U.S. organization prior to his indictment on federal tax evasion charges for allegedly concealing more than $20 million (U.S.) in restaurant profits and funneling some of those funds to Lebanon.

516.    In 2002, Chahine, whom federal prosecutors asserted had "connections at the highest levels of ... Hezbollah," attended an Al-Mabarrat fundraiser in Lebanon at which he and Fadlallah served as the keynote speakers.

517.    On July 24, 2007, FBI agents raided Al-Mabarrat's office in Dearborn, and seized files, paperwork and financial records, but the organization was never indicted or closed.

518.    In addition to funds it has raised in the United States through the Al-Mabarrat Society, the parent organization owns and operates several commercial enterprises in Lebanon and around the world. These include the following entities:

### (1) Arab Lebanese Trading & Contracting Company

519.    Arab Lebanese Trading & Contracting Company was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro. The company is co-owned by Al-Mabarrat's general manager, Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah, its president, Ali al-Sayyid Muhammad Hussein Fadlallah, and Hamzah Safieddine, the brother of two of Hezbollah's most

powerful leaders, Hashem and Abdallah Safieddine.

520.    Hamzah Safieddine's (nominal) ownership stake highlights the close connection between Al-Mabarrat and Hezbollah.

### (2) Assaha International Group (Offshore) SAL

521.    Assaha International Group (Offshore) SAL was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro (who also owns some shares in the company). The company is co-owned by Al-Mabarrat's general manager, Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah, and an individual named Jamal Makke.

### (3) Assaha Travel and Tourism SARL

522.    Assaha Travel and Tourism SARL, as discussed previously, was also incorporated by one of Hezbollah's lawyers, Ali Hassan Berro, but is owned by Al-Mabarrat directly.

523.    Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah and Jamal Makke co-founded the company and are partners in it, each one holding 5 percent of the shares.

524.    The company operates **Assaha Village,** a historically themed restaurant and event space in the heart of the Hezbollah-controlled southern outskirts of Beirut.

### (4) Al-Ittam Company for General Trading and Fuels

525.    Al-Ittam Company for General Trading and Fuels (a/k/a Aytam Petroleum), is a company which deals with trade, import and export, "especially in the field of hydrocarbons trade and other petroleum derivatives." Its director is Hassan Hamd Surur (who is also the auditor of Assaha International Group Offshore SAL). Both Hamzah Safieddine's (nominal) ownership stake and Sheikh Fadlallah's brother and son serving as founders of the company highlight the close connection between Al-Mabarrat, Al-Ittam and Hezbollah.

526.    Additionally, the company is co-owned by Al-Mabarrat's general manager,

Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah, Ahmad Muhammad Hussein Fadlallah (Sheikh Fadlallah's son), Abdallah Ismail al-Zayn, Ali al-Sayyid Muhammad Hussein Fadlallah (Sheikh Fadlallah's son), and Muhammad Ali al-Sayyid Abd al-Ra'uf Fadlallah (Sheikh Fadlallah's brother). Al-Mabarrat itself is listed as a partner.

527.    It was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro's sister—Zeinab Hassan Berro.

### (5) The Lebanese-Arab Company for Touristic Services

528.    The Lebanese-Arab Company for Touristic Services is a tourism company. As previously detailed, it is owned by Al-Mabarrat, Jamal Ali Makke, Hamzah Ali Safieddine, Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah, and Ali al-Sayyid Muhammad Hussein Fadlallah. It was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro.

529.    The Lebanese-Arab Company for Touristic Services is the major shareholder (63 percent) of **Rayan Foods** (discussed above), nominally an import and export company that focuses on renting, manufacturing, buying and selling various kinds of machinery and equipment, building materials, artificial stones, sanitary ware, electricals, paints, fuel, wood, metals, plastic, fertilizers, agricultural medicines, material and non-material movables, labor and brokering, abroad and in Lebanon. It also purports to be involved in management, investment, construction and rental of restaurants, amusement parks, cafes, cinemas, hotels, furnished apartments, and the use of all tourism businesses.

530.    As detailed previously, another major shareholder of Rayan Foods SAL is Ali Radwan Aidibi (31.81 percent). Ali Muhammad Hussein Fadlallah holds thirty shares and is the chairman; Jihad Muhammad Qansu (SDGT) is its auditor; Jamal Ali Makke is a board member and holds ten shares; and Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah is a board member

and holds ten shares. It was also incorporated by Hezbollah's Ali Hassan Berro.

### D. IMAM KHOMENEI RELIEF FOUNDATION– LEBANON ("IKRC") (A/K/A ISLAMIC CHARITABLE EMDAD COMMITTEE)

531.    The Imam Khomenei Relief Foundation was formed in 1979 by the Iranian government as a charitable organization, officially to help poor families and allow them to regain financial stability. It operates throughout the Middle East and has branches all over the region. As a key instrument of soft power used to promote Iran's ideological and political goals, IKRC is a humanitarian aid organization that also organizes anti-American protests, promotes Shi'a Islam and has been known to work closely with the IRGC–QF.

532.    The Imam Khomenei Relief Foundation–Lebanon is the Lebanese branch of IKRC ("IKRC-Lebanon"). It was reportedly established in Lebanon in 1987 and became a public welfare association by a Lebanese presidential decree in 1994.

533.    The Imam Khomenei Relief Foundation–Lebanon defined itself in 1997 as "a charitable NGO started by Hizbullah to alleviate social hardship in that part of the Lebanese population most affected by the Israeli occupation of the south of the country." IKRC–Lebanon maintains branches throughout Shi'a populated areas of Lebanon.

534.    Hezbollah controls and sets the policy for the Imam Khomenei Relief Foundation– Lebanon and determines the allocation of its budget.

535.    IKRC–Lebanon was designated as an SDGT on August 3, 2010.

536.    According to the U.S. Department of the Treasury, IKRC–Lebanon "is a Hizballah social service organization that was created by the Government of Iran in the 1980s and is directed and run by Hizballah members or cadre. Iran has provided millions of dollars to the Hizballah-run branch in Lebanon since 2007. The IKRC has helped fund and operate Hizballah youth training

camps, which have been used to recruit future Hizballah members and operatives. Hizballah Secretary General Hassan Nasrallah has acknowledged the IKRC branch in Lebanon as one of Hizballah's openly-functioning institutions linked to and funded by Iran."

### E.   WOUNDED ASSOCIATION (A/K/A *MUASSASAT AL-JARHA* / AL-JARHA ASSOCIATION)

537.   The Wounded Association (a/k/a *Muassasat al-Jarha*) was registered in Lebanon on October 31, 1992. The organization's stated focus is caring for people wounded in the "Resistance."

538.   The Wounded Association belongs to and is controlled by Hezbollah.

539.   For example, the Lebanon-based *Daily Star* published a feature story in 2002 about the Wehbe family that received financial assistance from the Association:

> The purchase of the apartment and all its perks come with compliments from the Al-Jarha (Wounded) Association, which caters to the war-wounded and disabled and is one of the social services provided by Hizbullah.
>
> Established in 1989, the association, located in Beirut's southern suburbs, cares for over 3,000 men, women and children. Eighty percent of the men the association assists were resistance fighters.

540.   The Association also received mention in Hezbollah leader Naim Qassem's book, *Hizbullah: The Story from Within.*

### h.   MEDIA / ENTERTAINMENT

#### 1.   Lebanese Communication Group

##### A.   *Al-Manar*

541.   *Al-Manar* started broadcasting in 1991 and began satellite broadcasts in 2000.

542.   *Al-Manar* raised funds for Hezbollah through advertisements broadcast

on the network and an accompanying website that requested donations for the terrorist organization.

543.     As recently as late 2005, Hezbollah-affiliated charities aired commercials on *Al-Manar*, providing contact information and bank account numbers for donations. Moreover, Hezbollah Secretary General Nasrallah publicized an invitation for all Lebanese citizens to volunteer for Hezbollah military training on *Al-Manar* and *Al-Nour* (discussed below).

544.     In addition to supporting Hezbollah, *Al-Manar* has also provided support to other designated Palestinian terrorist organizations, including Palestinian Islamic Jihad ("PIJ") and Al Aqsa Martyrs Brigade, notably transferring tens of thousands of dollars for a PIJ-controlled charity. PIJ is listed as a Specially Designated Terrorist, Specially Designated Global Terrorist, and a Foreign Terrorist Organization by the U.S. Government, and is also named on the European Union's list of terrorist entities.

545.     The U.S. Department of State added *Al-Manar* to the Terrorism Exclusion List (TEL) in December 2004. *Al-Manar* was designated by the U.S. Department of the Treasury as an SDGT on March 23, 2006.

### B.  *Al-Nour*

546.     *Al-Nour* is Hezbollah's primary radio station. The station started broadcasting on May 9, 1988 and is supported by the IRGC. The station had several names, including: Voice of Islam (Sawt al-Islam), Voice of Faith (Sawt al-Iman), and Voice of the Oppressed (Sawt al-Mustadafin). The station broadcasts mostly news, but also programs with religious contents and programs about the lives of terrorists who were killed or captured.

547.     *Al-Nour* was designated by the U.S. Department of the Treasury on March 23, 2006.

### 2. Hezbollah's Baqiyat Allah Magazine

548.    Baqiyat Allah Magazine was founded in 1991 as a cultural magazine to be distributed to Hezbollah operatives and commanders.

549.    It is printed by Hezbollah's Dbouk International for Printing and General Trading, which was registered by leading Hezbollah-affiliated attorney Ali Hassan Berro.

550.    The magazine is supervised by Al-Ma'aref Islamic Cultural Society.

551.    A 2015 issue of the magazine (No. 119) describes Hezbollah's various charitable institutions as part of the "society in resistance."

552.    Among the institutions described in the articles are the Islamic Resistance Support Organization ("IRSO"), The Martyrs Foundation–Lebanon, The Wounded Association, the Imam Khomenei Relief Foundation and Jihad al-Bina. The articles emphasize how these institutions are all integral parts of the Resistance.

### 3. Arts Council

553.    **Risalat (a/k/a Lebanese Arts Foundation)** was established in 2006, as a Hezbollah-run cultural institution. It is subordinate to Hezbollah's "Technical Activities" unit (part of the Executive Council, under Hashem Safieddine). Risalat operates exhibitions and offers art courses, lectures and workshops. It is headed by Kamal al-Din Kawtharani.

554.    **Mleeta Museum** (a/k/a "The Tourist Landmark of the Resistance," a/k/a "Museum for Resistance Tourism") is a "war" museum operated by Hezbollah's Executive Council.

555.    The museum was established on May 25, 2010 and aims to "circulate the culture of the resistance and work on building a resisting society; give attention to the ideological, artistic and cultural activities of relevance to the resistance; deepen the concept of martyrdom and explain its role in making life and preserving homeland, territory and sanctities."

126

556.    The site offers its visitors a chance to see its "spoils of war" exhibitions "gained by the resistance fighters since the beginning of the conflict with the enemy. In addition, information about the Zionist enemy and its different military formations are exhibited."

557.    Other sections of the museum include "The Pathway" – "a trail where thousands of Mujahedeen had positioned during the years of occupation… [and] launched to execute military operations against the opposing enemy outposts, reaching the occupied buffer zone." Another exhibit is titled "The Cave," which the museum states was "built by the resistance fighters for shelter … dug in rotation by more than 1000 freedom fighters over a span of 3 years."

### 4.  Amusement Parks

558.    The following Hezbollah-controlled entities operate in Lebanon:

- **Fantasy World SARL** is an amusement park with a restaurant operating in Beirut. It is headed by Adham Tabaja, who is also its founder, majority shareholder and board member. Amin Muhammad Cherri, a shareholder in al-Manar and Hezbollah's candidate for the parliament elections in 2005, is a co-founder of the company. The company's other partners and shareholders include Imad Muhammad Cherri, Ali Adham Tabaja and Muhammad Adham Tabaja. It was incorporated by Ali Hussein al-Ashi, a Hezbollah affiliated lawyer. Adham Tabaja's brother, Romel Hussein Tabaja, is listed as the company's co-founder.

- **City Park SARL** is a company which operates an amusement park and is part of Adham Tabaja's Al-Inmaa for Entertainment and Leisure Projects. Adham Tabaja, his brother Romel Tabaja, and Issam Ahmad Saad (SDGT) are shareholders and co-founders of the company. The company's other partners are Nada Hassan Hijazi and Abbas Ahmad Fahas. The company's attorney is Butrus Michel Ghanimah.

- **Family Park SARL** is a "Hezbollah-run and -financed amusement park," and part of Adham Tabaja's Al-Inmaa for Entertainment and Leisure Projects. The company's prominent partners are Raed Hashem al-Amin, Ali Rauf Shaito, Issam Ahmad Saad (SDGT), Rauf Ali Shaito, and Attallah Jamil Shaito.

- **Fun World Company** is an amusement park founded by Adham Tabaja and Issam Ahmad Saad (SDGT) and is affiliated with Tabaja's Al-

127

Inmaa for Entertainment and Leisure Projects. The company's majority shareholder and chairman is Fadi Ali Hawi. Compass Insurance SAL (owned by the Tabaja family, and which also owned a substantial stake in LCB) is another shareholder. Other noteworthy co-founders are Muhammad Taha Jumaa, a prominent figure in Tabaja's Network as well as Hezbollah's candidate for a seat in the town of Houmine al-Fawqa; and Imad Ramez Wazani, another prominent part of the Tabaja Network. The company's lawyer is Ali Hussein al-Ashi.

- **Farah Tyre SARL** is (supposedly) an amusement park in Abbassiya, near Tyre. Abbas Muslim Wehbe is the majority shareholder; Hassan Muhammad Attiya (part of the Tabaja Network, candidate for a seat in al-Khiyam on behalf of Hezbollah's list) and Ali Hussein Tabaja (Adham's brother) are also partners.

- Other related companies are Family House SARL, Hoops, Nexus SARL, Mikalab Company LLC, Farah Company for Tourism/Farah Travels Company SAE, Alia Company SAE, Mudun Tourism Projects Company SAL "Green City," Global Touristic Services SAL and Rayan Foods SAL.

### 5.  Golf Courses

559.    Al-Dalhamiya Country Club Company is a country club in the Bekaa Valley controlled by the Tajideen family.

560.    Hassan Hejeij (SDGT), a Shi'a businessman, runs a company named SOCOFI (Société de Construction et de Financement), which owns the gold club Mindoubé in Gabon. His brother, Kassem Hejeij, has been designated by the U.S. Department of the Treasury on June 10, 2015, for supporting Hezbollah financially:

> In addition to his support to Adham Tabaja and his affiliated companies in Iraq, Hejeij has helped open bank accounts for Hizballah in Lebanon and provided credit to Hizballah procurement companies. Hejeij has also invested in infrastructure that Hizballah uses in both Lebanon and Iraq.

561.    Along with his brother, Hassan Hejeij co-founded and was majority shareholder (58.75 percent) in MEAB.

### i.   AUTOMOTIVE SALES

562.   The following Hezbollah-controlled entities operate in Lebanon and Africa:

- **Car Escort Services (Offshore) SAL** is an import/export company based in Lebanon. Its chairman and shareholder is Ali Muhammad Kharrubi (designated an SDNT by the U.S. Department of the Treasury). Other shareholders and board members are Ali Yussuf Charara and Muhammad Ibrahim Bazzi (SDGT); each holds 1,000 shares. Both are prominent Hezbollah financiers.

- **Shaito Group SARL** deals with the trade of cars, machines and spare parts. Its co-founder and shareholder Attallah Jamil Shaito (a/k/a Shai'tu or Cheaito) is a prominent member of the Tabaja Network and holds various positions in companies directly owned by Adham Tabaja. Additionally, he is a politician from south Lebanon, and has run for a seat in a Hezbollah-supported list in the Lebanese elections of 2004. In 2010, he was elected president of Bint Jbeil District's Municipalities' Federation. Other shareholders and partners in the company are his family members. The company's attorney is Hisham Ali Faqih.

- **Car Care Center and Mikalab Company**[26] is a Lebanese one-stop-shop for car services including problems fixing, cleaning, car sales, spare parts sales, and so forth. The company was designated by the U.S. Department of the Treasury on June 2015 for its ties with Hezbollah. Former manager of Car Care Center, Hussein Ali Faour (SDGT), worked with Adham Hussein Tabaja to manage Al-Inmaa's projects in Iraq. Car Care Center is one of the most important companies established by Hezbollah. The company was located in a compound owned by Hezbollah in south Beirut and is secured by Hezbollah personnel. The company was incorporated by Faruq Muhammad Raef Hammoud, an attorney affiliated with the Tabaja Network (he is the attorney of African Fish Company SAL off shore, in which many prominent members of the Tabaja and al-Amin Networks are involved).

- **Ellissa Group SA** deals in sales of used cars in Africa, operating in Benin. It is owned by Ali Muhammad Kharrubi (who was designated, as mentioned above) and Ellissa Holding SAL, its parent company (of which, in turn, Kharrubi is majority shareholder as well). According to the investigation of the U.S. Drug Enforcement Administration, under the cover of selling used cars, Ali Muhammad Kharrubi's Ellissa

---

[26]   Car Care Center and Mikalab Company LLC appear to be the same company based on the fact that both companies had the same registration number as well as a few management personnel in common (as of the December 2017 registry form). Mikalab Company is headed by Khidr Ali Abi Haidar, who is also a partner and shareholder in the company. Hussein Ali Faour and his son, Batul, are listed as co-founders of Mikalab as well. Other shareholders and partners are Abd al-Mu'in Jawad al-Amin and Abbas Ali Karim.

company carries out illicit activities, including money laundering to finance Hezbollah. On January 18, 2012 the Beninese Government had decided to ban Ellissa Group.

- **Ellissa Park Cotonou/Ellissa Car Park** is a subsidiary of Ellissa Group SA and owned by it. It was also a part of Ayman Juma'a's drug trafficking and money laundering network. For this reason, it has been designated as SDNTK by the U.S. Department of the Treasury. Ellissa Park serves as an area to receive and sell used cars imported to the Cotonou port.

### j.   ARMS DEALING

563.   Hezbollah has strong connections to (among others) an arms-dealing network in Nigeria.

564.   One of Hezbollah's most prominent arms dealers is Mustafa Reda Darwish Fawaz who was designated by the U.S. Department of the Treasury as an SDGT on February 26, 2015 "for acting for or behalf of Hizbullah."

565.   Mustafa Fawaz has been a significant donor to Hezbollah and a member of Hezbollah's Islamic Jihad Organization.

566.   He is a Lebanese citizen who owns a chain of supermarkets in Abuja, Nigeria called Amigo Supermarket Ltd (an SDGT) as well as the Wonderland Amusement Park and Resort Ltd (an SDGT) in Abuja, Nigeria.

567.   According to the U.S. Department of the Treasury, since the 1990s, Mustafa Fawaz has been involved in activities related to communications, surveillance, and reporting for Hezbollah. He communicated with Hezbollah in Lebanon by e-mail and reportedly received updates and newsletters regarding Hezbollah activities and distributed this information to other Hezbollah supporters in Abuja, Nigeria.

568.   According to the U.S. Department of the Treasury, Mr. Fawaz used special surveillance cameras based at Amigo Supermarket (SDGT) to monitor the movements of

foreigners, especially Israelis.  He also provided Hezbollah with a report of his visit to the U.S. Embassy in Nigeria.

569.    As of at least mid-September 2003, Mustafa Fawaz solicited donations in Abuja, Nigeria, and helped arrange the transmission of these funds to Hezbollah in Lebanon.

570.    Mr. Fawaz maintained multiple accounts at Defendant BLOM BANK.

571.    In mid-May 2013, the Nigerian State Security Service arrested Mustafa Fawaz and two other men after the discovery of an arms cache in a residence in the northern Nigerian city of Kano.

572.    On May 30, 2013 Nigerian intelligence agents escorted journalists to a property in Kano and showed them a bunker where a massive haul of weapons had been stored.

573.    A Nigerian official, Bassey Etang, described the room as a "Hezbollah armory."

574.    Mustafa Fawaz reportedly confessed the details of Hezbollah activities in Nigeria and identified additional names of other Hezbollah IJO cell members in Nigeria, as well as a specific property in Kano, Nigeria, that was used to support terrorism.

575.    In November of 2013, Fawaz and one of the men arrested with him were acquitted of the charges against them because Hezbollah was not an illegal organization in Nigeria.

576.    The third man was convicted of conspiring to import weapons illegally.

577.    Fouzi Reda Darwish Fawaz, Mustafa Fawaz's brother, was also part of Hezbollah's Nigerian network.

578.    He was designated as an SDGT on February 26, 2015.

579.    Fouzi Fawaz was a Hezbollah Foreign Relations Department (FRD) official in Abuja, Nigeria. The FRD claims to be in charge of "community relations;" but the primary goal of the FRD in Nigeria was to scout recruits for Hezbollah's military units, as well as to create and

support Hezbollah's terrorist infrastructure in Africa and globally.

### k.  TECHNOLOGY & COMMUNICATIONS

580.    Among the technology companies that generate revenue for Hezbollah are Spectrum Investment Group Holding SAL and Spectrum International Investment Holding SAL, Lebanon-based telecommunications companies controlled by Ali Yussuf Charara (an SDGT) and his brother, Muhammad Yussuf Charara, that provide integrated telecommunications services in the Middle East, Africa, and Europe.

581.    The companies are involved in the following activities Telecommunication operations and management owning 50 percent of Gamtel - Gambia Telecommunications Company Ltd. (for fixed telephone lines), together with Gamcel (for mobile lines).

582.    In August 2008, the Government of Gambia sold 50 percent shares of Gambia Telecommunications Company Ltd to Spectrum Investment Group.

583.    Spectrum Investment Group Holding SAL was established on May 27, 2003.

584.    Spectrum International Investment Holding SAL was founded on December 9, 2007.

585.    Both Spectrum Investment Group Holding SAL and Spectrum International Investment Holding SAL were designated as SDGTs on January 7, 2016.

586.    Principal Bankers of Spectrum Investment Group Holding SAL comprise the following Defendants:

- BANK AUDI, Verdun Branch, Beirut;
- JAMMAL TRUST BANK, Verdun Branch, Beirut;
- BLOM BANK; and
- LEBANON AND GULF BANK.

### l.  NARCOTICS TRAFFICKING

587.    Hezbollah has exploited its control of Lebanon's Bekaa Valley to grow poppies and

cannabis.

588.    Hezbollah has also established an extensive network of laboratories for processing heroin and hashish, mostly smuggled in from Afghanistan and Pakistan.

589.    The Bekaa Valley also serves as a transit point for cocaine harvested in Colombia.

590.    The Hamiyya clan of Teraya, the Telis and Mathloum clans from Ritaal, and the al-Masri clan from Ta'ala are the most prominent Hezbollah-affiliated clans in the Bekaa Valley that run the narcotics trade.

591.    Hezbollah has also cultivated strong ties to the Lebanese Shi'a expatriate communities around the world, particularly in Africa and South America (especially in the Tri-Border Area of Paraguay, Brazil, and Argentina), and it has used these connections to establish an extensive international operational infrastructure to launder money and drugs through the international financial system.

592.    During the last decade, drug trafficking organizations with links to Hezbollah have increasingly used countries along or near the West African coast as trans-shipment hubs for importing massive quantities of narcotics, particularly cocaine from South America, to be later distributed in Europe or elsewhere within Africa.

593.    Through a combination of privately-owned aircraft and maritime vessels, these Hezbollah-controlled organizations, predominantly based in Venezuela and Colombia, have transported hundreds of tons of cocaine, worth billions of dollars, to West African nations such as Benin, Sierra Leone, and Togo.

594.    According to a 2010 report by the U.S. Congressional Research Service, law enforcement officials seized at least 46 metric tons of cocaine bound for Europe via West Africa between 2005 and 2008.

595.    As much as 300 metric tons of cocaine, worth approximately $13.5 billion (U.S.), is estimated to be trafficked through West Africa to Europe each year.

596.    The wholesale profits reaped by narco-traffickers during this period are estimated to be approximately $3.5 billion (U.S.) per year.

597.    Perhaps the most important Hezbollah operative involved in the drug trade is Ayman Joumaa—a Specially Designated Narcotics Trafficker who was indicted on November 23, 2011 and charged with conspiracy to distribute narcotics and conspiracy to commit money laundering.

598.    The indictment alleged that Joumaa and his co-conspirators coordinated the shipment of tens of thousands of kilograms of cocaine, including at least 85,000 kilograms of cocaine sold to Los Zetas, a Mexican drug cartel, between in or around 2005 to in or around 2007.

599.    The indictment also alleged that Joumaa laundered hundreds of millions of dollars in drug proceeds from West Africa, Europe, Mexico and the United States, largely for cocaine suppliers in Colombia and Venezuela, who paid Joumaa's organization a fee of between 8 percent and 14 percent of the laundered proceeds.

600.    According to the U.S. Government, Joumaa and his organization operate in Lebanon, West Africa, Panama and Colombia, and launder proceeds from their illicit activities, as much as $200 million per month, through various channels, including bulk cash smuggling operations and Lebanese exchange houses.

601.    According to the U.S. Government, Joumaa's organization pays fees to Hezbollah to facilitate the transportation and laundering of narcotics proceeds.

602.    For example, Mr. Joumaa's organization sends bulk cash shipments through the Beirut International Airport and pays Hezbollah security to safeguard and transport the cash to its

134

recipient.

603.    On January 26, 2011 the U.S. Department of the Treasury targeted Ayman Joumaa's drug and money laundering network. According to then-OFAC Director, Adam J. Szubin, Ayman Joumaa (SDNT) ran "a complex money laundering scheme moving hundreds of millions of dollars of illicitly derived proceeds through businesses operated by him and his associates."

604.    Ayman Joumaa's network used several money changers in Lebanon in order to launder the drugs money, among them the Hassan Ayash Exchange Company, the Ellissa Exchange Company, and New Line Exchange Trust Company, all designated SDNTs on January 26, 2011.

605.    The following chart diagramming the Joumaa Network was prepared by the U.S. Department of the Treasury:



606.    On October 1, 2015, the U.S. Department of the Treasury designated four Lebanese and two German nationals and eleven companies as SDNTs pursuant to the Foreign Narcotics Kingpin Designation Act (Kingpin Act).

607.    These individuals provided support for narcotics trafficking and money laundering activities conducted by Lebanese-Colombian drug trafficker and money launderer Ayman Saied Joumaa, key Joumaa associate Hassan Ayash, and the Joumaa criminal organization, which has ties to Hezbollah.

### m.  PHARMACEUTICALS AND COUNTERFEITING MEDICATIONS

608.    Hezbollah is also heavily involved in the international sale of pharmaceuticals,

136

including counterfeit medicines.

609. Counterfeiting medications is an attractive business for Hezbollah because the investment required to establish the infrastructure for counterfeiting medications is relatively modest, but the profits can be comparable to those achieved from the sale of narcotics.

610. The criminal sanctions for counterfeiting medications are minimal with far lighter sentences typically imposed than for drug trafficking.

611. Hezbollah has actively sold large quantities of counterfeit drugs, including:

- Captagon, which contains the amphetamine fenethylline (a synthetic stimulant), used to treat attention deficit hyperactivity disorder (ADHD); and

- Plavix (an anti-coagulant pill used to treat cardiac disease).

### n. INTERNATIONAL TRADE

612. At least hundreds of millions of dollars in U.S. currency are transported annually from Benin and other West African countries to Lebanon by money couriers, hawaladars, and currency brokers.

613. These U.S. dollar-denominated funds include the proceeds of car sales from the Benin car parks, along with the proceeds of narcotics trafficking, money laundering proceeds, and other crimes. A significant portion of this money moves through courier and security networks controlled by Hezbollah or individuals affiliated with Hezbollah.

614. The proceeds of the car sales help to conceal and disguise the true source, nature, ownership, and control of the narcotics proceeds.

615. For example, Ellissa Group (SDNT, discussed above)—headed by two Lebanese brothers Ali Muhammad Kharrubi (SDNTK) and Jamal Muhammad Kharrubi (SDNTK)—ran money exchange and used car selling companies in Lebanon and in Benin, Africa.

616.    On the night of January 17, 2012, the Benese Government arrested Ali Muhammad Kharrubi. His permanent residency status was withdrawn, he was declared "persona non grata" by Benese media and was extradited to the U.S. for his ties to Hezbollah.

617.    Similarly, according to the U.S. Government, between 2003 and 2011, at least 34 individuals who transported cash from Togo to Ghana also sought entry to the United States on non-immigrant visas. Most of them listed their employment as car buyers or car traders, and some identified as their points of contact U.S. car buyers who received wire transfers from LCB, the Hassan Ayash Exchange and the Ellissa Exchange (discussed herein).

618.    Hezbollah also uses money couriers to transport millions of undeclared U.S. dollars. As just one example, on December 9, 2010, three individuals connecting through Paris on their way from Benin to Lebanon were arrested while carrying over $6.5 million in undeclared U.S. currency. One of the individuals was also carrying a business card for Ellissa Megastore, Ellissa's car lot in Cotonou.

619.    Hezbollah frequently blurs the lines between narcotics trafficking, trade and money laundering. For example, a network of at least 44 Hezbollah-affiliated couriers *declared* over $97 million in U.S. currency at the border crossing between Ghana and Togo in West Africa in 2007 and 2008 alone.

620.    One of the individuals who transported money across the border between Ghana and Togo was Hassan Chokr, a Hezbollah weapons dealer.

## C.  THE IRGC DEPLOYS HEZBOLLAH SIGNATURE WEAPONS IN IRAQ

621.    One of the first indications that Hezbollah operatives might be present in Iraq after the U.S.-led invasion came in an article in *The New York Time*s published in November 2003 that stated:

> Both American and Israeli intelligence have found evidence that Hezbollah operatives have established themselves in Iraq, according to current and former United States officials. Separately, Arabs in Lebanon and elsewhere who are familiar with the organization say Hezbollah has sent what they describe as a security team of up to 90 members to Iraq. The organization has steered clear of attacks on Americans, the American officials and Arabs familiar with Hezbollah agree.

622. Hezbollah's reluctance to attack Americans was short-lived. During the next twelve months, Hezbollah would begin to gradually introduce both weapons and operational training into the Iraqi theatre that roughly corresponded to the U.S. military's effort to improve the armor protection of its vehicles.[27]

623. Beginning in late 2004 and into early 2005, the U.S. military began deploying up-armored HMMWVs equipped with one inch of rolled homogeneous armor ("RHA") on all doors and one-inch thick ballistic glass windows that were capable of absorbing and/or deflecting shrapnel from basic (non-technologically advanced) IEDs and small arms fire.

624. With the increasing ubiquity of the "up-armored" HMMWVs, improvised roadside bombs became a much less effective weapon against U.S. personnel because their blasts and shrapnel could not penetrate American vehicles' increased armor plating.

625. In response, the IRGC–QF directed Hezbollah to begin supplying their proxies with increasing numbers of EFPs that could defeat this newly-introduced American armor.

626. An EFP warhead is normally constructed with a 3- to 12-inch diameter steel pipe with one end sealed with a welded steel plate and a priming hole for the insertion of a detonator. The open end of the pipe is then packed with high-energy ("HE") explosive and closed with a copper plate.

---

[27] When American troops first invaded Iraq in 2003 and occupied Baghdad, generally only the U.S. military police possessed armored vehicles.

627. After detonation, the explosion creates enormous pressure that accelerates the liner (copper plate) while simultaneously reshaping it into a molten slug.

628. The EFPs Hezbollah deployed in Iraq were generally made with precision manufactured concave copper disk liners and HE explosives, such as Iranian-manufactured C-4, packed behind the liner.

629. As with any explosive device, EFPs had to be first be armed, then triggered.

630. "Arming" an EFP can best be described as transitioning the weapon from a passive or standby mode into an active, or ready mode. Once armed, an EFP is primed to detonate upon the occurrence of a given event.

631. That event is known as the "trigger."

632. In Iraq, EFPs were usually armed by remote frequency ("RF") or (insulated) command wire ("CW") capable of carrying a low-level electric charge with a maximum range of around 100 meters.

633. RF arming could be achieved using something as simple as a key-fob or as complex as a dual-tone multi-function reference board using the inside of a cell phone.

634. As noted above, a key signature of Hezbollah's TTP was the use of PIR devices in conjunction with EFPs.

635. Once remotely armed, by RF or command wire, an EFP would be triggered when the PIR would, for example, detect the heat signature of a passing vehicle and send an electrical current that set off the explosion within the EFP's casing.

636. In essence, passing American military vehicles would themselves trigger the EFPs.

637. To defeat Hezbollah's PIR triggers, Coalition Forces developed numerous counter-measures – just as the IDF had some years earlier.

638.   For example, the American military developed a device named a "Rhino" that consisted of a flat piece of metal at the end of a boom that was attached to the front of the combat vehicle. The metal was heated by the vehicle's engine, creating a heat signature that simulated the heat of the vehicle. When effective, the Rhino would cause an EFP's PIR trigger to mistake the Rhino for the vehicle itself, resulting in the device's premature detonation.

639.   Hezbollah, however, had gained extensive experience countering the IDF's tactics and quickly directed its agents in Iraq to recalibrate the aim of their EFPs, angling them backward to account for the recent deployment of heat-generating decoys.

640.   While such emplacing techniques might appear elemental, in hostile conditions they are far more complex, requiring a keen understanding of average U.S. convoy speeds, the extension lengths of the rhinos, the distance of the EFP from the target, and other battlefield variables.

641.   To evaluate the problem set presented, make targeting adjustments and communicate them across the battle space effectively is enormously challenging, particularly since the Hezbollah-directed cells were subject to surveillance, arrest and targeting.

642.   Yet, notwithstanding these complexities, with the help and direction of Hezbollah, its local Shi'a terror cells began successfully emplacing EFP arrays at precise angles that countered the Rhinos and resumed inflicting maximum damage to these moving, armored targets.

643.   In addition to EFPs, the IRGC–QF provided their proxies in Iraq with a variety of other lethal weapons that Hezbollah had previously tested against the IDF in Lebanon.

644.   During the 1980s and 1990s, Hezbollah frequently deployed 107 millimeter ("mm") and 122mm artillery rockets (frequently referred to as "Katyusha rockets") against IDF positions in southern Lebanon and against Israeli border towns in northern Israel.

645.    IRGC–QF and Hezbollah proxies in Iraq trained and directed by Hezbollah used these same types of artillery rockets in their indirect fire attacks on U.S. and Coalition Forward Operating Bases and MNF–I Headquarters in the Green Zone.

646.    Throughout 2004-2011, Hezbollah continuously adapted and modified tactics to adjust to U.S. Military counter-measures and then instituted those adaptations through the Iraqi terror cells they directed.

### D. HEZBOLLAH'S INVOLVEMENT IN TERRORISM IN IRAQ

647.    Initially, the Hussein government sponsored the late Ayatollah Muhammad Sadiq al-Ṣadr, a leading Shi'a cleric in Iraq during much of Saddam Hussein's rule, as a relatively moderate counterbalance to the influence of more radical Shi'a religious leaders. The Hussein regime allowed Sadiq al-Sadr to appoint imams to lead mosques in hundreds of towns and cities.

648.    Sadiq al-Sadr used this opportunity to develop a cohesive network under his guidance and control. He was particularly popular in the Shi'a slums of Baghdad and Basra and had established a network of mosques and social institutions that attempted to mirror Hezbollah's development in Lebanon.

649.    Unlike many of his Shi'a clerical peers, Mr. Sadr was not particularly favorably disposed toward Iran, even after the Islamic revolution in 1979, remaining instead an Arab nationalist and supporting Arab control of the seminaries of Najaf, traditionally dominated by senior clerics who are either Iranian-born or of Iranian descent.

650.    Nonetheless, the Hussein regime ultimately came to regard Sadr as a political threat and assassinated him and his two oldest sons, leaving his youngest son, Muqtada al-Sadr, as the de facto successor to what became known as the Sadrist Movement.

651.    The Sadrist Movement commanded the loyalty of perhaps millions of Iraqi Shi'a,

but under the Hussein regime's rule it had no military capacity; it was almost exclusively a social and political movement.

652.   The 2003 U.S.-led invasion freed Muqtada al-Sadr and his followers from the constraints placed on them by the Hussein regime, and the young Sadr set his sights on becoming the preeminent leader of Iraq's Shi'a community.

653.   At the invitation of Iran's Supreme Leader, Ayatollah Khamenei, Mr. Sadr and his key deputies were formally received in Iran in June 2003, shortly after the U.S. invasion.

654.   General Abdul Reza Shahlai—a deputy commander of the IRGC–QF—served as the "chief of protocol" for the visit and Qasem Soleimani, IRGC–QF Commander, served as host to the Sadr delegation.

655.   Sadr also met with Ayatollah Khamenei during the visit and received assurances from General Shahlai that the IRGC–QF wanted to financially support the Sadrist movement.

656.   Shortly thereafter, the IRGC dispatched two of Hezbollah's most senior terror operatives, Imad Mughniyah and Mustafa Badr al-Din, to help organize and birth the creation of the Sadrist Movement's armed faction.

657.   On July 18, 2003, Sadr gave a sermon in the Great Mosque in Kufa in which he branded the newly-formed Iraqi government "nonbelievers" and announced the formation of a religious army to counter the government called "Jaysh al-Mahdi" or "JAM" – the Mahdi Army.

658.   Hezbollah operatives were present on the ground in Iraq following the U.S. invasion in 2003 and were directly involved in providing training and support to JAM from its inception.

659.   JAM featured several attractive assets for Iran and Hezbollah, including a strong base of support among the poorest and most disenfranchised Shi'a communities, a network of

mosques and social institutions, and a vast supply of young, desperate men. However, it was an unruly and unprofessional organization ill-suited to confronting an advanced military in the way Hezbollah had successfully attacked the IDF.

660.    Imad Mughniyah and Mustafa Badr al-Din worked closely both with Sadr and his associates and the Iranian-sponsored Badr Corps (made up of Iraqi Shi'a who opposed the Hussein regime during the 1980–1988 Iran-Iraq War), but Hezbollah remained cautious and did not encourage either Badr or JAM to immediately confront Coalition Forces.

661.    As former Badr Corps leader and KH founder Abu Mahdi al-Muhandis (discussed below) would later explain to the Hezbollah-affiliated channel *Al-Mayadeen*:

> **Al-Muhandis**: Of course, my relationship with martyr Imad, the great martyr Imad [Mughniyah], and martyr Mustafa Badr a-Din, started in the early 1980s. This was a strong and operational relationship. The first ones to train the first Iraqi jihadi resistance groups in the beginning of the 1980s were Imad and Mustafa. They also had a major role in organizing the resistance cells against the Americans in Iraq.
>
> **Host**: Training Iraqis here, to fight the Americans?
>
> **Al-Muhandis**: Sure, they trained Iraqis. The first Iraqi cells, I was among them, after 2003.
>
> **Host**: After 2003…
>
> **Al-Muhandis**: They had a major role; their brothers and men still have an essential role in training and planning… they have a very important role.

662.    The same al-Muhandis was the mastermind behind the 1983 Kuwait bombings, and later became the founder of Kata'ib Hezbollah in Iraq and an advisor to Qasem Soleimani, the commander of the IRGC–QF. Mustafa Badr al-Din, one of Hezbollah's leading bomb-makers at the time, was arrested by Kuwait after the attacks and convicted for his role in the bombings. He later became a leading figure in Hezbollah after his escape from a Kuwaiti prison.

663.    In 2008, Imad Mughniyah was killed in Syria.

664. Ten years after his death, several of his former protégés gathered at an elaborate ceremony to pay tribute to Mughniyah and extol his contributions to the terror campaign he helped launch in Iraq.

665. At an event commemorating the anniversary of his death, on February 23, 2018, several Iraqi Shi'a notables spoke, including Abu Mahdi al-Muhandis, who declared: "The martyr Mughniyah is still present in all fields of confrontation as [part of] a jihadist school that terrorized the enemies....".

666. Qais Khazali, one of al-Sadr's top deputies who was also in attendance, asserted that: "The pillars of the Islamic Resistance that took place in Iraq were the fruit of the martyr Mughniyah."

667. He went on to say:

> I got to know him in 2003 or 2004. At that time when I met him, I didn't know that he is Imad Mughniyeh. I only knew him as "Haj Radwan." Imad Mughniyah was the person behind the Iraqi Resistance against the American occupation of Iraq. The first generation of the commanders of the Resistance were the product of the [sic] Mughniyah's training.

668. Although Mughniyah was a key figure in Hezbollah's operational activities in Iraq, Hezbollah's political and diplomatic role in guiding Iraqi Shi'a factions was of equal, if not greater importance.

669. For this purpose, Hezbollah tapped a senior member of its Political Council, Muhammad Kawtharani, to be responsible for the organization's Iraq portfolio. As the U.S. Department of the Treasury noted when it designated him an SDGT on August 22, 2013, Mr. Kawtharani was:

> [T]he individual in charge of Hizballah's Iraq activities, Kawtharani has worked on behalf of Hizballah's leadership to promote the group's interests in Iraq, including Hizballah efforts to provide training, funding, political, and logistical support to Iraqi Shi'a insurgent groups.

670.    Mr. Kawtharani was an inspired choice because he not only previously lived in Iraq but had also been a pupil of Ayatollah Muhammad Sadiq al-Ṣadr.

671.    Mr. Kawtharani wasted no time in contacting one of Sadr's most trusted deputies, Mustafa al-Yaqubi, soon after (and possibly before) the overthrow of the Saddam Hussein regime by Coalition Forces in 2003.

672.    Mustafa al-Yaqubi had frequent contact with Mr. Kawtharani through the years and appears to have served as a primary channel for communications between Hezbollah and Sadr and his JAM militia.

673.    From June 2003 through August 2004, at Iran's direction, Hezbollah's role was primarily to organize and train JAM gunmen and try to instill some discipline and professionalism into the organization so that it could effectively threaten U.S. and Coalition Forces across Iraq. Due to its conflict with Israel in Lebanon, Hezbollah possessed hard-earned specialized knowledge on how to deploy new tactical and technological counter-measures against a modern army.

674.    For several reasons, Hezbollah was the obvious and natural choice for implementing the IRGC's policies in Iraq.

675.    First, Hezbollah operatives were, like the Iraqi Sadrists, ethnically Arabs and spoke Arabic, whereas the Iranian IRGC members were ethnically Persian and spoke Farsi.

676.    Second, there were many long-standing personal and intellectual connections between Hezbollah and the Sadrist Movement.

677.    According to a 2007 MNF–I report, "members of the Sadr movement have deep respect for Lebanese Hezbollah…. Hezbollah sends trainers to Iran to train Iraqi fighters on EFPs."

678.    For instance, Muqtada al-Sadr's father-in-law was Grand Ayatollah Muhammad Baqir al-Sadr, who was a contemporary of Hezbollah's spiritual leader, Muhammad Fadlallah.

679.     Hezbollah's leader, Hassan Nasrallah, received his religious education in Lebanon from a seminary that taught Baqir al-Sadr's teachings on Shi'ism.

680.     Despite the affinity between Hezbollah and the leaders of the Sadrist Movement, when Hezbollah slowly began to introduce EFPs into Iraq in small numbers at the IRGC's direction (during the late autumn of 2003 and into the first half of 2004), it did so through Iran's other, more established proxy, the Badr Corps.

681.     Unlike JAM, the Badr Corps had prior (and extensive) military training from, and its operatives had long-standing operational ties to, both the IRGC–QF and Hezbollah.[28]

682.     Most notable among the Badr Corps cells was the so-called "Sheibani Network" named after Hamid A'atabi al-Sheibani, also known as Abu Mustafa al-Sheibani.

683.     Accordingly, when Hezbollah introduced its most effective anti-armor weapon into Iraq, it began by training Badr Corp operatives on the emplacement of single EFPs with relatively primitive initiation systems—a process that allowed Hezbollah to test the weapons, assess the capabilities of its Iraqi proxies and probe Coalition Forces' responses to the threat.

684.     According to the Chilcot Report released by the British Government, "[t]he first IED attack in Iraq using an Explosively Formed Projectile (EFP) took place against a UK Warrior vehicle in al-Amara in May 2004."

685.     By this method of slowly introducing the weapon system and directing its use against British forces, Hezbollah was able to assess the capabilities of the Badr Corp personnel, assess the effectiveness of its tactics, techniques, and procedures and adjust those TTPs based on how first British (and later American) forces responded.

---

[28]     The Badr Corps had long established four geographic commands inside Iraq, all with experience conducting attacks against the Hussein regime. The Baghdad-based command was supervised from an IRGC base in nearby Bakhtaran, Iran by Abu Mustafa al-Sheibani, whose extensive smuggling routes were used both before and after the 2003 U.S.-led invasion for transporting weapons, men and money from Iran into Iraq.

686.    A July 2004 UK Joint Intelligence Committee ("JIC") assessment noted: "We also judge that Lebanese Hizballah will retain an influence in Iraq (Hizballah members may have been linked to the group that attacked the Sheraton Hotel) and could supply Iraqi groups with terrorist expertise and munitions."

687.    The concern was well-founded.

688.    On August 3, 2004, the UK Defence Intelligence Staff ("DIS") accurately predicted the evolution of the IED threat in Iraq: "IED technology in use with other Middle Eastern groups[,] especially Lebanese Hizballah, can be expected to appear in Iraq. This would include multiple systems, such as RC (Radio-Controlled) switched PIRs [Passive Infrared]."

689.    By the summer of 2004, British intelligence had detected the EFP's appearance in southern Iraq:

> On 26 July, the DIS reported that an EFP IED had been found on 15 July in Baghdad. The DIS noted that the EFP IED design had not previously been encountered in Iraq but was, as with the find in May 2004, of a type associated with Lebanese Hizballah. There were also indications of Iranian involvement in the construction of the devices.

690.    On December 2, 2004, a British Defence Intelligence Report titled "The Evolution of the IED Threat in Iraq" stated:

> Improvement in IED technology has been most significant in Shia areas since May [20]04, where technical progress has been made that we assess could only have been achieved through focused external assistance. *We assess that this may be due to an influx of Lebanese Hezbollah IED technology under Iranian sponsorship.* (Emphasis added.)

691.    Similarly, the United States Department of State Country Reports on Terrorism 2006 noted:

> Since at least 2004, Hizballah has provided training and logistics to select Iraqi Shia militants, including for the construction and use of shaped charge IEDs, which Hizballah developed against Israeli forces in southern Lebanon during the late 1990s and which can penetrate heavily armored vehicles.

692.    At the same time it was supplying the Badr Corp with the initial training and direction to launch EFP attacks against Coalition Forces, Hezbollah also provided training and logistical support to JAM, though it did not initially furnish JAM operatives with EFPs.

693.    A Sadrist uprising led by armed JAM forces in August 2004 in the Shi'a holy city of Najaf would soon change the direction of the conflict.

694.    In Najaf in August, JAM forces launched an uprising and soon confronted U.S. Marines, other U.S. Army units, and their tactical air support.

695.    As a result, JAM suffered significant casualties.

696.    Over the course of approximately three weeks, the U.S. military lost nine soldiers and Marines.

697.    An estimated 1,500 JAM fighters were killed and an undetermined number, most likely in the thousands, were wounded.

698.    IRGC–QF personnel were present during the bloodshed and carefully observed the fighting.

699.    The lesson from the uprising was clear—JAM members were too disorganized and undisciplined to cause any serious harm to Coalition Forces. Thus, shortly after the uprising in Najaf was brought under control, Muqtada al-Sadr authorized his deputies to create what became known as the "Special Groups" to be supported and trained by Hezbollah and funded and controlled by the IRGC.

700.    Mr. Sadr's key deputies wanted to be able to deploy more professional (and lethal) forces that could successfully attack Coalition Forces in Iraq while his "regular" JAM militia concentrated on ethnic cleansing and kidnapping Sunnis as well as its traditional criminal enterprises.

701.    Initially, the Special Groups functioned essentially as regional commands under the overall leadership of Muqtada al-Sadr's senior deputies, including Qais al-Khazali and Akram al-Kaabi (a/k/a Akram Abbas al-Kabi).

702.    As the U.S. military later noted:

> When Special Groups were formed, [Qais Khazali] and Akram al-Kabi were named the general supervisors, or members of the Ishraf Committee (Ishraf means oversight and supervision). Qais and Layth [Qais' brother] were directly involved with Special Groups, and in this position, they would negotiate and procure weapons and IEDs from Iran and distribute them to JAM.

703.    Predictably, the IRGC and Hezbollah saw these newly-formed Special Groups (which they helped create and organize) as an opportunity to intensify Iran's control over JAM's terror apparatus.

704.    From the initial formation of JAM's Special Groups in 2004 through much of 2006, the IRGC used Hezbollah to train and direct Special Groups cells to target Coalition Forces.

705.    To this end, the IRGC–QF had previously instructed Hezbollah to create "Unit 3800," an entity dedicated to supporting Iraqi Shi'a terrorist groups targeting Multi National Forces–Iraq ("MNF–I").

706.    Unit 3800 was established by Hezbollah leader Hassan Nasrallah at Iran's behest.

707.    Unit 3800 trained, advised and directed the JAM Special Groups and Badr Corps in Iraq.

708.    Hezbollah also trained Special Groups and Badr Corps operatives at training camps in southern Lebanon and Iran, and Hezbollah's expertise in the use of EFPs, kidnapping, communications and small-unit operations were critical to the IRGC's operations in Iraq between 2003 and 2011.

709.    By early 2005, the presence of Hezbollah operatives in Iraq became an open secret

150

when Iraqi Interior Minister Falah al-Naquib announced the arrest of eighteen Lebanese Hezbollah operatives on terrorism charges.

710. On October 10, 2005, the British Broadcasting Company (BBC) reported that:

> An armour-piercing version of the bomb - blamed for the deaths of eight British soldiers this year - marks the latest advance in the insurgents' arsenal. *The UK has accused Iran of supplying the new weapon to militants in southern Iraq, via the Lebanese Hezbollah militia group,* although Tehran has denied this. (Emphasis added.)

711. The UK's *Belfast Telegraph* reported in 2007 that Muqtada al-Sadr publicly acknowledged his organization's coordination with Hezbollah:

> Speaking in Tufa in Iraq, Muqtada al-Sadr, the head of the Mehdi Army, admitted to 'formal links' with Hizbollah. 'We have formal links with Hizbollah, we do exchange ideas and discuss the situation facing Shiites in both countries,' he said. 'It is natural that we would want to improve ourselves by learning from each other. We copy Hizbollah in the way they fight and their tactics, we teach each other, and we are getting better through this.'

712. From September 2004 to late 2005, these newly-formed Special Groups conducted low-intensity operations against the British and U.S. military, launching increasing numbers of EFP attacks but mostly training in Iran and Lebanon with Hezbollah and the IRGC–QF, developing their TTPs and preparing for the next round of conflict.[29]

713. As Special Groups operatives detained by Coalition Forces later explained, only Hezbollah instructors taught Special Groups operatives the "Engineers Course" that focused on the construction and employment of EFPs.

---

[29]     EFPs were provided by the IRGC for the *exclusive* purpose of targeting Coalition Forces, and Hezbollah's advanced training was provided exclusively to assist Special Groups to improve their emplacement of EFPs against United States and British armored vehicles. On rare occasions certain elements defied this directive. For example, EFPs were used in the assassinations of two provincial governors and two provincial police chiefs in the latter half of 2006. The U.S. military assessed that these events were contrary to IRGC policy.

714.    Not every Iraqi Special Group operative received this training. One detainee reported that "Engineers are special and have to be smart. If you are not smart no one will waste the time and expenses to send you to Iran to train to be an engineer because you will fail."

715.    Hezbollah also trained these "Engineers" on how to incorporate EFPs into the tactical design of ambushing MNF–I convoys, principally to kidnap U.S. and Coalition soldiers. The tactics for a kidnapping-ambush using EFPs closely resembled the tactics Hezbollah developed in attempting to kidnap IDF soldiers in southern Lebanon.

716.    One MNF–I interrogation of a detainee revealed the extensive training he and other Iraqi operatives received from the IRGC–QF and Hezbollah for attacking MNF–I convoys with EFPs and other weapons:

> During one of [Detainee]'s training sessions, his group was instructed on techniques involving the attack of military convoys and abduction of POWs. Upon the arrival of a four-vehicle convoy, EFP's would be emplaced to disable the first three vehicles in a convoy. The attackers, who are hiding on one side of the road from an unidentified distance away, would successively fire upon the fourth vehicle with shoulder-fired missiles. Amidst the attack, two small groups of individuals would alternatively bound from the hidden area away from the road to the fourth vehicle while firing upon the fourth vehicle using small arms. The alternatively bounding small groups would advance to the vehicle, pull out any individual who is still living, and bring the individual back to an area where the attackers' own convoy of vehicles is waiting. In order to prevent a quick reaction force from arriving to aid the disabled convoys, a simultaneous mortar attack would be planned on a nearby military base. The simultaneous mortar attack would be followed through to keep the quick reaction force at the nearby base busy. Another way to prevent assistance from a quick reaction force would be to emplace more EFPs at a further distance down the same planned route as the military convoy.

717.    An attack combining an EFP and other methods of attacking a convoy is called a "complex attack."

718.    By 2007, MNF–I officials were reporting carefully planned, complex ambushes and retaliatory attacks on United States forces that included direct assaults on U.S. military outposts,

ambushes in which American troops were captured, and complex attacks that used multiple weapons to strike more than one U.S. military target.

719.    As Qais Khazali would later explain to his interrogators: "EFPs still come solely from Iran and there is currently nobody in Iraq manufacturing the components of an EFP."

720.    Hezbollah and the IRGC–QF also introduced their proxies to the use of 107mm and 122mm artillery rockets (which Hezbollah had previously deployed in large numbers against the IDF in southern Lebanon and against Israeli border towns in northern Israel).

721.    Both JAM and the Special Groups used these same types of rockets in their indirect fire attacks on U.S. and Coalition Forward Operating Bases and MNF–I Headquarters in the Green Zone.

722.    The IRGC also supplied JAM and JAM Special Groups with 240mm rockets (also known as the Fadjr-3) developed by the Shahid Bagheri Industries division of the Aerospace Industries Organization of Iran ("AIO").

723.    Not only did the IRGC supply these weapons to both Hezbollah and (later) its Iraqi Shi'a proxies, but Hezbollah's TTP in the use of these weapons was also transferred to JAM and JAM Special Groups.

724.    During a July 2, 2007 press briefing, U.S. Brigadier General Kevin J. Bergner noted that Special Groups were trained in Iran by Hezbollah instructors in a four-week long course that was titled "Artillery."

725.    According to General Bergner, U.S. intelligence concluded that: "This course teaches the use of indirect fire weapons including 60mm and 120mm mortars, and 107mm, 122mm and 240mm rockets."

726.    In May 2006, senior Hezbollah commander Ali Mussa Daqduq traveled to Tehran with Yussuf Hashim, a fellow Hezbollah operative and senior supervisor of Hezbollah operations in Iraq.

727.    There they met with the Commander and Deputy Commander of the IRGC–QF Special External Operations.

728.    Mr. Daqduq was directed to return to Iraq and report on the training and operations of the Special Groups and provide assessments on their training in mortars and rockets, use of IEDs and kidnapping operations.

729.    General Shahlai—the aforementioned deputy commander in the IRGC–QF who met with Daqduq and Hashim—served as the case officer or supervisor of the Special Groups.

730.    The United States later designated General Shahlai in September 2008 "for threatening the peace and stability of Iraq and the Government of Iraq." The U.S. Department of the Treasury further found that General Shahlai supplied weapons and training to the Iraqi Special Groups:

> In late-August 2006, Shahlai provided material support to JAM Special Groups by supplying JAM Special Groups members with 122mm grad rockets, 240mm rockets, 107mm Katyushas, RPG-7s, 81mms, 60mm mortars, and a large quantity of C-4.
>
> Shahlai also approved and coordinated the training of JAM Special Groups. As of May 2007, Shahlai served as the final approving and coordinating authority for all Iran-based Lebanese Hizballah training for JAM Special Groups to fight Coalition Forces in Iraq. In late-August 2006, Shahlai instructed a senior Lebanese Hizballah official to coordinate anti-aircraft rocket training for JAM Special Groups.

731.    The United States Department of State Country Reports on Terrorism 2006 noted that Iran provided guidance and training to Iraqi Special Groups for carrying out attacks against MNF–I and Coalition Forces:

154

Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.* (Emphasis added.)

732. The Australian government reported in 2006 that Hezbollah, along with the IRGC-QF, was committing attacks in Iraq through insurgent groups it developed:

> Hizballah has established an insurgent capability in Iraq, engaging in assassinations, kidnappings and bombings. The Hizballah units have been set up with the encouragement and resources of Iran's Revolutionary Guards al-Qods Brigades. Hizballah has also established a special training cell known as Unit 3800 (previously known as Unit 2800) specifically to train Shia fighters prior to action in Iraq.

733. In July 2007, General Bergner briefed the media on how the IRGC–QF used Hezbollah operatives in Iraq: "Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups…. Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq."

734. Bergner further noted that: "The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms -- including explosively formed penetrators, the deadliest form of improvised explosive device -- and funding from Iran. They also have received planning help and orders from Iran."

735.    In October 2007, the U.S. Department of the Treasury designated the IRGC–QF[30]

as an SDGT noting:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.
>
> In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

736.    The U.S. State Department's 2007 Country Reports on Terrorism stated that the

IRGC–QF and Hezbollah provided Iraqi Special Groups with the tools necessary to carry out

attacks against armored Coalition vehicles:

> The [IRGC–QF] continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devises (IEDs) and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

737.    The U.S. State Department's 2008 Country Reports on Terrorism noted that Iran

and Hezbollah continued attacks on MNF–I and Coalition Forces through their Iraqi proxies by:

> Provid[ing] lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was […] providing militants with the capability

---

[30]    In October 2017, the U.S. Government designated the IRGC itself an SDGT "for the activities it undertakes to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, the IRGC–QF."

to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force*, in concert with Lebanese Hezbollah,* provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. (Emphasis added.)

738.    Ali Mussa Daqduq conducted multiple visits to Iraq to undertake training needs assessments, survey the operational environment, and obtain feedback from Special Groups members in Iraq on their needs.

739.    This was intended to ensure that the training being designed and staffed by Hezbollah instructors would provide the greatest benefit to their students.

740.    In addition, Mr. Daqduq's assessments provided informed feedback to the IRGC–QF logisticians on the armaments the Special Groups fighters needed to meet their needs and improve their operational performance.

741.    Hezbollah's coordination with the IRGC–QF in support of Special Groups came into stark relief on January 20, 2007 when a team of approximately twelve Special Group Asa'ib Ahl Al–Haq ("AAH") gunmen, disguised as U.S. soldiers, entered the Provincial Joint Coordination Center ("PJCC") in Karbala, where U.S. soldiers were conducting a meeting with local officials.

742.    Two months later, in March 2007, Coalition Special Forces captured AAH leaders Qais al-Khazali and his brother Layth al-Khazali, and Daqduq in Basra.

743.    The documents, computers and media recovered from the target site as well as the subsequent interrogations of these men significantly supplemented the U.S. military's understanding of Hezbollah's operational role in Iraq and the IRGC–QF's central role in supporting and enabling the Special Groups.

744.    Mr. Khazali later described Mr. Daqduq as the "designer of the Special Groups."[31]

745.    MNF–I's exploitation of a computer that was captured during the 2007 raid revealed contents that confirmed the training and evaluation role that Mr. Daqduq performed. MNF–I described the contents as follows:

> Documents seized include: spreadsheets detailing weapons and targets, step-by-step instructions for operations/attacks; and numerous letters equivalent to after-action reports detailing attacks, including, for example; an ambush and IED attack on a MNF convoy in Karbala resulting in 4 X MNF KIA; an IED attack on a British patrol which destroyed two Land Rovers and killed the occupants; and a sniper attack on a British patrol which killed a British soldier.

746.    According to U.S. intelligence estimates following Mr. Daqduq's 2007 arrest, the IRGC–QF provided Hezbollah and Mr. Daqduq up to $3 million in U.S. currency every *month* to run Special Groups in Iraq.

747.    On January 9, 2008, the U.S. Department of the Treasury designated several individuals and entities "for threatening the peace and stability of Iraq and the Government of Iraq."

748.    These individuals included Ahmad Foruzandeh, a Brigadier General in the IRGC–QF.

749.    According to the U.S. Department of the Treasury, Mr. Foruzandeh was directly involved in terrorist operations targeting MNF–I and Coalition Forces in Iraq:

> As of mid-February 2007, Foruzandeh ordered his Iranian intelligence officers to continue targeting Shia and Sunnis to further sectarian violence within Iraq. Foruzandeh is also responsible for planning training courses in Iran for Iraqi militias, including Sayyid al-Shuhada and Iraqi Hizballah [KH], to increase their ability to combat Coalition Forces. The training

---

[31]    Ali Mussa Daqduq was held in U.S. detention until November 2011 with the goal to continue to hold him in U.S. custody. The Iraqi Government denied the request, and he was transferred to Iraqi custody on December 18, 2011. The charges that the U.S. had brought against him were summarily rejected by an Iraqi Court in May 2012 as lacking evidence, and he was released from confinement, later returning to Lebanon.

includes courses in guerilla warfare, light arms, marksmanship, planting improvised explosive devices (IEDs), and firing anti-aircraft missiles.

750.     At the same time, the U.S. Department of the Treasury designated Abu Mustafa al-Sheibani for his role as the leader of the Sheibani Network, noting:

> The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.
>
> Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad. In early-May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.

751.     A 2010 Department of Defense report confirmed that weapons Iran delivered to its proxy militias in Iraq included EFPs (with radio-controlled, remote arming and passive infrared detonators), IEDs, anti-aircraft weapons, mortars, 107 and 122mm rockets, rocket-propelled grenades and launchers, explosives, and small arms.

752.     The report also noted that "Lebanese Hizballah provides insurgents with the training, tactics and technology to conduct kidnappings, small unit tactical operations and employ sophisticated IEDs."

## E.   HEZBOLLAH'S AND THE IRGC'S AGENTS & PROXIES IN IRAQ

### 1.   THE BADR CORPS (a/k/a BADR ORGANIZATION)

753.     The Badr Corps was established in 1982 as the military wing of the Supreme Council for Islamic Revolution in Iraq ("SCIRI"), which was founded by Muhammad Baqr Hakim in Iran in 1982 during the Iran-Iraq War.

754. From its headquarters in Iran, the Badr Corps operated extensive networks throughout Iraq in the 1990s. The group smuggled men and weapons into Iraq to conduct attacks against the Iraqi regime of Saddam Hussein.

755. Like Hezbollah, the Badr Corps established clandestine offices in various businesses and social organizations in Iraq.

756. The Badr Corps also used Iraqi front companies to recruit operatives, collect intelligence, and circulate propaganda materials in Shi'a populated areas.

757. Before 2003, the Badr Corps served as Iran's most important surrogate inside Iraq, acting as a *de facto* arm of the IRGC-QF in conducting operations against Saddam Hussein's government.

758. The Badr Corps received training and weapons from the IRGC and Hezbollah.

759. Following the toppling of the Hussein regime in 2003, the IRGC saw an immediate opportunity to repatriate Muhammad Baqr Hakim to Iraq and carefully cultivate his party's growth within the new post-war political framework being developed by the Coalition Forces, while simultaneously slipping thousands of Badr Corp fighters back across the border.

760. After Saddam Hussein's overthrow in 2003, the Badr Corps renamed itself the Badr Organization, and many of its operatives joined the newly-formed Iraqi security forces.

761. Published reports indicate that thousands of members of the Badr Organization remained on the IRGC–QF payroll after 2004.

762. Several senior Badr Corps operatives later emerged as key conduits for funneling weapons to IRGC proxies in Iraq from 2004 through 2011, including the previously mentioned Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis (a/k/a "The Engineer"), who later led Kata'ib Hezbollah (discussed

further below).

763.    The IRGC–QF's Ramazan Corps, led by General Abdul Reza Shahlai, was in charge of supporting Hezbollah-trained terror cells in Iraq and remains the largest Qods Force command outside of Iran. It coordinated, armed and directed the Badr Organization.

764.    Although the Badr Organization evolved into a major political organization with seats in the new Iraqi parliament through its political wing SCIRI, it also played a significant role in facilitating Special Groups operations in Iraq.

765.    Several senior Special Groups commanders such as Mr. al-Muhandis are, or were, Badr Organization personnel.

766.    After 2003, Badr inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (notably the Iraqi Ministry of Interior intelligence structure and key special forces and Iraqi Army units).

767.    This infiltration of Iraqi police, intelligence, and military units not only assisted in Badr's efforts to murder former Hussein regime leaders and pursue ethnic cleansing of Sunni neighborhoods, but also made it possible for Badr operatives to regularly tip-off Special Groups operatives of Coalition Forces' activities, and provided Badr's own terror cells with targeting guidance.

## 2. ASA'IB AHL AL–HAQ ("AAH" OR THE "LEAGUE OF THE RIGHTEOUS")

768.    The Asa'ib Ahl Al–Haq ("AAH" or the "League of the Righteous") terrorist organization was a Special Group that was directed by Hezbollah and funded and armed by the IRGC–QF.

769.    It conducted numerous attacks on Iraqi Security Forces and Coalition Forces, particularly on American targets.

770.    AAH was originally established by senior JAM commander and later MNF–I detainee, Qais al-Khazali.

771.    Qais Khazali was a pupil of Muqtada al-Sadr's father and later one of Muqtada al-Sadr's senior deputies. But he also maintained an uneasy rivalry with the younger al-Sadr that occasionally devolved into open hostilities.

772.    Mr. Khazali had accompanied Mr. Sadr to Tehran in 2003, and he maintained contact with senior IRGC–QF leadership when he assumed control of Special Groups cells after 2004.

773.    According to a report by the U.S. military:

> In August 2006 MAS (Muqtada al-Sadr) asked [Qais al-Khazali] to lead a delegation to Tehran to discuss the situation in Iraq and Iranian support for JAM (Jaysh al-Mahdi (JAM) Militia subordinate to Muqtada al-Sadr). According to reporting, Ali Khamenei (Sayyid Ali Hosseini Khamenei was then and is still now the Supreme Leader of Iran) met with [Qais al-Khazali] and recruited him to lead a special group known as Asayb Al–Haq, or the K2 network. The K2 network would operate with the knowledge or authorization of MAS. [Qais al-Khazali] agreed. Iran was interested in working with [Qais al-Khazali] because of his influence on MAS. Layth (al-Khazali's brother, captured with him on 20 March 2007 in Basra, served as the Operations Chief for Asayb Al–Haq) and as a liaison between the secret network formed by Qayis and the Iranians. In his position, Layth travelled frequently between Iraq, Iran and Syria.

774.    Qais al-Khazali and his brother Layth al-Khazali returned to Iraq, requisitioned the most experienced and capable fighters from Mr. Sadr's JAM terror cells and formed AAH.

775.    At first, AAH appears to have remained within JAM's orbit.

776.    At its inception, AAH was a Hezbollah-directed and IRGC-supplied cluster of terror cells that owed fealty to Mr. Sadr. Over time, it became a more cohesive entity that grew more independent of Sadr (even ceremonially). This evolution was the product of assessments made by senior Hezbollah commanders, including Ali Mussa Daqduq, who had travelled to Iraq

at the IRGC–QF's behest to evaluate the training, organization and effectiveness of the Special Groups.

777.    Hezbollah identified Qais Khazali and Akram Kaabi as among the more capable JAM commanders, cultivated them, and ultimately recruited them to serve as direct proxies of the IRGC–QF.

778.    According to an April 2007 MNF–I report, Qais Khazali admitted that AAH received direct financing from the IRGC–QF.

779.    Within months of Qais Khazali's formation of AAH, he blessed the Hezbollah-planned and orchestrated raid on the PJCC in Karbala on January 20, 2007.

780.    As discussed more fully below, the kidnapping and murder of five American soldiers during the operation led to a concerted effort to locate the perpetrators, and it eventually resulted in the capture of both Khazali brothers in March 2007.

781.    Thereafter, despite the capture and detention of the Khazali brothers, AAH continued to function as a full-fledged terrorist organization because of the significant funding, training and supply of weapons it received from the IRGC, and from the training it received from, and close cooperation it maintained with, Hezbollah.

782.    AAH was able to maintain a high-level offensive tempo from mid-2007 until the departure of United States forces from Iraq at the end of 2011, and Qais Khazali emerged from U.S. detention to become one of Iraq's most important political leaders.

783.    In sum, from 2006 to 2011, AAH operated as the IRGC-QF's direct terror proxy targeting U.S. personnel at the direction of Hezbollah, working in concert with the IRGC–QF.

784.    Iran harbored elements of its leadership (and their families), trained and supplied its operatives, and funded the AAH cells.

785.    Iran used Hezbollah to train and direct AAH to commit attacks on Americans in Iraq.

786.    AAH formally split from JAM in 2007 (though it continued to maintain significant ties with JAM cells even later).

787.    Since that time, AAH has conducted countless attacks against U.S. and Iraqi forces, targeted kidnappings of Westerners and Iraqis, rocket and mortar attacks on the U.S. Embassy, murdered American and British soldiers, and assassinated Iraqi officials.

788.    At his July 2, 2007 press briefing, Brigadier Gen. Bergner, spokesman for the MNF–I, noted the extensive financial support the IRGC-QF provided in developing the Special Groups:

> The Qods Force also supplies the special groups with weapons and funding of 750,000 to 3 million U.S. dollars a month. Without this support, these special groups would be hard pressed to conduct their operations in Iraq […] The Qods Force goal was to develop the Iraqi special groups into a network similar to the Lebanese Hezbollah. Special groups would be unable to conduct their terrorist attacks in Iraq without Iranian-supplied weapons and other support. Like Ali Mussa Daqduq, Qais [Khazali] main contact was [General Shahlai], the deputy commander for Qods Force Department of External Special Operations. Funding and training of the special groups started in 2004.

789.    As MNF–I investigators would later learn, senior Lebanese Hezbollah commander Ali Mussa Daqduq not only provided training to AAH cells and advised them on terrorist operations, he also helped plan operations and had final approval over them.

790.    Mr. Daqduq reported to Yussuf Hashim, the head of Lebanese Hezbollah Special Operations, and the latter reported to Hezbollah's Muhammad Kawtharani and General Shahlai, the director of the IRGC–QF External Operations.

### 3. JAYSH AL MAHDI ("JAM" or the "MAHDI ARMY") AND THE PROMISED DAY BRIGADES ("PDB")

791.    As noted above, Jaysh al-Mahdi ("JAM" or the "Mahdi Army") was established by radical Shi'a cleric Muqtada al-Sadr in June 2003 with the help of Imad Mughniyah and Mustafa Badr al-Din, two of Hezbollah's most senior commanders.

792.    JAM expanded its territorial control of mixed or predominantly Shi'a neighborhoods and displaced or killed the local Sunni population.

793.    JAM was able to gain initial control in many of the neighborhoods in and around Baghdad (such as Sadr City) by offering the Shi'a population protection and social services.

794.    After Hezbollah and the IRGC–QF began their complete takeover of the Special Groups in 2006-2007, JAM receded to a degree.

795.    In the summer of 2007, Mr. Sadr declared a six-month ceasefire and a ban on attacking Coalition Forces. According to a 2007 MNF–I report, during this time, Mr. Sadr was receiving approximately $2 million (U.S.) per month from Iran.

796.    For much of 2007-2008, he was also embroiled in political disputes with rival Shi'a parties, and JAM engaged in violent clashes with the Badr Corps in Karbala during a religious festival.

797.    In June 2008, Mr. Sadr announced his intention to disband JAM to focus his organization on social, cultural and religious activities, but he soon further proclaimed that he would maintain an elite force, the Promised Day Brigades ("PDB"), to carry out attacks against Coalition Forces.

798.    The PDB received funding and weapons from the IRGC and training and direction from both Hezbollah and the IRGC–QF and deployed many EFPs against American and Coalition Forces in Iraq after July 2008.

799. In August 2009 alone, MNF–I attributed 15 EFP attacks in Baghdad to PDB.

800. MNF–I took significant and forceful measures against the PDB, but because of the financial, logistical and operational support it received from both Hezbollah and the IRGC–QF, PDB was able to survive and continued to menace American forces in Iraq through 2011.

801. For example, on June 28, 2011, the PDB issued a statement claiming responsibility for ten mortar and Katyusha rocket attacks against U.S. military convoys in which U.S. officials confirmed that three U.S. troops were killed.

### 4. KATA'IB HEZBOLLAH ("KH")

802. Kata'ib Hezbollah ("KH") (Hezbollah Brigades) was active in Iraq from 2007 to 2011.

803. KH was founded by Abu Mahdi al-Muhandis, a member of the Badr Corps and one of the IRGC–QF's senior operatives in Iraq.

804. In the 1980s, al-Muhandis was a member of the Iraqi Da'wa Party, in which capacity he worked closely with the IRGC–QF and Lebanese Hezbollah.

805. KH's overall operations were run by Karim Ja'far Muhsin al-Ghanimi, described by the U.S. Department of the Treasury as "the overall leader of KH, which has used facilities in Iran to send weapons to Iraq." According to the U.S. Government, "Ghanimi has organized KH military-related training in Iran from the IRGC–QF and Lebanese Hizballah. Ghanimi has sent money provided by the IRGC–QF to KH leaders in Iraq."

806. KH functioned as Iran's premiere terror proxy in Iraq, and like other Special Groups, its operatives received extensive training from the IRGC–QF and Hezbollah, including Hezbollah's TTP for the use of explosives, as well as weapons like the RPG–29, EFP, and the deployment of Katyusha rockets for indirect fire attacks on U.S. Forward Operating Bases.

807. According to MNF–I, IRGC–QF provided RPG–29 anti-armor weapons exclusively to KH.

808. The IRGC–QF also provided Improvised Rocket Assisted Munitions ("IRAMs") almost exclusively to KH.

809. IRAMs are "flying IEDs"—explosive devices made from large metal canisters, such as propane gas tanks, filled with explosives, scrap metal and ball bearings, propelled into the air by rockets.

810. IRAMs first appeared in southern Iraq in November 2007.

811. Like other IEDs, IRAMs could be triggered remotely by radio control, or set to fire by way of a washing-machine timer. But, notwithstanding the fact that IRAMs were constructed from commonly-used "household" materials (such as, *e.g.*, propane tanks), proper assembly required a high-degree of technical sophistication that KH obtained from Hezbollah and the IRGC–QF.

812. IRAMs were "purpose-built" for one thing: being lobbed over walls and Hesco[32] barriers at short ranges, preventing interception by C-RAM defense systems[33] that were protecting Coalition Forces manning bases in Iraq.

813. The first known IRAM attack in Iraq occurred at Forward Operating Base Loyalty in Baghdad, killing two American soldiers and wounding 16 others.

814. A second attack in the Sha'ab neighborhood of Baghdad resulted from an accidental explosion of IRAMs likely intended for Combat Outpost Callahan, approximately 800-yards away

---

[32]    Hesco barriers are a multi-cellular barrier system manufactured from welded zinc-aluminum coated steel wire mesh, joined with vertical, helical-coil joints, and lined with a heavy-duty non-woven polypropylene geotextile. Once filled with earth, sand, and dirt, the Hesco barriers provide protection against conventional fire attacks.

[33]    Counter Rocket, Artillery, and Mortar, abbreviated "C-RAM" or "Counter-RAM," is a set of systems used to detect and/or destroy incoming artillery, rockets and mortar rounds in the air before they hit their ground targets, or simply provide early warning.

from where the truck carrying the IRAMs prematurely exploded, killing 18 civilians and wounding an additional 29 people.

815.    IRAM attacks were particularly dangerous to U.S. troops, and had the potential to kill dozens in a single attack. Once launched, an incoming IRAM could not be stopped.

816.    A soldier spotting the approach of a suspected IRAM-bearing vehicle could have as little as "two seconds to decide whether the person emerging from it ha[d] just set it for firing or [was] simply an innocent driver getting out to change a tire."[34]

817.    The IRAM could be launched from either a frame resting on the ground or mounted on the bed of a truck and was designed to cause catastrophic damage and inflict mass casualties.

818.    IRAMs became a signature weapon of KH.

819.    KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout southeastern Iraq conducting, *first*, rocket-propelled grenade (RPG) attacks; *second*, 107mm and 240mm rocket attacks; *third*, IRAM attacks; and, *fourth*, EFP attacks on U.S. and Coalition Forces.

820.    KH was also supplied by Iran with their production model of the RPG–29 anti-armor shoulder fired weapon that was first used against U.S. Forces during operations in Sadr City, Baghdad.

821.    On June 24, 2009, the United States designated KH a Foreign Terrorist Organization.

822.    The State Department's notice of KH's FTO designation stated that:

> [KH] has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hezbollah [sic] also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.

---

[34]    Robert Burns, *Lob Bombs' Biggest Worry for U.S. in Baghdad* (Associated Press, July 12, 2008).

823.   KH was also simultaneously designated as an SDGT, because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007."

824.   The U.S. Department of the Treasury also designated KH pursuant to E.O. 13438.

825.   The U.S. Department of the Treasury 2009 press release announcing KH's designation explained that KH had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces…."

826.   The press release also quoted then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]hese designations play a critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq."

827.   The U.S. Department of the Treasury press release also stated: "[f]urther, the IRGC–Qods Force provides lethal support to Kata'ib Hizballah and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."

828.   The 2009 press release further reported that:

> Between March 2007 and June 2008, Baghdad-based Kata'ib Hizballah cell members participated in multiple rocket-propelled grenade (RPG) and improvised rocket-assisted mortar (IRAM) attacks against U.S. forces. These attacks included a May 13, 2008 RPG–29 attack on a U.S. tank located in Sha'ab, Iraq, and a February 19, 2008 IRAM attack on a U.S. base near Rustamiya, Iraq. A February 19, 2008 rocket attack in the Rustamiya area resulted in one U.S. civilian killed and injuries to U.S. civilian and Coalition Forces personnel.

> As of 2008, Kata'ib Hizballah was funded by the IRGC–Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training—to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks—to Kata'ib Hizballah members in Iran.

Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons—including RPG–29s, IRAMs, and EFPs—against Coalition Forces in Iraq.

One of the hard drives contained 35 attack videos edited with the Kata'ib Hizballah logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hizballah conducting multiple attacks against Coalition Forces in Iraq.

Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hizballah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

829.    In 2008, the U.S. Department of Defense described the linkages it found between KH, Iran and multiple terrorist attacks against Coalition Forces in Iraq—including KH's use of EFPs:

[A]lso known as Hezbollah Brigades, is a terrorist group believed to receive funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators'— roadside bombs designed to pierce armor-hulled vehicles— and other weapons such as rocket-assisted mortars.

830.    As noted above—and as stated by the U.S. Department of the Treasury in its July 2009 press release—throughout 2008, *Al-Manar*, Hezbollah's official television outlet in Lebanon (and itself a designated SDGT since May 2006), played numerous videos of KH launching rocket and IED attacks against U.S. troops.

831.    In this manner, Hezbollah helped publicize KH's activities and wage psychological warfare against the United States.

832.    The U.S. Department of the Treasury designated KH's founder, Abu Mahdi al-Muhandis, an SDGT in July 2009 and announced the designation in the same press release announcing KH's designation.

833.    The U.S. Department of the Treasury's press release noted:

> As of early 2007, al-Muhandis formed a Shia militia *group employing instructors from Hizballah* to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)—from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapons smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces.
>
> Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks—containing mortars, Katyusha rockets, EFPs, and other explosive devices—from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.
>
> In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.
>
> In addition to the reasons for which he is being designated today, al-Muhandis participated in the bombing of Western embassies in Kuwait and the attempted assassination of the Emir of Kuwait in the early 1980s. Al-

171

Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination. (Emphasis added.)

834.    In a July 2010 press briefing, the then-MNF–I commander, U.S. Army General Ray Odierno, identified KH as the group behind increased threats to U.S. bases in Iraq.

835.    General Odierno confirmed that KH operatives had gone to Iran for special training and then returned to Iraq.

836.    General Odierno stated, "[T]hey are clearly connected to Iranian IRGC [Iranian Revolutionary Guard Corps]."

## VI.    DEFENDANTS ARE DEPENDENT ON UNITED STATES CORRESPONDENT BANK ACCOUNTS AND U.S. DOLLAR CLEARING, INCLUDING DOLLAR CLEARING FOR HEZBOLLAH

837.    As of the end of 2011, the Lebanese banking sector included 69 active commercial banks and two specialized medium- and long-term credit banks.

838.    According to the Central Bank of Lebanon (a/k/a Banque du Liban), Lebanon's banking system is well-regulated, exhibits good financial sector soundness indicators, and has good ratings relative to peers. It is an attractive destination for domestic and expatriate deposits because bank failures have never caused depositors to lose money (the Central Bank of Lebanon has chosen to deal with troubled monetary institutions largely through mergers).

839.    In reality, Lebanon is in many respects a failed state, dominated if not wholly controlled by Hezbollah, the world's most powerful terrorist organization, which plays a decisive role in its political and security arrangements and a significant role in its economy.

840.    Notwithstanding that reality, both Lebanon and Hezbollah are inextricably tied to the United States, including its payment system, stable currency, and robust financial services sector.

841.    In 2006, almost 75 percent of Lebanese bank deposits (i.e., $45 billion (U.S.)) were in U.S. dollars.

842.    In 2018, approximately 67 percent of Lebanese bank deposits (i.e., around $120 billion (U.S.)) were in U.S. dollars.

843.    As explained further below, Lebanon's banking system, including Hezbollah's financing machinery, depends substantially on Lebanon's ability to access U.S. dollars and clear them in New York.

844.    Lebanon maintains a consistent current account deficit, and its credit rating is relatively weak.

845.    Lebanon is a predominantly importing country characterized by large trade deficits, generally offset by capital account inflows, domestic income earnings, and a large volume of cross-border remittances.

846.    The U.S. Department of the Treasury has characterized the dynamics of the Lebanese banking system as follows:

> a steady flow of diaspora deposits in recent years have helped the Lebanese banking system to maintain relatively robust lending, improve asset quality, and maintain adequate liquidity and capitalization positions. However, banks remain highly exposed to the heavily indebted sovereign, carry significant currency risk on their balance sheets, and operate in a volatile political security environment…. Of particular relevance is the possibility that a portion of the substantial flow of remittances from the Lebanese diaspora, estimated at $7 billion—21% of GDP—in 2009, according to the World Bank, could be associated with underground finance and Trade-Based Money Laundering ("TBML") activities. Laundered criminal proceeds come primarily from Lebanese criminal activity and organized crime.

847.    To service its debt with minimal exportable production of its own, the Lebanese government runs on debt on a scale that places it as the third most indebted economy in the world.

848.   For example, Lebanon's trade balance recorded deficits of approximately $7.9 billion (U.S.) in 2007, $11.1 billion (U.S.) in 2008, $11.2 billion (U.S.) in 2009, $12.3 billion (U.S.) in 2010, and $12.8 billion (U.S.) in 2011.

849.   In 2010, for example, Moody's rated Lebanon's government debt on the same level as Senegal and Vietnam. Standard and Poor's and Fitch ranked Vietnam higher.

850.   In 2011, Lebanon's government debt service represented approximately 42.9 percent of total expenditures and 34.3 percent of total revenues.

851.   Compared to other countries, Lebanon has a high net outstanding public debt to gross domestic product ("GDP") ratio, reaching 119 percent by the end of 2011.

852.   To finance its massive debt, Lebanon chose to link its economy to the U.S. dollar, running a massive proportion of its economy through correspondent accounts with U.S. financial institutions, largely in New York.

853.   Specifically, the Lebanese economy is dependent on the following inter-related policies:

- For two decades the Lebanese pound has been pegged to the U.S. dollar at a fixed rate sometimes called a "currency peg."[35]

- To keep the public sector afloat, two thirds of the Lebanese banking sectors' balance sheets consist of loans to the Lebanese Central Bank and the Lebanese government.[36]

---

[35]   Since 1992, the Central Bank of Lebanon exchange rate policy has been to anchor the Lebanese pound to the U.S. dollar, utilizing both its hard currency (i.e. U.S. dollar) reserves and an aggressive interest rate policy to keep its domestic currency stable and avoid capital flight. Since 1999, the Central Bank of Lebanon has maintained its monetary policy of pegging the value of the Lebanese pound to the U.S. dollar at a fixed rate of 1,507.5 Lebanese pounds per $1.00 USD.

[36]   In 1997, according to data from the Federal Reserve Bank of St. Louis ("FRB–St. Louis"), a large number of Lebanese commercial banks began subscribing to Lebanon's Eurobond issues (continuing to do so for over 20 years). A "Eurobond" is an international bond that is denominated in a currency not native to the country – i.e. in this case bonds issued in U.S. dollars not Lebanese pounds. Between 2004 and 2011, Lebanon issued Eurobonds under the Note Program in an aggregate principal amount in excess of $22 billion (U.S.). Banks in Lebanon provide the bulk of both private sector and government financing, holding more than 50 percent of total sovereign debt.

- The Lebanese Central Bank maintains high interest rates that keep money flowing into banks.

- With economic growth slowing and traditional sources of foreign exchange, such as tourism, real estate and foreign investment having proven insufficient, Lebanon heavily relies on the billions of U.S. dollars expatriate Lebanese deposit into its local banks.

854.    With its currency tied to the U.S. dollar and its dependence on infusions of U.S. dollars in hard currency from expatriate Lebanese, the entire structure of the Lebanese financial system is dependent on Lebanese commercial banks maintaining access to U.S. dollar-clearing capabilities through the maintenance of correspondent accounts with U.S. financial institutions.

855.    Therefore, the Lebanese banks have chosen to maintain correspondent banking relationships with U.S. financial institutions in New York.

856.    The fact that Lebanon has voluntarily waived its sovereign immunity defense as to any disputes relating to the government Notes it issues, accepts New York law as the governing law, and submits to jurisdiction in U.S. courts, highlights the fact that the entire Lebanese banking sector is dependent on access to U.S. dollars through networks of correspondent accounts.

857.    The willingness of Lebanon's banks, including Defendants, to finance the government is to a large degree explained by the fact that over half of these banks' assets are invested in Lebanon's sovereign debt (issued by either the Ministry of Finance or the Central Bank of Lebanon).

858.    The circularity and mutual dependence that this level of investment and re-investment in the sovereign creates is a high-risk strategy for the Central Bank of Lebanon and the commercial banks because it relies on an ever-increasing level of domestic and expatriate deposits, mostly in U.S. dollars.

859. Ultimately, the ability of Lebanon's banks to continue financing the government rests on the steady growth of the banks' respective hard currency deposit base, fueled by U.S. dollar-denominated remittances and transfers from the Lebanese diaspora in general, and Hezbollah in particular.

860. For instance, Lebanon's substantial influx of remittances from expatriates has been estimated by the World Bank at approximately $7.6 billion (U.S.) annually over the last four years.

861. This includes enormous amounts of U.S. dollars that flow from drug-trafficking, arms dealing, contracts obtained by Hezbollah operatives from friendly African governments and even ordinary (i.e., otherwise legal) trade conducted by Hezbollah's world-wide enterprises.

862. It also includes massive amounts of Iranian financial support (most of it in U.S. dollars, the currency needed by Lebanon and earned by Iran in selling oil) that is laundered through Hezbollah and Iranian organizations based in Lebanon, and Hezbollah's commercial network and Iran's sanctions evasions network globally that is then routed through Lebanese entities and banks.

863. Not only are Defendants herein aware of this, they *depend* on these U.S. dollars deposits from Hezbollah to flow from South America, Africa and elsewhere through the United States and into the balance sheets of the banks that in turn underwrite the Lebanese government's enormous and otherwise unsustainable debt structure.

864. Thus, deposit accounts in Lebanese banks that receive U.S. dollars from Hezbollah are primarily U.S. dollar-denominated (Eurodollar) accounts.

865. Lebanon is formally a member of the Middle East and North Africa Financial Action Task Force, an intergovernmental regional body similar to the global Financial Action Task Force.

176

866.    Lebanon's Financial Intelligence Unit ("FIU") is the Special Investigation Commission ("SIC–Beirut"), a nominally independent legal entity empowered to investigate suspicious financial transactions and freeze assets.

867.    However, according to the U.S. State Department's Bureau for International Narcotics and Law Enforcement Affairs, Lebanon faces significant money laundering and terrorism financing challenges by Hezbollah, the IRGC–QF, and other malign actors.

868.    This is inevitable in light of Hezbollah's preeminent role in the Lebanese government and its complementary position as an armed faction with capabilities far superior to the hapless Lebanese army (which it also dominates).

869.    Thus, there are no meaningful controls on Hezbollah's access to and use of the Lebanese banking system.

870.    In Lebanon, checks are the predominant payment instrument in use among non-banks, for both high-value and low-value payments.

871.    Checks denominated in U.S. dollars account for over 95 percent of foreign currency checks, reflecting the importance of the U.S. dollar in Lebanese economic and financial transactions.

872.    Payment transactions are settled primarily by the Central Bank of Lebanon over the accounts kept with it by members of the banking and financial sectors, including Defendants.

873.    The Central Bank of Lebanon effects final settlement between accounts in its books for members of the Lebanese clearing system, which includes all Defendants herein.

874.    Lebanese commercial banks, including Defendants, must ensure that the balances on their accounts at the Central Bank of Lebanon are sufficient at the end of each day to allow transfer orders to be executed and to maintain reserve requirements.

875.    At the end of each day, remaining amounts from U.S. dollar-denominated transactions are settled through the Central Bank of Lebanon's correspondent accounts in New York.

876.    The entire structure of the Lebanese financial system is dependent on the Lebanese commercial banks, including Defendants, being able to maintain access to the Eurodollar market and direct or indirect correspondent accounts with banks in New York for clearing and settling U.S. dollar-denominated electronic funds transfers.

877.    Thus, Defendants and other Lebanese commercial banks are – of economic and political necessity – tied to and dependent on Hezbollah and the influx of U.S. dollars in cash and New York-based dollar clearing it provides to keep the precarious Lebanese banking system afloat.

## VII.    DEFENDANTS' MATERIAL SUPPORT TO HEZBOLLAH

### A.  SOCIETE GENERALE DE BANQUE AU LIBAN, SAL

#### 1.  SGBL ACQUIRED LCB

878.    LCB was a commercial bank based in Beirut, Lebanon that maintained a network of 35 branches in Lebanon and a representative office in Montreal, Canada.

879.    In 2011, the bank was eighth largest among Lebanese banks in assets.

880.    LCB was the majority shareholder of Prime Bank Limited, a private commercial bank and LCB subsidiary located in Serrekunda, The Gambia. LCB owned 51 percent of Prime Bank while the remaining shares were held by local and Lebanese partners.

881.    In February 2011, after the public disclosures by the United States Government revealed that LCB was a central actor in BAC's money laundering network for Hezbollah, the dangers posed to the entire Lebanese banking sector became immediately apparent.

882.     While LCB presented a clear and egregious case, including being found by the U.S. Government to have laundered enormous sums for Hezbollah through the Ellissa Money Exchange and others, it was by no means alone among Lebanese commercial banks in providing substantial assistance to Hezbollah. To cite just one, Defendant BLOM BANK also maintained accounts for Ellissa Exchange.

883.     From the perspective of Lebanon's Central Bank and the country's largest commercial banks, it was critical that LCB's conduct be seen as aberrational and all legal issues with the United States resolved immediately.

### 2.   SGLB ACQUIRED LCB'S LIABILITIES

884.     Within months, pursuant to an agreement dated June 22, 2011 (the "Sale and Purchase Agreement") between LCB and SGBL, SGBL agreed to acquire substantially all of LCB's assets and liabilities, in exchange for the payment of a purchase price of $580 million (U.S.), subject to the final review and approval of the Central Bank of Lebanon – which had every incentive to quickly consummate this banking marriage.

885.     A copy of the "Sale and Purchase Agreement" is attached hereto as **Exhibit 1**.

886.     Section 2.3 of the "Sale and Purchase Agreement" stated:

> The Assumed Liabilities consist *inter alia* of any and all of the Seller's liabilities and/or obligations and/or debts of any kind, character or description, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, determined, determinable or otherwise, to the extent they relate to the Seller's Business, all as at the Completion Date.

887.     On September 7, 2011, the Central Council of the Central Bank of Lebanon granted its final approval of the acquisition by SGBL of the assets and liabilities of LCB.

888.   LCB was immediately placed under liquidation and asked that its banking license be revoked, which request was promptly consented to by the Central Bank of Lebanon.

889.   DOJ and the U.S. Department of the Treasury then let SGBL pay a civil fine and quietly resolve the matter.

890.   The result was a solid victory for all concerned parties. DOJ and the U.S. Department of the Treasury received credit for striking a powerful symbolic blow against Hezbollah's narcotics trafficking networks; the Central Bank of Lebanon contained the crisis that threatened to implicate nearly the entire Lebanese banking system in Hezbollah's financing; the Lebanese banking sector was freed to continue its highly lucrative financial services for Hezbollah; and Hezbollah itself was freed to continue and even more aggressively pursue its financial activities, content in the knowledge that the United States Government is, at most, prepared to inconvenience it slightly.

### a. LCB KNOWINGLY PROVIDED MATERIAL SUPPORT TO HEZBOLLAH'S MARTYR FOUNDATION THROUGH ITS CORRESPONDENT BANK ACCOUNTS IN THE UNITED STATES

891.   From at least 2004 through at least July 2006, Hezbollah continuously maintained bank accounts at various LCB branches in Lebanon, for the Martyr Foundation-Lebanon.

892.   As described above, the Martyr Foundation-Lebanon is an integral part of Hezbollah and constitutes a key part of Hezbollah's financial arm.

893.   According to the DOJ, since 2003, LCB exempted the Martyr Foundation from signing cash transaction slips (discussed below) disclosing the source of funds for transactions up to $100,000 U.S. dollars per day at its Airport Road branch in Beirut, on the grounds that Martyr Foundation is nominally a "charity."

894.   The practical result was to allow Hezbollah to receive enormous amounts of cash

deposited at its LCB accounts without creating a traceable record.

895. From 2004 through at least July 2006, LCB facilitated dozens of dollar-denominated wire transfers totaling several million dollars on behalf of the Martyr Foundation-Lebanon through the U.S. correspondent account it maintained with AMEX-NEW YORK (since acquired by Standard Chartered Bank in 2008).

## b. LCB PROVIDED MATERIAL SUPPORT TO ABDALLAH SAFIEDDINE

896. On February 10, 2011, FinCEN reported that "LCB managers are linked to Hezbollah officials outside Lebanon. For example, Hezbollah's Tehran-based envoy Abdallah Safieddine is involved in Iranian officials' access to LCB and key LCB managers, who provide them banking services."

897. As described above, Abdallah Safieddine is the brother of senior Hezbollah leader Hashem Safieddine. Hashem Safieddine is the head of Hezbollah's Executive Assembly and one of seven elected members of Hezbollah's ruling Shura Council.

898. Between 2009 and 2010, Abdallah Safieddine and Muhammad Bazzi, discussed below, worked with the Central Bank of Iran to expand banking access between Iran and Lebanon.

899. Abdallah Safieddine, who was designated as an SDGT on May 17, 2018, is Hezbollah's representative to Iran and acts as a conduit between Hezbollah and the IRGC.

900. He is also the cousin of Hezbollah's leader, Hassan Nasrallah, who was first designated as an SDT on January 23, 1995.

## c. LCB PROVIDED MATERIAL SUPPORT TO HEZBOLLAH'S OWN FINANCE UNIT

901. LCB maintained banking relationships with Bayt al-Mal and Yousser Company for Finance and Investment ("Yousser"), which are key parts of Hezbollah's financing operations.

902.     On September 7, 2006, the U.S. Department of the Treasury designated Bayt al-Mal and Yousser SDGTs, announcing that it was "target[ing] Hizballah's Bank."

903.     The U.S. Department of the Treasury found that Bayt al-Mal and Yousser "function as Hizbullah's unofficial treasury, holding and investing its assets and serving as intermediaries between the terrorist groups and mainstream banks."

904.     The U.S. Department of the Treasury further found that "Bayt al-Mal is a Hezbollah-controlled organization that performs financial services for the terrorist organization. Bayt al-Mal operates under the direct supervision of Hezbollah Secretary General Hassan Nasrallah. As Hizballah's main financial body, Bayt al-Mal serves as a bank, creditor, and investment arm for Hezbollah." The central headquarters of Bayt al-Mal was located in Beirut's southern suburbs.

905.     According to the U.S. Department of the Treasury, "Bayt al-Mal utilizes the Yousser Company for Finance and Investment to secure loans and finance business deals for Hizballah companies."

906.     The head of Bayt al-Mal, Hussein al-Shami, was also a director of Yousser.

907.     The U.S. Department of the Treasury described Mr. Al-Shami as "a senior Hezbollah leader who has served as a member of Hezbollah's Shura Council [i.e., the council runs Hezbollah] and as the head of several Hezbollah-controlled organizations, including the Islamic Resistance Support Organization. Mr. Shami is also responsible for foreign donations to Hezbollah fundraising organizations."

908.     LCB maintained banking relationships with Bayt al-Mal and Yousser, managed out of LCB's Airport Road branch.

### d. **LCB MAINTAINED ACCOUNTS FOR VARIOUS HEZBOLLAH CONTROLLED ENTITIES**

909.    LCB also maintained a banking relationship with Farah Company, a subsidiary of Yousser, with the relationship managed out of LCB'S Airport Road branch.

910.    LCB also maintained a banking relationship with Lebanese Arab Company for Touristic Services SARL, which was managed out of the Airport Road branch. As discussed above, this company was owned by the Al-Mabarrat Charitable Society and four individuals: Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah; Jamal Ali Makke; Ali al-Sayyid Muhammad Hussein Fadlallah; and Hamzah Safieddine.

911.    The Al-Mabarrat Charitable Society, described above, is a Hezbollah-controlled organization based in Lebanon.

912.    Muhammad Hussein Fadlallah was the founder of Al-Mabarrat Charitable Society and, as noted above, also Hezbollah's spiritual leader, up to his death in April 2010.

913.    Ali al-Sayyid Muhammad Hussein Fadlallah is Muhammad Hussein Fadlallah's son.

914.    Hamzah Safieddine, as described further above, is the brother of two of Hezbollah's most powerful leaders, Hashem and Abdallah Safieddine.

915.    LCB maintained a banking relationship with Rayan (Offshore) LLC, which was owned by, *inter alia*, Nawaf Moussaoui (a Hezbollah public spokesperson and Member of the Lebanese Parliament), and Colonel Rida el-Moussaoui (the brother-in-law of Muhammad Hamdoun, LCB Executive Board Member and Deputy general manager).

916.    LCB also maintained a banking relationship with Matrix (Offshore) SAL, a company controlled by Qassem Mohammad Ajami, a Hezbollah field commander who was killed in July 2017, and Muhammad Ali Izz-al-Din.

183

917.    Ajami and Izz-al-Din were business associates of Tajco SARL, which is described further above.

918.    LCB maintained a banking relationship with the Hassan Ayash Exchange; the exchange and its principals held accounts through LCB's branch in Verdun, Beirut.

919.    The Hassan Ayash Exchange (SDNT), also described above, was owned and controlled by Mahmoud Hassan Ayash (SDNT) and his son, Hassan Mahmoud Ayash (SDNT). Hassan Ayash has stated that he has family ties to Hezbollah, including its leader, Hassan Nasrallah. Hassan Ayash has stated that his connections to important people in Lebanon help him provide services for clients of his exchange.

920.    LCB also maintained a banking relationship with Ellissa Exchange (SDNT).[37] The exchange and its principals held accounts through LCB's branch in Verdun, Beirut.

921.    Ellissa Exchange was owned and controlled by Jamal Mohamad Kharrubi (SDNT) and Ali Muhammad Kharrubi (SDNT), "a self-proclaimed supporter of Hezbollah."

922.    The U.S. Government found that both the Elissa and the Hassan Ayash Exchanges facilitated bulk cash transfers and laundered money for Ayman Joumaa's narcoterrorism network, discussed above. The exchanges originated wire transfers to the United States, using LCB and LCB's New York-based correspondent banks, to fund the purchase of used cars.

923.    The wire transfers and car purchases were part of the money laundering scheme run through LCB and intended to disguise and conceal the source, nature, ownership and control of proceeds of narcotics trafficking for the benefit of Hezbollah.

---

[37]    Defendant BLOM BANK maintains accounts for Ellisa Exchange.

184

**e. LCB DISREGARDED ANTI-MONEY LAUNDERING RULES FOR INDIVIDUALS AND ENTITIES ASSOCIATED WITH HEZBOLLAH**

924.   During the relevant time period, LCB had a policy requiring cash transaction slips ("CTS") for all cash transactions greater than $10,000 (U.S.). CTSs required disclosure of the source of funds deposited and were filed with the Central Bank of Lebanon.

925.   LCB's policy requiring CTSs accorded with the "Regulations on the Control of Financial and Banking Operations for Fighting Money Laundering," Basic Decision No. 7818 of the Banque du Liban (the Lebanese Central Bank), issued on May 16, 2001 (the "Regulations").

926.   The Regulations contained "Know Your Customer" provisions whereby banks, including LCB, were required to "check the identity" of their clients.

927.   The Regulations also contained provisions whereby banks, including LCB, were required in some circumstances to enquire about the source and destination of funds, the object of the operation, and the identities of both the beneficiary and the economic right owner of funds. Additionally, the Regulations required banks, including LCB, to give special attention to indicators of money laundering.

928.   In or around September 2003, Ahmad Safa, LCB's Associate General Manager for Branches and Operations, granted exceptions to certain LCB clients from LCB's policy of requiring CTSs for cash transactions greater than $10,000 (U.S.).

929.   The clients granted exceptions by Mr. Safa included individuals and entities (which are described in greater detail above) related to Hezbollah:

- Yousser Company (SDGT) was exempted from signing CTSs for cash transactions up to $50,000 (U.S.) per week at the Nabatieh branch and up to $60,000 (U.S.) per day at the Airport Road branch.

- Farah Company for Tourism (Farah Travels Company SAL, owned by Adham Tabaja and Issam Saad (SDGTs) among others) was exempted

from signing CTSs for cash transactions up to 50 million Lebanese pounds per week at the Nabatieh branch, roughly equivalent to $33,000 (U.S.) in 2003 dollars.

- Hussein al-Shami (SDGT), using the name Hussein Ali Muhammad Chami, was exempted from signing CTSs for cash transactions up to $30,000 (U.S.) per week at the Nabatieh branch.

- Wahid Mahmoud Sbeity, another owner of the Yousser Company, was exempted from signing CTSs for cash transactions up to $30,000 (U.S.) per week at the Nabatieh branch.

- Al-Shami and two other directors of Yousser Company were exempted from signing CTSs for cash transactions up to $200,000 (U.S.) per day and 200 million Lebanese pounds ($132,000 (U.S.) in 2003 dollars) per day at the Airport Road branch.

- Al-Mabarrat Charitable Society was exempted from signing CTSs for cash transactions up to $55,000 (U.S.) per day at the Airport Road branch.

- Lebanese Arab Touristic Company, owned by Al-Mabarrat Charitable Society, was exempted from signing CTSs for cash transactions up to $22,000 (U.S.) per day at the Airport Road branch.

- Al-Ittam (founded by Al-Mabarrat Charitable Society) was exempted from signing CTSs for cash transactions up to $50,000 (U.S.) per day at the Airport Road branch.

930.    The exemptions discussed in the preceding paragraph essentially allowed Hezbollah to transfer millions of U.S. dollars, convert those dollars to cash, and use them without being traceable.

931.    In addition to enabling Hezbollah operatives to make large cash deposits without documentation, Ahmad Safa also disregarded internal LCB reports that raised concerns about lack of documentation relating to Ellissa Exchange.

932.    LCB was required to perform customer due diligence in accordance with regulations set forth by Lebanon's Central Bank to comply with anti-money laundering laws.

933.    A 2006 LCB customer due diligence report noted that Ellissa Exchange and its principals were implicated in smuggling cash out of Africa through several channels, including cash smuggling on flights from Ghana to Beirut.

934.    The report further noted that LCB had limited "Know Your Customer" files for these clients and that another Lebanese commercial bank had closed its accounts with Ellissa Exchange. The report described large cash deposits into accounts of the exchange's owners, transactions inconsistent with the nature and purpose of the accounts, and the exchange's failures to supply information about the nature and purpose of transactions.

> **f.   LCB PARTICIPATED IN A MAJOR MONEY LAUNDERING SCHEME WITH HEZBOLLAH IN THE UNITED STATES INVOLVING NARCOTICS, USED CARS, AND THE TRANSFER OF OVER $250 MILLION (U.S.) THROUGH LCB'S NEW YORK CORRESPONDENT BANK ACCOUNTS**

935.    Ayman Joumaa, the Hezbollah narcotics trafficker and money launderer described above, controlled an international network of drug traffickers that transported, distributed and sold multi-ton bulk shipments of cocaine from South America, and laundered the proceeds—as much as $200 million (U.S.) per month on behalf of Hezbollah.

936.    Mr. Joumaa's network was described by David S. Cohen, then-Under Secretary for Terrorism and Financial Intelligence, as "a sophisticated multi-national money laundering ring, which launders the proceeds of drug trafficking for the benefit of criminals and the terrorist group Hezbollah."

937.    FinCEN's February 10, 2011's "Finding that the Lebanese Canadian Bank SAL is a Financial Institution of Primary Money Laundering Concern," reported that the proceeds of Mr. Joumaa's drug sales were laundered through various methods, including bulk cash smuggling operations and use of several Lebanese exchange houses that utilize accounts at LCB branches.

938.    On January 26, 2011, the U.S. Department of the Treasury designated Mr. Joumaa

under the Foreign Narcotics Kingpin Designation Act, together with Hassan Ayash Exchange and

Ellissa Exchange—the two exchanges houses discussed above—for their roles in Joumaa's

laundering of narcotics proceeds.

939.    Both exchange houses used LCB to facilitate U.S. dollar–denominated transfers.

As described below, these money laundering activities were, in part, for Hezbollah's benefit.

940.    As part of the money laundering scheme, LCB repeatedly and continuously used

correspondent bank accounts in New York to transfer money for Hezbollah.

941.    FinCEN's February 10, 2011 report described how Joumaa instructed LCB to

perform wire transfers in furtherance of two money laundering schemes:

> [S]ome of the funds move to LCB's U.S. correspondent accounts via
> suspiciously structured electronic wire transfers to multiple U.S.-based used
> car dealerships—some of which are operated by individuals who have been
> separately identified in drug-related investigations. The recipients use the
> funds to purchase vehicles in the United States, which are then shipped to
> West Africa and/or other overseas destinations, with the proceeds ultimately
> repatriated back to Lebanon. Other funds are sent through LCB's U.S.
> correspondent accounts to pay Asian suppliers of consumer goods, which
> are shipped to Latin America and sold, and the proceeds are laundered
> through a scheme known as the Black-Market Peso Exchange, in each case
> through other individuals referred to in this finding or via companies owned
> or controlled by them.

942.    According to FinCEN, Hezbollah derived financial support from this narco-

trafficking and money-laundering scheme, and LCB managers were complicit in the money

laundering activities.

943.    With LCB's support, Hezbollah financed its terrorist activity around the world. The

proceeds from the drug sales were laundered through various methods, including bulk cash

smuggling operations and the use of several Lebanese exchange houses that utilized accounts at

LCB branches managed by family members of other participants in the global money laundering network.

944.    Hassan Ayash Exchange and Ellissa Exchange were among those exchanges used to facilitate bulk cash transfers and launder money for Joumaa and Hezbollah.

945.    The U.S. Department of the Treasury found that LCB was likely the favored bank for the Joumaa-Hezbollah illegal banking activity:

> With respect to the exchanges and companies related to Ayman Joumaa, numerous instances indicate that substantial amounts of illicit funds may have passed through LCB. Since January 2006, hundreds of records with a cumulative equivalent value of $66.4 million identified a Lebanese bank that originated the transfer; approximately half of those were originated by LCB, for a cumulative equivalent value of $66.2 million, or 94%, thus, indicating that LCB probably is the favored bank for these exchange houses, particularly in the context of illicit banking activity. Similarly, a review of all dollar-denominated wire transfers with the two primary exchange houses either as sender or receiver between January 2004 and December 2008 showed 72% originated by one of the exchange houses through LCB.

946.    The movement of money was also facilitated by Ossama Salhab, a Hezbollah operative who controlled a network of money couriers based primarily in West Africa.

947.    Mr. Salhab, who is discussed below, and/or his relatives and associates owned, operated or controlled Cybamar Swiss, a Michigan company (with European affiliates) used as part of the money laundering network.

948.    The proceeds from the drug sales were deposited as bulk cash into the exchange houses, which in turn deposited the currency into their LCB accounts.

949.    Mr. Joumaa or the exchange houses then instructed LCB to perform wire transfers in furtherance of one of two TBML schemes.

950.    In the first scheme, Abou Jaoude, Mr. Hamdoun, and Mr. Safa used LCB to wire large amounts of U.S. currency to car buyers throughout the United States.

951.    The wire transfers passed through LCB's correspondent bank accounts at five New York banks: Bank of New York Mellon, Standard Chartered Bank, Wells Fargo Bank, JPMorgan Chase Bank, and Mashreq Bank.

952.    LCB made repeated, substantial use of the correspondent banking services of New York banks. Between 2007 and 2011, approximately 30 used-car purchasers received over 3,400 wire transfers equaling over $247 million (U.S.).

953.    According to the U.S. Government, between January 2007 and January 2011, Hassan Ayash Exchange participated in the money-laundering conspiracy by sending approximately $142 million (U.S.) by wire transfer to the United States for the purpose of purchasing or shipping used cars.

954.    In the same period, Ellissa Exchange participated in the money-laundering conspiracy by sending approximately $62 million (U.S.) by wire transfer to the United States for the purpose of purchasing or shipping used cars.

955.    Of the approximately $204 million (U.S.) wired by the exchanges to the United States, approximately 84 percent of the money originated from accounts held at LCB, underscoring the extent of LCB's involvement in the money laundering scheme.

956.    According to the U.S. Government, both Hassan Ayash Exchange and LCB knew that these transactions were:

> [T]he proceeds of illegal activities and that the transfers were in furtherance of a scheme intended to conceal and disguise the true source, nature, ownership, and control of those proceeds, and to promote those illegal activities; and that *this money laundering scheme benefitted Hezbollah*. (Emphasis added.)

957.    Account holders other than Hassan Ayash Exchange Ellissa Exchange initiated additional wire transfers of over $59 million (U.S.) from accounts at LCB to bank accounts in the

United States for the purchase or shipping of used cars in furtherance of the money laundering conspiracy.

958.    Some of the individuals linked to Hezbollah who sent wire transfers into the United States for the purchase of used cars as part of the money laundering scheme include: Ali Salhab (believed by the U.S. Government to be a relative of Ossama Salhab); Khodor Fakih, a Hezbollah operative from Lebanon who worked in the car business in Cotonou; Muhammad Hassan Hammoud, a Hezbollah supporter from Lebanon who owned a shipping company in Cotonou; and Yussuf Sobhi Nehme, a self-proclaimed Hezbollah supporter.

959.    The car buyers in the United States used the money transferred from LCB via its New York correspondent banks to purchase used cars.

960.    The "Salhab Companies," which included, but were not limited to, STE Nomeco SARL, STE Monaco SARL, the Salhab Travel Agency and Cybamar Swiss, were used extensively by Hezbollah operatives in the money-laundering operation.

961.    The Salhab Companies provided cover to Hezbollah operatives travelling to the United States to engage in the purchase of used cars. Additionally, STE Nomeco SARL owned and operated used car lots in Benin, used for the re-sale of cars acquired in the United States; STE Marco SARL was a transportation company operating between Togo and Ghana; and Cybamar Swiss was a shipping company frequently used by the car buyers to transport the cars to Africa.

962.    The Salhab Companies were owned, operated or controlled by Ossama Salhab or his relatives and associates. Mr. Salhab was a Hezbollah operative who was born in the Bekaa Valley of Lebanon.

963.    He was heavily involved in the used car business in Togo and Benin and controlled a network of money couriers who have: (a) travelled to the United States to transport cash and to

purchase cars for shipment to West Africa, and (b) transported millions of dollars in cash from West Africa to Lebanon.

964.    Mr. Salhab's involvement with Hezbollah was known to the U.S. Government, which denied him entry into the United States:

> On or about November 22, 2009, Salhab flew into the Detroit Metropolitan Airport on a flight from Beirut. During an interview with a U.S. Customs and Border Protection ("CBP") officer, Salhab stated that he was travelling to the United States for business on behalf of Cybamar Swiss. He had on his person a business card identifying him as the President of STE Marco SARL. During a border inspection of a fingerprint-encrypted laptop Salhab carried with him, CBP officers found, among other things, images of Hezbollah Secretary General Hassan Nasrallah; audio of the Hezbollah anthem; images of Hezbollah militants stomping on an Israeli flag; and movie files of executions, hangings, torture, and beheadings. Salhab claimed that the images were placed on his computer by an employee, Houssam Mehana. Salhab was allowed to withdraw his application for admission into the United States and departed the country."[38]

965.    As a result of the designation, the U.S. Government blocked $700,000 (U.S.) held by JP Morgan Chase Bank NA belonging to Hassan Ayash Exchange and Ellissa Exchange. The funds were in the process of being wired through an account in New York to an account held in the name of Hassan Ayash Exchange at LCB in Lebanon.

966.    In another money-laundering scheme, Abou Jaoude, Mr. Hamdoun, and Mr. Safa used LCB to wire large amounts of U.S. dollar-denominated funds through the Eurodollar market to buy consumer goods from Asian suppliers.

967.    According to the U.S. Government, Hezbollah derived financial support from these criminal activities, and LCB managers were complicit in the money laundering scheme.

968.    The electronic funds transfers passed through LCB's correspondent bank accounts in the following five New York banks: Bank of New York Mellon, Standard Chartered Bank,

---

[38]    *U.S. v. Lebanese Canadian Bank, et al.*, 11 Civ 9186, Verified Amended Complaint (Oct. 26, 2012).

Wells Fargo Bank, JPMorgan Chase Bank, and Mashreq Bank.

969.     The consumer goods from Asia were shipped to Latin America and sold. The proceeds of the sales were then laundered through the Black-Market Peso Exchange.

970.     The Black-Market Peso Exchange is a mechanism used to place substantial amounts of currency from U.S. narcotics sales into U.S. financial institutions to avoid detection. In simple terms, drug cartels sell drug-related, U.S.-based currency to black market peso exchangers in Latin America – especially in Colombia – who, in turn, place the currency into U.S. bank accounts. The exchangers then sell monetary instruments drawn on their bank accounts to Colombian importers who use them to purchase foreign goods.[39]

971.     Through these schemes, LCB provided funds and services to or for the benefit of Hezbollah and participated in a channel for laundering proceeds of narcotics trafficking and other unlawful activities, to generate profits, fees and commissions to be paid to Hezbollah operatives and supporters who were involved in the money laundering scheme.

### g.  LCB'S GAMBIAN SUBSIDIARY, PRIME BANK, WAS CO-OWNED BY AN INDIVIDUAL DESIGNATED BY THE U.S. GOVERNMENT FOR PROVIDING MATERIAL SUPPORT FOR HEZBOLLAH

972.     LCB was the majority shareholder of Prime Bank Limited, a private commercial bank in Serrekunda, The Gambia.

973.     Prime Bank was officially opened as a subsidiary of LCB in May 2009.

---

[39]     The money-laundering system that employs the Black-Market Peso Exchange works as follows: Drug cartels export drugs to the United States, where they are sold for dollars. A drug cartel enters into a "contract" with a Black Market Peso Exchanger. Pursuant to this "contract," the cartel sells its U.S. dollars to the exchanger's U.S. agent. Once the U.S. dollars are delivered, the peso exchanger deposits the agreed upon equivalent (of U.S. dollars) in local currency (usually Colombian pesos) into the cartel's account in Latin America. The laundered drug dollars are introduced into the U.S. banking system through structured transactions, and the exchanger has a pool of laundered funds to sell to Latin American importers who use the dollars to purchase goods, such as from Asian suppliers. These goods are transported to Latin America and sold.

974.     The most important minority shareholder in Prime Bank was Muhammad Ibrahim Bazzi, a Lebanese national later designated an SDGT.

975.     As described above, the U.S. Department of the Treasury designated Mr. Bazzi an SDGT on May 17, 2018 for assisting in, sponsoring or providing financial, technological or material support for—or financial or other services to or in support of—Hezbollah.

976.     Mr. Bazzi was designated for being one of Hezbollah's top financiers, as well as for his links to drug dealers and money laundering to fund terrorism.

977.     Bazzi reportedly has links to Ayman Joumaa's organization.

978.     In addition to providing millions of dollars to Hezbollah, Mr. Bazzi was a close associate of Yahya Jammeh, the then-President of The Gambia, who was identified on December 21, 2017, in the annex to E.O. 13818, which implemented the Global Magnitsky Human Rights Accountability Act (the "Magnitsky Act").[40] Mr. Jammeh appointed Mr. Bazzi as The Gambia's honorary Consul to Lebanon.

979.     Mr. Bazzi derived significant amounts of money from Gambian oil contracts, which he won by providing Mr. Jammeh with illegal goods and services.

980.     For example, Euro Africa Group, a company Mr. Bazzi controlled and in which he was the biggest shareholder, made payments in 2013 totaling $2.55 million (U.S.) to a foundation Jammeh controlled.

981.     Euro Africa Group held exclusive rights to import fuel to The Gambia between 2008 and 2013 and held a fuel supply deal with the state-run utility. Euro Africa Group was designated as an SDGT on May 17, 2018.

---

[40]     The Magnitsky Act addresses human rights abuses on a global scale. It allows the U.S. Government to sanction corrupt government officials implicated in abuses anywhere in the world.

982.     Mr. Bazzi, who has been described as "Jammeh's business surrogate," was also allegedly involved in the sale of Iranian weapons to Hezbollah. He coordinated the exchange on behalf of Mr. Jammeh; the weapons were stored at Kanilai Farms in Jammeh's home village, and Mr. Bazzi allegedly used Prime Bank, LCB's subsidiary, for the financing.

983.     Mr. Bazzi has also maintained ties to Adham Tabaja and Ali Yussuf Charara, whom the U.S. Department of the Treasury designated as SDGTs for providing material support to Hezbollah on June 10, 2015, and January 7, 2016, respectively. Both Messrs. Tabaja and Charara are described above.

984.     According to the U.S. Government, Mr. Bazzi provided funds to Mr. Tabaja, with whom he held a joint line of credit, and worked closely with Abdallah Safieddine. In sum, Mr. Bazzi coordinated his activities with the co-leaders of Hezbollah's BAC.

985.     The following diagram regarding Hezbollah's illicit financing networks was prepared by the U.S. Department of the Treasury:



986.    Mr. Tabaja's uncle, Ahmad Ali Tabaja, was the general manager, chairman and a shareholder of Trust Compass Insurance SAL, which in turn was a shareholder of LCB.

### 3.   SGBL HAS AIDED AND ABETTED HEZBOLLAH

987.    In addition to Defendant SGBL acquiring the liabilities of LCB and being the legal successor-in-interest to LCB and its criminal conduct, SGBL has itself long provided material support to, and aided and abetted, Hezbollah.

988.    SGBL has knowingly held accounts and provided financial services to Hezbollah's Martyrs Foundation through Atlas Holding SAL (detailed above).

989.    SGBL has knowingly held accounts and provided financial services to Hezbollah's Al-Mabarrat Charitable Society.

196

990.    SGBL has knowingly held accounts and provided financial services to Al-Inmaa Engineering and Contracting, the prominent Hezbollah construction and investment arm headed by Adham Tabaja (an SDGT).

991.    SGBL has knowingly held accounts and provided financial services to Al-Saad Establishment for Trading of Eggs, an IRGC–QF front company with close ties to Hezbollah.

992.    SGBL has knowingly held accounts and provided financial services to the publisher of Hezbollah's *Baqiyat Allah* magazine, a Hezbollah-controlled company called Dbouk International for Printing and General Trading.

993.    SGBL has knowingly held accounts and provided financial services to Hoda for Touristic Services and Management Holding SAL, a company controlled by two senior Hezbollah financiers, Abbas Abdel Latif Fawaz and Ali Yussuf Charara (an SDGT).

994.    SGBL has knowingly held accounts and provided financial services to Fantasy World SARL which operates the well-known Fantasy World amusement park in Hezbollah's stronghold of Dahiyah in the southern suburbs of Beirut that was founded and operated by Adham Tabaja, co-chairman of Hezbollah's BAC.

995.    SGBL knows or consciously avoided knowing that these companies are part of Hezbollah and its financial arm, and willing assisted Hezbollah in its commercial enterprises.

**B. FRANSABANK SAL**

996.    Defendant FRANSABANK SAL has knowingly maintained accounts for, and provided material support that aided and abetted, several core Hezbollah-controlled "charities" that are widely and publicly associated with, the organization including:

      a.   IRSO, Cheiah Branch (a/k/a Al-Shiyah)
         Account number: 252010/69283021

      b.   Martyrs Foundation–Lebanon

Account number: 21-10-0360062-73

c. Wounded Association; Muasassat al-Jarha
Account number: 805458023.

997.    In addition, Defendant FRANSABANK also maintains accounts for, and provided material support that aided and abetted Compu House SARL, the Hezbollah-controlled technology importer, founded and majority owned by Sultan Khalifa As'ad, Deputy Chairman of the Executive Council for Municipal Affairs, former head of Hezbollah's Finance Unit and former director of Jihad al-Bina.

998.    In August 2006, NBC News reported that the Israeli government had bombed FRANSABANK's offices in Beirut "which they claim help Hezbollah receive and move money around the world."

999.    According to NBC News, "[t]he Fransabank General Manager tells NBC 'We have no relationship with Hezbollah or any other political party anywhere. We don't have any relation and we refuse to have one.'"[41]

1000.   At the same time, FRANSABANK maintained accounts for multiple Hezbollah institutions as well as a BAC-entity, Compu House SARL, controlled by the well-known, long-standing Hezbollah leader, Sultan Khalifa As'ad.

**C. BLOM BANK SAL**

1001.   As set forth below, Defendant BLOM BANK maintains accounts for a wide-spectrum of Hezbollah entities and operatives ranging from the nominally charitable, to money-laundering for narcotics traffickers to arms dealers:

- Al-Mabarrat Charitable Society–Lebanon;

---

[41]    *See* Adam Ciralsky and Lisa Myers, *Hezbollah Banks Under Attack in Lebanon* (NBC News, July 25, 2006), archived at https://web.archive.org/web/20060810204050/http://www.msnbc.msn.com/id/14015377.

- Arch Consulting SARL;

- Ellissa Exchange Company SARL;

- Ovlas Trading SA;

- Spectrum Investment Group Holding SAL;

- Mustafa Reda Darwish Fawaz;

- Teltac World Wide Incorporated (Offshore) SAL; and

- Beton Plus SAL.

1002.   Taken as a whole, this roster of customers includes four designated Hezbollah persons or companies and entities widely and openly known to be associated with and/or controlled by designated entities belonging to Hezbollah.

1003.   Defendant BLOM BANK's roster of Hezbollah-controlled customers reflects the bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S. and international financial systems and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1004.   BLOM BANK maintained accounts for Al-Mabarrat Charitable Society–Lebanon and provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this prominent and well-known Hezbollah organization, founded by Hezbollah's "spiritual leader" Sheikh Muhammad Hussein Fadlallah, who was designated a terrorist by the United States in 1995.

1005.   Defendant BLOM BANK maintained accounts for Ellissa Exchange Company SARL (an SDNT) and provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known front

for Hezbollah's narcotics trafficking network run by Ayman Joumaa.[42]

1006.   Defendant BLOM BANK maintained accounts for Arch Consulting SARL and provided material support that aided and abetted Hezbollah, through its role in providing financial services to this prominent and well-known front for Hezbollah's construction arm, Jihad al-Bina (SDGT).

1007.   Defendant BLOM BANK maintained accounts for Ovlas Trading SA (an SDGT) and provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Tajideen Network of companies operated on behalf of Hezbollah's Business Affairs Component.

1008.   Defendant BLOM BANK maintained accounts for Spectrum Investment Group Holding SAL (an SDGT) and provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Charara Network of companies operated on behalf of Hezbollah's Business Affairs Component.

1009.   Defendant BLOM BANK maintained accounts for Mustafa Reda Darwish Fawaz, (an SDGT) and provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known member of Hezbollah's Islamic Jihad Organization, who has supported the organization's communications, surveillance, and arms dealing activities in West Africa.

1010.  Defendant BLOM BANK maintained accounts for Teltac World Wide Incorporated (Offshore) SAL and provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this well-known part of the Charara

---

[42]      BLOM Bank was identified by the U.S. Government as one of four Lebanese banks whose New York correspondent banks were used by Lebanese exchange houses to launder money for Hezbollah.

Network of companies operated on behalf of Hezbollah's Business Affairs Component.

1011. Defendant BLOM BANK maintained accounts for Beton Plus SAL and provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this part of Hezbollah's Business Affairs Component, co-founded by Salah Abd al-Rauf Azz al-Din, sometimes referred to as the Lebanese "Bernie Madoff," to whom the organization transferred the large sums it received from Iran in order to invest it in Europe and America.

### D. MIDDLE EAST AFRICA BANK SAL ("MEAB")

1012. Defendant MEAB was co-founded and -chaired—until June 2015—by Kassem Hejeij who stepped down as a result of being designated by the U.S. Department of the Treasury as an SDGT for his direct links to Hezbollah.

1013. The bank was established to serve the needs of the Hejeij brothers, who owned a large construction business in Africa.

1014. According to the U.S. Department of the Treasury:

> Hejeij is a Lebanese businessman that maintains direct ties to Hizballah organizational elements. In addition to his support to Adham Tabaja and his affiliated companies in Iraq, Hejeij has helped open bank accounts for Hizballah in Lebanon and provided credit to Hizballah procurement companies. Hejeij has also invested in infrastructure that Hizballah uses in both Lebanon and Iraq.

1015. In 2007, Muhammad Bitar served as the manager of MEAB's Tyre Branch, where he attended a dinner in honor of Iranian Authority for the Rehabilitation of Lebanon ("ICRL"), which took place in December 2007.

1016. Among those in attendance were Hezbollah operatives Sheik Faez Alawiya (municipal work official), Sheik Haydar Daqmaq (media official) and Murtada Hashem (public relation official) as well as IRGC General Hassan Shateri (a/k/a Khoshnevis)—the director of

ICRL.[43]

1017.   MEAB was involved in Hezbollah's conspiracy to launder narcotics trafficking proceeds through the sale of used cars in Africa.

1018.   Between approximately January 2007 and early 2011, MEAB (along with three other Lebanese banks), through its correspondent bank account(s) with U.S. financial institutions located in New York helped knowingly move tens of millions of dollars on behalf of Hezbollah that were ultimately laundered by money exchange businesses in Lebanon.

1019.   Defendant MEAB has also knowingly held accounts (including Account No. 004-002-036-100250-012) and provided financial services to the Imam Khomenei Relief Foundation–Lebanon (SDGT).

1020.   Defendant MEAB also maintained (and maintains) accounts and provided financial services to Al-Inmaa Engineering and Contracting, the prominent Hezbollah construction and investment arm headed by Adham Tabaja (an SDGT).

1021.   Defendant MEAB has also knowingly held accounts and provided financial services to Fantasy World SARL which operates the well-known Fantasy World amusement park in Hezbollah's stronghold of Dahiyah in the southern suburbs of Beirut that was founded and operated by Adham Tabaja, co-chairman of Hezbollah's BAC.

1022.   Moreover, a public campaign to support Hezbollah was announced on June 16, 2007 asking donors to contribute the money into a Hezbollah-owned bank account at Defendant MEAB, Account No. 10680.

**E.  BYBLOS BANK SAL**

1023.   As set forth below, Defendant BYBLOS BANK SAL maintains accounts for a

---

[43]       Muhammad Bitar went on to serve as Regional Manager of Defendant LEBANON AND GULF BANK.

wide-spectrum of Hezbollah entities and operatives ranging from the core fundraising arm of Hezbollah's terror apparatus, to a front for its U.S.-designated "social welfare" arm, to various nodes within Hezbollah's Business Affairs Component:

- Islamic Resistance Support Organization;

- Al-Amana SARL;

- Global Touristic Services SAL (a/k/a GTS);

- Société Orientale Libanaise d'Investissement et Développement SAL (a/k/a Solid);

- Afrimex (Offshore) SAL;

- Amigo Travel and Transport SAL; and

- Medical Equipment and Drugs International Corporation SAL (a/k/a MEDIC).

1024.  Taken as a whole, this roster of customers includes the most infamous designated Hezbollah organizations and many other key elements of its Business Affairs Component.

1025.  BYBLOS BANK's roster of Hezbollah-controlled customers reflects the bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S. and international financial systems and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1026.  Defendant BYBLOS BANK maintained accounts for the benefit of Islamic Resistance Support Organization and provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this prominent and well-known Hezbollah organization.[44]

1027.  Defendant BYBLOS BANK maintained (and maintains) accounts for Al-Amana

---

[44]     BYBLOS's account for the "Resistance" at its Harel Hreik branch was broadcast openly on *Al-Manar*.

SARL, a company that owns gas stations in Lebanon (nominally owned by Atlas Holding) on behalf of the U.S.-designated Martyrs Foundation–Lebanon.

1028.   At all relevant time BYBLOS BANK knew (and knows) that Al-Amana SARL was (and is) a Hezbollah-controlled entity.

1029.   The company is owned by Atlas Holding—the well-known "investment arm" of the U.S.-designated Martyrs Foundation–Lebanon.

1030.   Its management includes prominent Hezbollah operatives Muhammad Ali Bashir, Shawki Muhammad Shafiq Nur El Din, Qassem Muhammad Ali Bazzi and Osama Muhammad Aliq.

1031.   Moreover, the company was set up by one of Hezbollah's principal attorneys, Ali Hassan Berro.

1032.   Defendant BYBLOS BANK maintained (and maintains) accounts for Global Touristic Services SAL (a/k/a GTS), a company nominally owned by Atlas Holding on behalf of the U.S.-designated Martyrs Foundation–Lebanon.

1033.   At all relevant time BYBLOS BANK knew (and knows) that Global Touristic Services SAL (a/k/a GTS) was (and is) a Hezbollah-controlled entity.

1034.   The company is also owned by Atlas Holding.

1035.   Its management includes prominent Hezbollah operatives Muhammad Ali Bashir, Shawki Muhammad Shafiq Nur El Din, Qassem Muhammad Ali Bazzi and Jihad Muhammad Qansu, an SDGT, who is part of Adham Tabaja's Network.

1036.   Moreover, the company was set up by one of Hezbollah's principal attorneys, Ali Hassan Berro.

1037.   Defendant BYBLOS BANK maintained (and maintains) accounts for Afrimex

(Offshore) SAL, a company founded by Yussuf Muhammad Tajideen (brother of two Tajideens who are designated as SDGTs).

1038.   Afrimex (Offshore) SAL is part of the Tajideen family's network and Hezbollah's Business Affairs Component.

1039.   Board members include Yussuf Muhammad Tajideen's sister-in-law, Ibrahim Muhammad Tajideen's wife, Hana Abdelkarim Jawad, and his brother-in-law, Hussein Tawfiq Sayegh, the husband of Fatimah Tajideen.

1040.   Although the nominal ownership of the company is in the hands of undesignated members of the Tajideen family, because of the family's preeminent status as a leading Hezbollah family coupled with the fact that its lawyer and accountant are Amir Afif Abu Khalil and Shawqi Ra'if Abu Khalil – two individuals associated with multiple Hezbollah companies – it would have been obvious to Defendant BYBLOS BANK that they were aiding and abetting the Tajideen family and, by extension, Hezbollah by helping them operate their businesses and evade sanctions directed against the Tajideen Network and Hezbollah.

1041.   The company was also set up by the same attorney / auditor – Shawqi Ra'if Abu Khalil – who was involved in setting up other (designated) Hezbollah / Tajideen Network companies such as Ovlas Trading SA.

1042.   Defendant BYBLOS BANK maintained (and maintains) accounts for Amigo Travel and Transport SAL, a company that is part of Adham Tabaja's network of companies and Hezbollah's Business Affairs Component.

1043.   The company's management includes Jihad Muhammad Qansu, a designated SDGT identified as part of the Tabaja Network, and was co-founded by Khadir Ali Abi Haidar, who is also a director of the U.S.-designated Car Care Center (a/k/a Mikalab SARL), which is also

part of Adham Tabaja's network of companies and Hezbollah's Business Affairs Component.

1044.   Moreover, the company was set up by an attorney, Nabil Kamil al-Akhras, who set up other companies controlled by Jihad Muhammad Qansu, including Al-Ansab Lebanese for International Trading (Offshore) SAL (a/k/a ALIT), Golden Fish (Offshore) SAL, and Mega Investment Group (Offshore) SAL (a/k/a MIG).

1045.   Defendant BYBLOS BANK maintained (and maintains) accounts for Société Orientale Libanaise d'Investissement et Développement SAL (a/k/a Solid), a company that it knows is part of Hezbollah's Business Affairs Component.

1046.   Defendant BYBLOS BANK knows that it is aiding Hezbollah by maintaining accounts for Société Orientale Libanaise d'Investissement et Développement SAL because the company was founded by Atlas Holding—the well-known "investment arm" of the U.S. designated Martyrs Foundation–Lebanon.

1047.   Its management includes prominent Hezbollah operatives, including Hassan Ali Tajideen, the son of Ali Tajideen, a U.S.-designated Hezbollah financier.

1048.   Hassan Ali Tajideen is currently executive manager of Tajco (an SDGT holding company through which Hassan's father and uncles launder and transfer money for Hezbollah.) and shareholder in Tajco SAE. Hassan's mother, Nur al-Ain Muhammad Ali Atwi, is also a shareholder in the company. She is the wife of Ali Tajideen, who was named an SDGT on December 9, 2010.

1049.   Jihad Muhammad Qansu, an SDGT who is part of Adham Tabaja's Network, is listed as the company's auditor, and the company was set up by one of Hezbollah's principal attorneys, Ali Hassan Berro.

1050.   Defendant BYBLOS BANK maintained (and maintains) accounts for Medical

Equipment and Drugs International Corporation SAL (a/k/a MEDIC), a Hezbollah-controlled company established in 2013 to sell pharmaceuticals and other medical products.

1051.   At all relevant time BYBLOS BANK knew (and knows) that Medical Equipment and Drugs International Corporation SAL was (and is) a Hezbollah-controlled entity.

1052.   The company is owned by Atlas Holding—the well-known "investment arm" of the U.S.-designated Martyrs Foundation–Lebanon which was designated seven years before the company was established.

1053.   Its management includes Qassem Muhammad Ali Bazzi—just as the other Atlas Holding portfolio companies do.

1054.   BYBLOS BANK's roster of Hezbollah-controlled customers reflects the bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S. and international financial systems and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1055.   It also demonstrates the interconnectedness of Hezbollah's Business Affairs Component.   BYBLOS BANK's roster of Hezbollah-controlled customers includes companies with overlapping ownership and management structures that include representatives of the Martyrs Foundation–Lebanon, the Tajideen Network and the Tabaja Network – all working on behalf of the organization, with BYBLOS BANK providing its access to the banking sector and USD-clearing to ensure that the Business Affairs Component can carry out its mission, generate revenue for the organization and navigate American sanctions.

**F.  BANK AUDI SAL**

1056.   As set forth below, Defendant BANK AUDI SAL maintains accounts for a wide-spectrum of Hezbollah entities ranging from various nodes within Hezbollah's Business Affairs

Component to sub-divisions of Hezbollah's "social welfare" arm:

- Ovlas Trading (Offshore) SAL;

- Ovlas Trading SA;

- Spectrum International Investment Holding SAL;

- Spectrum Investment Group Holding SAL;

- Teltac World Wide Incorporated (Offshore) SAL;

- Al-Hadi Institution; and

- Medical Equipment and Drugs International Corporation SAL (a/k/a MEDIC).

1057. Defendant BANK AUDI maintained (and maintains) accounts for Ovlas Trading (Offshore) SAL, which was designated by the U.S. Department of the Treasury on December 9, 2010.

1058. The company is controlled by the Tajideen family—part of Hezbollah's Business Affairs Component.

1059. The company's chairman, Ahmad Hassan Tajideen, is the son of Hassan Muhammad Abd al-Hassan Tajideen, the late older brother of Ali and Hussein Tajideen – both designated SDGTs.

1060. Hassan Muhammad Abd al-Hassan Tajideen founded the company, and his wife remains on the board of directors after he died in a 2010 plane crash.

1061. The company's auditor is Shawqi Ra'if Abu Khalil, who works at the Tajideen family's primary accounting/auditing firm.

1062. The company's lawyer is Amir Afif Abu Khalil, the Tajideen family's primary attorney.

1063. Defendant BANK AUDI maintained (and maintains) accounts for Ovlas Trading

SA, which was designated by the U.S. Department of the Treasury on December 9, 2010.

1064.   The company is controlled by the Tajideen family—part of Hezbollah's Business Affairs Component.

1065.   Hassan Muhammad Abd al-Hassan Tajideen founded the company, but after his death in 2010, the company is now owned by his brother, Qassem Tajideen (an SDGT since 2009), according to the U.S. Department of the Treasury.

1066.   Defendant BANK AUDI maintained (and maintains) accounts for Spectrum Investment Group Holding SAL (an SDGT) and provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Charara network of companies operated on behalf of Hezbollah's Business Affairs Component. Charara's Network has been described by the U.S. Government as "a key Hizballah support network."

1067.   Defendant BANK AUDI maintained (and maintains) accounts for Spectrum Investment Group Holding SAL

1068.   Defendant BANK AUDI maintained (and maintains) accounts for Teltac World Wide Inc. (Offshore) SAL and provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Charara network of companies operated on behalf of Hezbollah's Business Affairs Component.

1069.   Teltac World Wide was founded by Ali Ibrahim Charara, who co-founded the U.S.-designated SDGT Spectrum Investment Group Holding SAL.

1070.   Defendant BANK AUDI maintained (and maintains) accounts for Al-Hadi Institution, a charitable institution for disabled children owned and operated by Al-Mabarrat.

1071.   While the institution provides genuine services to disabled children, it does so as part of Hezbollah's successful effort to galvanize support for its core mission and political program, i.e. Hezbollah sees Al-Mabarrat, the Martyrs Foundation and other outreach institutions as part of its wider efforts to proselytize and harden its domestic support for its terrorist program.

1072.   Defendant BANK AUDI maintained (and maintains) accounts for Medical Equipment and Drugs International Corporation SAL (MEDIC), a Hezbollah-controlled company established in 2013 to sell pharmaceuticals and other medical products.

1073.   At all relevant time BANK AUDI knew (and knows) that Medical Equipment and Drugs International Corporation SAL (MEDIC) was (and is) a Hezbollah-controlled entity.

1074.   The company is owned by Atlas Holding—the well-known "investment arm" of the U.S.-designated Martyrs Foundation–Lebanon, which was designated seven years before the company was established.

1075.   Its management includes Qassem Muhammad Ali Bazzi—just as the other Atlas Holding portfolio companies do.

1076.   BANK AUDI's roster of Hezbollah-controlled customers reflects the bank's commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S. and international financial systems and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

**G.  LEBANON AND GULF BANK**

1077.   As set forth below, Defendant LEBANON AND GULF BANK maintains accounts for the benefit of a wide-spectrum of Hezbollah entities ranging from the most infamous arm of Hezbollah's "social welfare" apparatus to various nodes within Hezbollah's Business Affairs Component run by (a) the Martyrs Foundation (SDGT), (b) companies controlled by Adham

Tabaja (SDGT), (c) the Tajideen family, and (d) the Charara Network:

- Islamic Resistance Support Organization;

- Al-Amana SARL;

- Amana Plus Company;

- Shahed Pharm Drugstore SARL (discussed above);

- City Pharma SARL;

- Al-Inmaa Engineering and Contracting;

- Ovlas Trading (Offshore) SAL;

- Ovlas Trading SA; and

- Spectrum Investment Group Holding SAL.

1078.   Defendant LEBANON AND GULF BANK has maintained accounts for and provided material support that aided and abetted the Hezbollah-controlled "charity" widely and publicly associated with the organization: Islamic Resistance Support Organization (IRSO), bank account numbers: 202-336254 and 202-329665 (nominally held by the al-Ma'rifa Society and al-Bushra Societies respectively—expressly and publicly soliciting donations for the benefit of IRSO).

1079.   Defendant LEBANON AND GULF BANK maintained (and maintains) accounts for Al-Amana SARL and has provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Martyrs Foundation–Lebanon network of companies operated on behalf of Hezbollah's Business Affairs Component.

1080.   Al-Amana SARL operates 12 gas stations under the name of AL AMANA in Beirut, South Lebanon and the Bekaa Valley in Lebanon.

1081.   The company is owned by the Martyrs Foundation–Lebanon (an SDGT) through Atlas Holding SAL but 2 percent of the shares are owned by Hezbollah operative and Al-Rasoul al-Azam Hospital CEO, Muhammad Ali Bashir, and Martyrs Foundation–Lebanon Director Shawki Nur al-Din.

1082.   Bashir is the company's manager, and Hezbollah operative Qassem Muhammad Ali Bazzi serves as a member of the board.

1083.   Al-Amana SARL was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro.

1084.   Defendant LEBANON AND GULF BANK maintained (and maintains) accounts for the related company (with the same founders and management), Amana Plus Company, and has provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Martyrs Foundation–Lebanon network of companies operated on behalf of Hezbollah's Business Affairs Component.

1085.   Defendant LEBANON AND GULF BANK maintained (and maintains) accounts for Shahed Pharm Drugstore SARL (with largely the same Hezbollah founders and management as Al-Amana SARL and Amana Plus Company) and has provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Martyrs Foundation–Lebanon network of companies operated on behalf of Hezbollah's Business Affairs Component.

1086.   Defendant LEBANON AND GULF BANK maintained (and maintains) accounts for City Pharma (with largely the same Hezbollah founders and management as Al-Amana SARL, Amana Plus Company and Shahed Pharm Drugstore SARL) and has provided material support

that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Martyrs Foundation–Lebanon network of companies operated on behalf of Hezbollah's Business Affairs Component.

1087. City Pharma SARL was one of several Lebanese companies controlled by Hezbollah that was caught importing counterfeit medications from Southeast Asia and transferring them to factories in Europe where they were officially labeled as having been produced in Europe.

1088. The licenses of the 15 pharmacies were temporarily revoked but the counterfeit medications had reached hospitals, clinics, and pharmacies in Lebanon, where they had been prescribed to the public.

1089. Defendant LEBANON AND GULF BANK maintained (and maintains) accounts and provided vital financial services to Al-Inmaa Engineering and Contracting (SDGT), the prominent Hezbollah construction and investment arm headed by Adham Tabaja (an SDGT).

1090. Defendant LEBANON AND GULF BANK maintained (and maintains) accounts for Ovlas Trading (Offshore) SAL which was designated by the U.S. Department of the Treasury on December 9, 2010.

1091. The company is controlled by the Tajideen family—part of Hezbollah's Business Affairs Component.

1092. The company's chairman, Ahmad Hassan Tajideen, is the son of Hassan Muhammad Abd al-Hassan Tajideen, the late older brother of Ali and Hussein Tajideen—both designated SDGTs.

1093. Hassan Muhammad Abd al-Hassan Tajideen founded the company, and his wife remains on the board of directors after he died in the 2010 plane crash.

1094. The company's auditor is Shawqi Ra'if Abu Khalil—who works at the Tajideen

family's primary accounting/auditing firm.

1095.   The company's lawyer is Amir Afif Abu Khalil—the Tajideen family's primary attorney.

1096.   Defendant LEBANON AND GULF BANK maintained accounts for Ovlas Trading SA, which was designated by the U.S. Department of the Treasury on December 9, 2010.

1097.   The company is controlled by the Tajideen family—part of Hezbollah's Business Affairs Component.

1098.   Hassan Muhammad Abd al-Hassan Tajideen founded the company, but after his death in 2010, the company is now owned by his brother, Qassem Tajideen (an SDGT since 2009), according to the U.S. Department of the Treasury.

1099.   Defendant LEBANON AND GULF BANK maintained (and maintains) accounts for Spectrum Investment Group Holding SAL (an SDGT) and provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Charara network of companies operated on behalf of Hezbollah's Business Affairs Component.

1100.   Mr. Charara's Network has been described by the U.S. Government as "a key Hizballah support network."

1101.   LEBANON AND GULF BANK's roster of Hezbollah-controlled customers reflects the bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S. and international financial systems and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

## H.  BANQUE LIBANO-FRANCAISE SAL

1102.   Defendant BANQUE LIBANO-FRANCAISE SAL has maintained accounts for and provided material support that aided and abetted the Hezbollah-controlled "charity" widely and publicly associated with the organization: Islamic Resistance Support Organization (IRSO) – Account numbers: 657409.17; 657469.171.

1103.   Defendant BANQUE LIBANO-FRANCAISE SAL maintained (and maintains) accounts for Ovlas Trading SA, which was designated by the U.S. Department of the Treasury on December 9, 2010.

1104.   The company is controlled by the Tajideen family—part of Hezbollah's Business Affairs Component.

1105.   Hassan Muhammad Abd al-Hassan Tajideen founded the company, but after his death in 2010, the company is now owned by his brother, Qassem Tajideen (an SDGT since 2009), according to the U.S. Department of the Treasury.

1106.   Defendant BANQUE LIBANO-FRANCAISE SAL has knowingly held accounts and provided vital financial services to Hoda for Touristic Services and Management Holding SAL, a company controlled by two senior Hezbollah financiers, Abbas Abdel Latif Fawaz and Ali Yussuf Charara (an SDGT).

1107.   Defendant BANQUE LIBANO-FRANCAISE SAL has knowingly held accounts and provided vital financial services to Al-Inmaa Engineering and Contracting (SDGT), the prominent Hezbollah construction and investment arm headed by Adham Tabaja (an SDGT).

1108.   Defendant BANQUE LIBANO-FRANCAISE SAL has knowingly held accounts and provided vital financial services to REEM Pharmaceutical SAL a designated SDGT since 2017, owned by Muhammad Abd-al-Amir Farhat, a Hezbollah operative with close ties to the

IRGC–QF.

1109. BANQUE LIBANO-FRANCAISE's roster of Hezbollah-controlled customers reflects the bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S. and international financial systems and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

## I. BANK OF BEIRUT SAL

1110. Defendant BANK OF BEIRUT SAL has maintained accounts for and provided material support that aided and abetted Hezbollah's BAC.

1111. Defendant BANK OF BEIRUT maintained an account for Mustafa Reda Darwish Fawaz (an SDGT) and provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known member of Hezbollah's Islamic Jihad Organization, who has supported the organization's communications, surveillance, and arms dealing activities in West Africa.

1112. Defendant BANK OF BEIRUT also maintains accounts for and provided material support that aided and abetted Compu House SARL, the Hezbollah-controlled technology importer, founded and majority owned by Sultan Khalifa As'ad, Deputy Chairman of the Executive Council for Municipal Affairs, former head of Hezbollah's Finance Unit and former director of Jihad al-Bina.

1113. Defendant BANK OF BEIRUT has also knowingly held accounts and provided vital financial services to Medical Equipment and Drugs International Corporation SAL MEDIC, another entity that is part of Hezbollah's network of pharmaceutical companies. Although the company was established after the period relevant to this action, because it is owned by Atlas

216

Holding SAL – i.e. Martyrs Foundation–Lebanon – BANK OF BEIRUT's willingness to provide material support to one of Hezbollah's most prominent organizations in recent years confirms that BANK OF BEIRUT continues to provide material support to Hezbollah even when its customers' ties to Hezbollah are glaring.

### J. BANK OF BEIRUT AND THE ARAB COUNTRIES

1114.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES ("BBAC") has maintained accounts for and provided material support that aided and abetted Hezbollah's BAC.

1115.   BBAC has knowingly held accounts and provided vital financial services to Al-Inmaa Engineering and Contracting, a designated SDGT controlled by Adham Tabaja, the prominent Hezbollah financier.

1116.   BBAC has knowingly held accounts and provided vital financial services to Ovlas Trading SA, the Lebanese arm of the Tajideen family network of companies.

1117.   BBAC has knowingly held accounts and provided vital financial services to Hyram Maritime SAL, part of the Tajideen family network of companies.

1118.   BBAC has knowingly held accounts and provided vital financial services to Vatech SARL, an SDGT controlled by Fadi Hussein Serhan (also an SDGT).

1119.   Serhan is a Hezbollah procurement agent who serves as the general manager of Vatech SARL, which was used to purchase sensitive technology and equipment for Hezbollah.

1120.   Serhan has purchased unmanned aerial vehicles (UAVs) and accessories, and various electronic equipment from companies in the United States, Europe, Asia, and the Middle East.

1121.   BBAC has knowingly held accounts and provided vital financial services to Teltac World Wide Incorporated (Offshore) SAL, headed by Ali Ibrahim Charara who serves as its

chairman and CEO.

1122.   Ali Ibrahim Charara is also a Co-Founder of Spectrum Investment Group Holding SAL, the U.S.-designated company led by Hezbollah financier, Ali Yussuf Charara (also an SDGT).

### K.  JAMAL TRUST BANK SAL

1123.   Defendant JAMAL TRUST BANK SAL has maintained accounts for and provided material support that aided and abetted the Hezbollah-controlled "charity" widely and publicly associated with Hezbollah's Islamic Resistance Support Organization ("IRSO").

1124.   IRSO has openly advertised and solicited donations published with its JAMAL TRUST BANK account 140/028355.28/0/5 at its branch in Ghobeiry (Hezbollah's stronghold in the southern suburbs of Beirut).

1125.   Defendant JAMAL TRUST BANK has knowingly held accounts and provided vital financial services to Car Escort Services (Offshore) SAL, the prominent Hezbollah automotive company which is itself an SDGT and is owned by three prominent members of Hezbollah's BAC, Ali Muhammad Kharrubi, Ali Yussuf Charara and Muhammad Ibrahim Bazzi – all designated by the U.S. Department of the Treasury.

1126.   Defendant JAMAL TRUST BANK has knowingly held accounts and provided vital financial services to Spectrum International Investment Holding SAL and Spectrum Investment Group Holding SAL—both designated SDGTs and both controlled by well-known Hezbollah financier and BAC leader, Ali Charara.

1127.   Defendant JAMAL TRUST BANK has knowingly held accounts and provided vital financial services to New All Pharma SARL, part of Hezbollah's network of pharmaceutical companies.

218

1128.   Defendant JAMAL TRUST BANK has also knowingly held accounts and provided vital financial services to Medical Equipment and Drugs International Corporation SAL MEDIC, another entity that is part of Hezbollah's network of pharmaceutical companies. Although the company was established after the period relevant to this action, because it is owned by Atlas Holding SAL – i.e. Martyrs Foundation–Lebanon – JAMAL TRUST BANK's willingness to provide material support to one of Hezbollah's most prominent organizations in recent years confirms that JAMAL TRUST BANK continues to provide material support to Hezbollah even when its customers' ties to it are glaring.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) FOR VIOLATION OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

1129.   Plaintiffs repeat and re-allege every allegation of the foregoing paragraphs as if fully set forth herein.

1130.   During all relevant times, each Defendant knew that Hezbollah engaged in acts of international terrorism and each Defendant knew that Hezbollah had been designated an FTO.

1131.   Each Defendant knowingly provided material support to Hezbollah during the period between 2003 through 2011 and allowed Hezbollah to transfer millions of dollars through the U.S. financial system for the benefit of Hezbollah.

1132.   Each Defendant's conduct *involved* violent acts or acts dangerous to human life that constitute violations of 18 U.S.C. § 2339B.

1133.   By knowingly providing material support to Hezbollah, each Defendant's conduct objectively appeared to be intended to intimidate or coerce a civilian population or influence the

policy of a government by intimidation or coercion by substantially assisting Hezbollah in operating its global terror network.

1134. By knowingly providing material support to Hezbollah and providing a financial lifeline in the form of global access to critical U.S. dollars, each Defendant substantially and foreseeably contributed to Hezbollah's capacity to orchestrate, direct and commit terrorist acts, including the terrorist attack that injured Plaintiffs.

1135. Each Defendant's activities occurred primarily outside the United States.

1136. As the U.S. Department of the Treasury noted in 2016 (quoting Adam J. Szubin, then-acting Under Secretary for Terrorism and Financial Intelligence), Hezbollah "relies upon accomplices in the business community to place, manage, and launder its terrorist funds."

1137. Defendants herein were the most central accomplices relied upon by Hezbollah for facilitating its financial operations.

1138. Defendants' knowing provision of material support to FTO Hezbollah was a substantial reason that Hezbollah was able to orchestrate the terrorist attacks at issue.

1139. Defendants' knowing provision of material support to FTO Hezbollah increased its ability to plan, direct and orchestrate deadly attacks that were a foreseeable consequence of facilitating the transfer of millions of U.S. dollars to persons and entities controlled by Hezbollah.

**SECOND CLAIM FOR RELIEF**

**CIVIL LIABILITY UNDER 18 U.S.C. § 2333(d) FOR AIDING AND ABETTING HEZBOLLAH, A FOREIGN TERRORIST ORGANIZATION**

1140. Plaintiffs repeat and re-allege every allegation of the foregoing paragraphs as if fully set forth herein.

1141. Plaintiffs were injured by an act of international terrorism as defined by 18 U.S.C. § 2331.

1142.   Plaintiffs were injured by an act of international terrorism committed, planned or authorized by FTO Hezbollah (and in some cases, also FTO Kata'ib Hezbollah).

1143.   Hezbollah had been designated as an FTO (in 1997) as of the date of all the attacks alleged herein.

1144.   As set forth in detail above, the IRGC–QF tasked Hezbollah with organizing its Iraqi agents to launch terrorist attacks on U.S. service members in Iraq.

1145.   Accordingly, Hezbollah trained, organized, advised and directed various terror cells who acted as its agents, launching attacks on U.S. and Coalition Forces at Hezbollah's behest and under its guidance.

1146.   Each Defendant aided and abetted Hezbollah in its commission of these acts of international terrorism, including the terrorist attack that injured Plaintiffs, by providing substantial and vital assistance to Hezbollah between 2003 through 2011 and allowing it to transfer hundreds of millions of dollars through the U.S. financial system for its benefit.

1147.   Defendants substantially assisted Hezbollah by, *inter alia*, laundering hundreds of millions of dollars for Hezbollah that it needed to sustain its operations and to commit acts of international terrorism.

1148.   Each Defendant understood its role in helping fuel Hezbollah's illicit activities, was aware that by providing substantial assistance to Hezbollah it was aiding and abetting Hezbollah's terrorist and criminal activities and nonetheless continually assisted Hezbollah in its efforts.

1149.   The amount and extent of assistance each Defendant provided—illegal access to millions of U.S. dollars and the international financial system—was integral to the overall terrorist activities of Hezbollah and the foreseeable acts of terrorism at issue.

1150.   Each Defendant provided this substantial assistance to Hezbollah for years.

1151.   Each Defendant knew that Hezbollah was not only an FTO, but among the most dangerous terrorist groups in the world, and that providing illegal access to the U.S. financial system would foreseeably aid Hezbollah in committing acts of international terrorism, including terrorism in Iraq.

1152.   As the U.S. Department of the Treasury noted in 2016 (quoting Adam J. Szubin, then-acting Under Secretary for Terrorism and Financial Intelligence), Hezbollah "relies upon accomplices in the business community to place, manage, and launder its terrorist funds."

1153.   Defendants herein were the most central accomplices relied upon by Hezbollah to assist it in collecting and distributing its operational funding and they fully understood their role in Hezbollah's operations.

1154.   Plaintiffs' injuries were proximately caused by Hezbollah's conduct, which each Defendant substantially assisted.

### THIRD CLAIM FOR RELIEF

### CIVIL LIABILITY UNDER 18 U.S.C. § 2333(d) FOR SGBL AND MEAB'S CONSPIRACY WITH HEZBOLLAH, A FOREIGN TERRORIST ORGANIZATION

1155.   Plaintiffs repeat and re-allege all allegation of the foregoing paragraphs as if fully set forth herein.

1156.   Defendants SGBL (as the legal successor to LCB) and MEAB conspired with FTO Hezbollah between 2003 through 2011 to provide Hezbollah with illegal material support in the form of financial services critical to Hezbollah's capacity to commit acts of international terrorism.

1157.   Defendants SGBL and MEAB agreed with Hezbollah, its agents and corporate entities to participate in unlawful acts (violations of U.S. criminal laws including 18 U.S.C. § 2339B) and provided substantial assistance to Hezbollah in furtherance of the common scheme by which these Defendants clandestinely served as a conduit for Hezbollah's illicit financing network.

1158.  Defendants SGBL and MEAB knew the objective of the conspiracy was to provide material support for and increase Hezbollah's capacity to, *inter alia*, commit acts of international terrorism.

1159.  Defendants SGBL and MEAB knew that entering into a conspiracy to provide material support to FTO Hezbollah in the form of illegal access to the U.S. financial system and millions of U.S. dollars would in fact substantially contribute to Hezbollah's capacity to commit acts of international terrorism.

1160.  Accordingly, Defendants knew they were playing a role in and facilitating Hezbollah's violent activities.

1161.  Plaintiffs' injuries were proximately caused by overt acts performed by Hezbollah as a consequence of, in furtherance of, and pursuant to, Defendants' and Hezbollah's conspiracy to provide material support for terrorism.

## FOURTH CLAIM FOR RELIEF

## SUCCESSOR LIABILITY OF SGBL

1162.  Plaintiffs repeat and re-allege all allegations of the foregoing paragraphs as if fully set forth herein.

1163.  In accordance with the Purchase Agreement dated June 22, 2011, Defendant SGBL assumed all of the assets and liabilities of LCB and therefore became successor-in-interest to LCB, continuing to operate in substantially the same manner as LCB.

1164.  SGBL is liable for the acts of LCB to the same extent that LCB would be found liable.

1165.  SGBL is liable for LCB's violation of 18 U.S.C. §§ 2333(a), 2333(d) and 2339B.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

(a)      Accept jurisdiction over this action;

(b)      Enter judgment against each Defendant and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial;

(c)      Enter judgment against each Defendant and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333;

(d)      Enter judgment against each Defendant and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333; and

(e)      Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: April 10, 2019

By      /s/ Aaron Schlanger
        **OSEN LLC**
        Aaron Schlanger, Esq.
        Cindy Schlanger, Esq.
        William Friedman, Esq.
        Gerard Filitti, Esq.
        Michael Radine, Esq.
        Dina Gielchinsky, Esq.
        2 University Plaza, Suite 402
        Hackensack, NJ 07601
        (201) 265-6400
        (201) 265-0303 Fax

        **TURNER & ASSOCIATES, P.A.**
        Tab Turner, Esq.
        (pro hac vice to be submitted)
        4705 Somers Avenue, Suite 100
        North Little Rock, AR 72116
        (501) 791-2277

**MOTLEY RICE, LLC**
John M. Eubanks, Esq.
(pro hac vice to be submitted)
28 Bridgeside Boulevard, P.O. Box 1792
Mount Pleasant, South Carolina 29465
(843) 216-9000

Attorneys for Plaintiffs